# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN NYPL; LISA MCCARTHY; MAD TRAVEL INC., A.K.A. TRAVEL LEADERS; VALARIE JOLLY; GO EVERYWHERE, INC.; WILLIAM RUBINSOHN, DOING BUSINESS AS RUBINSOHN TRAVEL,<br><br>                              Plaintiffs,<br><br>v.<br><br>JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; HSBC FINANCE CORPORATION, HSBC BANK USA, N.A.; HSBC NORTH AMERICA HOLDINGS, INC.; HSBC HOLDINGS, PLC; CITICORP; CITIGROUP INC.; CITIBANK, N.A.; UBS AG; BARCLAYS PLC; BARCLAYS CAPITAL, INC.; ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND, PLC,<br><br>                              Defendants. | Case No. 1:15-CV-09300 (LGS)<br><br>[rel. 13-cv-7789-LGS]<br><br>ECF CASE<br><br>ORAL ARGUMENT REQUESTED |

# DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ...................................................................................... 3

    A.    The SAC Seeks Recovery Only For Transactions In The Consumer Retail Market. ............................................................... 3

    B.    The SAC Alleges Manipulation Only In The FX Spot Trading Market ............... 4

    C.    The SAC Does Not Allege Any Link Between The Price Of The *Nypl* Plaintiffs' Purported Transactions In The Consumer Retail Market And The Alleged Manipulation In The "Completely Different" FX Spot Trading Market. ................................................... 5

ARGUMENT ........................................................................................... 6

I.    The *NYPL* PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING* BECAUSE THEY DISCLAIM TRADING IN THE MARKET IN WHICH THE ALLEGED MANIPULATION OCCURRED. .......... 8

II.    The *NYPL* PLAINTIFFS ARE NOT EFFICIENT ENFORCERS OF THE ANTITRUST LAWS AS TO MANIPULATION IN THE FX SPOT TRADING MARKET ................................................................. 12

    A.    The SAC Does Not Allege That The *Nypl* Plaintiffs Suffered A Direct Injury From Alleged Manipulation In The FX Spot Trading Market. .................. 13

    B.    More Direct Alleged Victims Pursued Antitrust Claims Long Before The *Nypl* Plaintiffs Filed Their Complaint ................................ 18

    C.    The *Nypl* Plaintiffs' Damages Would Be Highly Speculative. ............................. 19

    D.    The *Nypl* Plaintiffs' Claim Threatens Excessive And Duplicative Damages ........................................................... 21

III.    THE *NYPL* PLAINTIFFS LACK ARTICLE III STANDING ........................................ 22

IV.    THE *NYPL* PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT THE ASSERTED TEMPORAL SCOPE OF THEIR CLAIMS. ............................................ 23

CONCLUSION ....................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
  369 F.3d 732 (3d Cir. 2004).................................................................................14

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
  2009 WL 3346674 (S.D.N.Y. Oct. 15, 2009) ......................................................25

*Allen v. Bank of Am. Corp.*,
  2016 WL 4446373 (S.D.N.Y. Aug. 23, 2016)..........................................7, 22, 23

*Allen v. Wright*,
  468 U.S. 737 (1984) .......................................................................................22, 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................6

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
  241 F.3d 696 (9th Cir. 2001) .................................................................................8

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983)...............................................................8, 12, 13, 18, 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................6

*Blue Shield of Va. v. McCready*,
  457 U.S. 465 (1982)..............................................................................................12

*Boyd v. AWB Ltd.*,
  544 F. Supp. 2d 236 (S.D.N.Y. 2008)......................................................16, 17, 18

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)..............................................................................................18

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)..............................................................................................22

*De Atucha v. Commodity Exch., Inc.*,
  608 F. Supp. 510 (S.D.N.Y. 1985)...................................................................14, 20

*DeBlasio v. Merrill Lynch & Co.*,
  2009 WL 2242605 (S.D.N.Y. July 27, 2009) .......................................................24

*Gatt Commc'ns v. PMC Assocs., L.L.C.*,
 711 F.3d 68 (2d Cir. 2013)..................................................................6, 7, 8, 13, 21, 22

*Gelboim v. Bank of Am. Corp.*,
 823 F.3d 759 (2d Cir. 2016)...............................................................2, 6, 12, 13, 19, 21

*Gladstone Realtors v. Vill. of Bellwood*,
 441 U.S. 91 (1979)....................................................................................................23

*Hughes* v. *Tobacco Inst., Inc.*,
 278 F.3d 417 (5th Cir. 2001) ......................................................................................8

*In re Aluminum Warehousing Antitrust Litig.*,
 -- F.3d --, 2016 WL 4191132 (2d Cir. Aug. 9, 2016) ........................1, 2, 6, 7, 8, 9, 10, 11, 12

*In re Dig. Music Antitrust Litig.*,
 812 F. Supp. 2d 390 (S.D.N.Y. 2011)..............................................................15, 16, 17

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
 74 F. Supp. 3d 581 (S.D.N.Y. 2015).........................................................................18

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
 No. 13-cv-7789 (S.D.N.Y.)..........................................................................................1

*In re Lithium Ion Batteries Antitrust Litig.*,
 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ..............................................................24

*In re Refrigerant Compressors Antitrust Litig.*,
 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)............................................................14

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
 2008 WL 686834 (N.D. Cal. Mar. 11, 2008)..............................................................24

*Laumann v. Nat'l Hockey League*,
 907 F. Supp. 2d 465 (S.D.N.Y. 2012)........................................................................14

*Laydon v. Mizuho Bank, Ltd.*,
 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .................................................14, 15, 16

*Mayor & City Council of Balt. v. Citigroup Inc.*,
 709 F.3d 129 (2d Cir. 2013)..........................................................................................9

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
 596 F.2d 573 (3d Cir. 1979)........................................................................................12

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
 676 F. Supp. 486 (S.D.N.Y. 1987)..............................................................................20

*Nypl v. JP Morgan Chase & Co.*,
  2016 WL 3211440 (S.D.N.Y. June 8, 2016) ..................................................3, 4, 9

*Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*,
  185 F.3d 957 (9th Cir. 1999) .........................................................................14

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  2015 WL 4987751 (E.D.N.Y. Aug. 19, 2015) ........................................23, 24, 25

*Province v. Cleveland Press Publ'g Co.*,
  787 F.2d 1047 (6th Cir. 1986) .......................................................................14

*Rapoport v. Asia Elecs. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000) ...............................................................24

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980)...............................................11, 12, 13, 14, 17, 19

*Serpa Corp.* v. *McWane, Inc.*,
  199 F.3d 6 (1st Cir. 1999)................................................................................8

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
  123 F. Supp. 3d 1219 (C.D. Cal. 2015) ...........................................................14

*US Airways, Inc. v. Sabre Holdings Corp.*,
  105 F. Supp. 3d 265 (S.D.N.Y. 2015)...............................................................16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969)........................................................................................11

## Other Authorities

Fed. R. Civ. P. 8 .................................................................................................6

Fed. R. Civ. P. 12(b)(1)..................................................................................7, 22, 23

Fed. R. Civ. P. 12(b)(6)......................................................................................6

## PRELIMINARY STATEMENT

The *Nypl* plaintiffs' Second Amended Class Action Complaint ("SAC," ECF 94) asserts the same theory of collusion that has been asserted (and settled) in the *FOREX* case,[1] with one critical distinction.  Unlike the *FOREX* over-the-counter ("OTC") plaintiffs, the *Nypl* plaintiffs claim to have traded in the consumer retail market, and specifically disavow ever transacting in the FX spot trading market that they allege was manipulated.  *See* Opposition To Motion To Stay Or Consolidate (ECF 99) at 2-4 ("*Nypl* Pl. Stay Opp.").  The *Nypl* plaintiffs concede that the consumer retail and spot trading markets are "completely different."  *Id.* at 3.  This concession makes sense, as the spot trading market involves rapid, high-volume trading, speculating, and hedging in FX instruments among large FX traders—including FX spot trades, swaps, and options—while the alleged consumer retail market primarily involves consumers and small businesses (such as travel agencies) exchanging U.S. dollars for foreign currency (or vice versa) at local banks.

The distinctions the *Nypl* plaintiffs have raised between the allegedly manipulated FX spot trading market and the consumer retail market in which the *Nypl* plaintiffs purportedly transacted are fatal to their antitrust claim for at least three independent reasons.

*First*, the *Nypl* plaintiffs fail to allege antitrust injury because they expressly disclaim transacting in the FX spot trading market.  As the Second Circuit recently reaffirmed, "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is *directly restrained*."  *In re Aluminum Warehousing Antitrust Litig.*, -- F.3d --, 2016 WL 4191132, at *7 (2d Cir. Aug. 9, 2016) (emphasis added).  Far from attempting to satisfy this rule, the *Nypl*

---

[1]      *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13-cv-7789 (LGS) (S.D.N.Y.).

plaintiffs have argued (in opposing the defendants' motion to stay) that the two markets are "completely different." *Nypl* Pl. Stay Opp. (ECF 99) at 3.  The *Nypl* plaintiffs have not pleaded any facts showing how any alleged injury they suffered in the consumer retail market was "inextricably intertwined," *Aluminum Warehousing*, 2016 WL 4191132, at *7, with the injury allegedly inflicted upon participants in the spot trading market.  Their conclusory allegations that they paid "inflated" exchange rates, *e.g.*, SAC ¶¶ 13, 15-18, do not suffice.

*Second*, the *Nypl* plaintiffs are not "efficient enforcers" of the antitrust laws under the standards the Second Circuit reaffirmed in the context of another financial benchmark case.  *See Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777-80 (2d Cir. 2016).  The *Nypl* plaintiffs fail to allege any link—much less one sufficiently direct for antitrust standing—between the FX spot trading market and the consumer retail market.  The traders who transacted with the defendant banks in the FX spot trading market (*i.e.*, the OTC *FOREX* plaintiffs) began asserting antitrust claims for the same alleged misconduct several years ago and already have agreed to settle their claims against the *Nypl* defendants for almost $2 billion.  Allowing claims by plaintiffs who are remote from the allegedly manipulated spot trading market contributes nothing to efficient antitrust enforcement, would allow excessive damages, and would embroil this Court in a speculative attempt by the *Nypl* plaintiffs to calculate damages allegedly suffered by participants in a market that is "completely different" from the purportedly manipulated market.  *Nypl* Pl. Stay Opp. (ECF 99) at 3.

*Third*, the *Nypl* plaintiffs fail an even more basic test—Article III standing.  The *Nypl* plaintiffs lack standing under Article III because they make no attempt to explain how their alleged consumer retail market injury is at all traceable to the purported spot trading market manipulation.

*Finally*, if the Court permits the *Nypl* plaintiffs' claim to proceed, the claim should be narrowed from the asserted scope (January 2007 to the present) to end by January 2013.  Claims after January 2013 are barred because there is no allegation of misconduct beyond that date. Indeed, the materials attached to the SAC demonstrate that the alleged conspiracy ceased by January 2013.

## BACKGROUND[2]

### A.   The SAC Seeks Recovery Only For Transactions In The Consumer Retail Market.

The *Nypl* plaintiffs allegedly exchanged U.S. dollars for foreign currency (or vice versa) at their local banks "for their own end use."  *See, e.g.*, SAC ¶¶ 1, 19, 21; *see also Nypl* Pl. Stay Opp. (ECF 99) at 3, 9, 10, 16 (the *Nypl* plaintiffs took immediate physical delivery of currency "at their local banks" for end use).  Putting aside that certain defendants did not provide such a service in the United States,[3] the *Nypl* plaintiffs allege no transactions of their own in the FX spot trading market and no transactions at any FX benchmark.  Plaintiffs "were neither 'OTC purchasers' nor 'exchange purchasers.'"  *Nypl v. JPMorgan Chase & Co.*, 2016 WL 3211440, at *3 (S.D.N.Y. June 8, 2016).  Indeed, the *Nypl* plaintiffs exclude from their proposed class any FX traders whose claims are at issue in the *FOREX* action, *Nypl* Pl. Stay Opp. (ECF 99) at 9, and "disavow any overlap in the two cases' classes."  *Nypl*, 2016 WL 3211440, at *3.

---

[2]   For a discussion of the general background on this action, the defendants refer the Court to the proceedings in connection with Defendants' Motion to Stay or Consolidate (ECF Nos. 97, 99, 101, 104) and the recently submitted motion by certain foreign banks seeking dismissal of the SAC for lack of personal jurisdiction (ECF 124 at 3-7).  The factual statements discussed in this section are taken from the SAC or other characterizations by the *Nypl* plaintiffs of the SAC's (or its predecessors') allegations.

[3]   S*ee* Foreign Defendants' Joint Memo. Of Law In Support Of Mot. To Dismiss For Lack Of Personal Jurisdiction (ECF 124) at 5, 13-16.

**B.      The SAC Alleges Manipulation Only In The FX Spot Trading Market.**

The SAC does not allege any wrongdoing in the consumer retail market in which the *Nypl* plaintiffs purportedly transacted.  As the Court has observed, "[t]he core allegations in both the *FOREX* and *Nypl* complaints describe the same conduct by Defendants"—namely, "an antitrust conspiracy to manipulate currency exchange rate benchmarks."  *Id.* at *1, 3.  The SAC draws its allegations of misconduct almost entirely from a DOJ press release announcing plea agreements with certain defendants.  *E.g.*, SAC ¶ 33.  That press release describes alleged manipulation of the World Market/Reuters ("WM/R") and European Central Bank ("ECB") benchmarks, which are used exclusively by "large" FX traders in the "FX spot market" to price certain FX "orders."  *Id.*  Likewise, the exhibits to the SAC describe conduct only within the FX spot trading market.[4]

---

[4]      *See* Ex. A (DOJ press release regarding plea agreements alleging that certain defendants conspired to "manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market" using "an exclusive electronic chat room and coded language to manipulate benchmark exchange rates"); Ex. B (excerpt from JP Morgan Chase & Co. May 2015 8-K and copy of JP Morgan Chase & Co. DOJ plea agreement discussing alleged manipulation of the "euro/U.S. dollar [] currency pair exchanged in the foreign currency exchange spot market" through coordination of trading in connection with the ECB and WM/R benchmarks); Ex. C (CFTC press release discussing alleged manipulation of FX benchmarks "used for pricing of cross-currency swaps, foreign exchange swaps, spot transactions, forwards, options, futures and other financial derivative instruments"); Ex. D (OCC press release discussing alleged unsafe and unsound practices relating to "foreign exchange (FX) trading businesses" and "FX sales and trading"); Ex. E (Federal Reserve Board press release discussing agreements to manipulate "benchmark currency prices"); Ex. F (*Bloomberg* news article discussing DOJ accusations relating to attempts to "influence benchmark rates"); Ex. G (*New York Times* news article discussing various regulatory settlements regarding alleged misconduct affecting FX benchmarks).

**C.   The SAC Does Not Allege Any Link Between The Price Of The *Nypl*
Plaintiffs' Purported Transactions In The Consumer Retail Market
And The Alleged Manipulation In The "Completely Different" FX
Spot Trading Market.**

The SAC does not allege how the purported misconduct in the FX spot trading market

affected the price of the *Nypl* plaintiffs' consumer retail transactions at their local banks, much

less allege how (if at all) those markets are purportedly connected.  To the contrary, the *Nypl*

plaintiffs admit that transactions in FX instruments over the counter ("OTC") or on an exchange

are "completely different from the transactions of the *Nypl* class of *consumers* who purchased

foreign currency for dollars for their own end use at their local banks."  Opposition To Motion to

Transfer Under 28 U.S.C. Section 1404 ("*Nypl* Pl. Transfer Opp.", ECF 40) at 2 (emphasis in

original); *see also Nypl* Pl. Stay Opp. (ECF 99) at 3 ("The *Nypl* end-user purchases of foreign

currency . . . are completely different from the computer generated ECN *FX* spot trading in the

*FX* market.").  Indeed, the *Nypl* plaintiffs point to many characteristics that differentiate retail

transactions from FX spot transactions by sophisticated traders:

> *FX* traders trade foreign currencies, not at their local banks where
> the *Nypl* class makes its purchases, but through an electronic
> communications network ("ECN") computer system or telephonic
> messages to salespersons at dealer banks that customers can use to
> execute orders with dealers, which include single-bank proprietary
> platforms operated by dealers and multi-bank dealer systems (*FX*
> SAC ¶90 ), headquartered in London and New York, which the *FX*
> SAC alleges "are the two largest FX trading centers" for *FX*
> traders (*FX* SAC ¶80), or for the FX Exchange Class on exchanges
> such as the Chicago Mercantile Exchange. (*FX* Exchange Class).

*Nypl* Pl. Stay Opp. (ECF 99) at 9.  According to the *Nypl* plaintiffs, the two markets are so

distinct that discovery conducted by the *FOREX* plaintiffs would not even relate to the *Nypl*

plaintiffs' claims.  *See Nypl* Pl. Stay Opp. (ECF 99) at 4-5 ("discovery in *FX* was confined to the

traders' trading damages, no discovery in *FX* and no discovery [sic] was done with respect to the

*Nypl* end-user's claims").

Unlike the *Nypl* plaintiffs, FX traders engage in "speculating or hedging on price changes in trading transaction in 'pairs' of currencies by concluding their transactions with an offsetting transaction." *Id.* at 8.  As explained by the *Nypl* plaintiffs' counsel, the FX spot traders are "very technical persons who are in a substantial trading position, buying and selling, even on the same day, of course.  And none of . . . the transactions are for the purposes of buying services or products."  Tr. of Jan. 7, 2016 Hr'g (ECF 92) at 3:22-4:3.  Thus, the *Nypl* plaintiffs' "end-user foreign currency purchases" at their local bank branches fundamentally differ from the instruments "traded by the *FX* traders in the *FX* market," such as "any *FX* spot transaction, outright forward, *FX* swap, *FX* option, *FX* futures contract, an option on an *FX* futures contract, or other instrument *traded in the FX market*."  *Nypl* Pl. Stay Opp. (ECF 99) at 10 (citation omitted) (emphasis in original).

## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), plaintiffs must plead sufficient "facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss").  Federal Rule of Civil Procedure 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

The *Nypl* plaintiffs must establish antitrust standing.  *Aluminum Warehousing*, 2016 WL 4191132, at *4.  "Like constitutional standing, antitrust standing is a threshold inquiry resolved at the pleading stage."  *Gelboim*, 823 F.3d at 770 (citing *Gatt Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013)); *see also Aluminum Warehousing*, 2016 WL 4191132, at *4 (antitrust standing must be shown "at the pleading stage").  "To satisfy the antitrust standing requirement, a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust

injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations." *Aluminum Warehousing*, 2016 WL 4191132, at *4 (citing *Gatt Commc'ns*, 711 F.3d at 76).  The first of those steps requires the plaintiff to "demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" while the second step requires the plaintiff to "demonstrate that it is a suitable plaintiff, *i.e.*, an 'efficient enforcer' of the antitrust laws." *Aluminum Warehousing*, 2016 WL 4191132, at *4 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)).  The *Nypl* plaintiffs fail both requirements and therefore lack antitrust standing on either basis (*see* Sections I and II *infra*).

As this Court recently recognized, a "'district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action.'" *Allen v. Bank of Am. Corp.*, 2016 WL 4446373, at *2 (S.D.N.Y. Aug. 23, 2016) ("*Allen*") (quoting *Cortland St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (internal quotation marks and citation omitted)).  The *Nypl* plaintiffs lack Article III standing because they have not alleged that any purported injury-in-fact in the FX consumer retail market is fairly traceable to the alleged manipulation in the FX spot trading market (*see* Section III *infra*).

And even if the *Nypl* plaintiffs had plausibly alleged antitrust or constitutional standing, the plausible temporal scope of the claim alleged is narrower than they assert (*see* Section IV *infra*).

I.     **THE *NYPL* PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING* BECAUSE THEY DISCLAIM TRADING IN THE MARKET IN WHICH THE ALLEGED MANIPULATION OCCURRED.**

As the Second Circuit recently reaffirmed in *Aluminum Warehousing*, "to suffer antitrust injury, the putative plaintiff must be a participant in the *very market that is directly restrained*." 2016 WL 4191132, at *7 (emphasis added); *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983) ("*AGC*") ("the Union was neither a consumer nor a competitor in the market in which trade was restrained"); *Gatt Commc'ns*, 711 F.3d at 78 (plaintiffs must prove that the alleged injury "'flows from that which makes defendants' acts unlawful'" (quoting *Brunswick Corp.*, 429 U.S. at 489)).  Only in exceptional circumstances where the defendant allegedly "corrupt[s] a separate market in order to achieve its illegal ends," can a plaintiff in that separate market suffer antitrust injury that is "'inextricably intertwined' with the injury of the ultimate target." *Aluminum Warehousing*, 2016 WL 4191132, at *7.[5]  In *Aluminum Warehousing*, purchasers of semi-fabricated and fabricated aluminum did not suffer antitrust injury even though they alleged that aluminum traders and warehouse operators conspired to increase aluminum storage costs, thereby impacting the price of aluminum products, because the purchasers did not participate in the allegedly manipulated market and were not used as a means in effecting the alleged conspiracy.  *Id.* at *7-8.  Like those plaintiffs,

---

[5]     The Second Circuit's decision in *Aluminum Warehousing* is in accord with several other circuits that have held that an antitrust plaintiff generally must have traded in the same market that the defendants allegedly manipulated.  *See, e.g., Hughes* v. *Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." (citations and footnote omitted)); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 704-05 (9th Cir. 2001) ("antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained" (quotation marks and citation omitted)); *Serpa Corp.* v. *McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury.").

the *Nypl* plaintiffs fail this clear test because they are not participants in the allegedly "directly restrained" spot trading market.  *Id.*

The *Nypl* plaintiffs base their allegations exclusively on manipulation that supposedly occurred in the FX spot trading market.  *See, e.g.*, SAC ¶ 33 (defendants "conspir[ed] to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market").  They make no allegation that any antitrust misconduct occurred directly in the FX consumer retail market.  *See Mayor & City Council of Balt. v. Citigroup Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (The "plaintiff's job . . . is to allege enough facts to support the inference that a conspiracy actually existed.").[6]  And, like the *Aluminum Warehousing* plaintiffs, 2016 WL 4191132, at *7, the *Nypl* plaintiffs have expressly disavowed any participation in the market where the alleged manipulation occurred.  *See Nypl* Pl. Stay Opp. (ECF 99) at 9 ("[T]he FX traders are excluded from the *Nypl* consumer, end-user market, just as the *Nypl* end-users who take delivery of foreign currency are not included in the FX traders' FX market."); *see also Nypl*, 2016 WL 3211440, at *2 ("Plaintiffs' class definition does not suggest that *Nypl* class members transacted with Defendants on the 'FX spot market.'").  As the Second Circuit held in *Aluminum Warehousing*, allegations that the defendants' conduct in one market (the FX spot trading market) caused effects in a different market (the FX consumer retail market) generally fail to support antitrust injury.  2016 WL 4191132, at *4 ("only those that are participants in the

---

[6]    The SAC does not allege facts sufficient to infer that *any* defendant participated in an antitrust conspiracy within the consumer retail FX market in which the *Nypl* plaintiffs transacted. Glaringly, except for parroting allegations from the government enforcement actions (concerning the "completely different" FX spot trading market, *Nypl* Pl. Transfer Opp. (ECF 40) at 2-3; *Nypl* Pl. Stay Opp. (ECF 99) at 3), the *Nypl* plaintiffs offer *no* basis for inferring a conspiracy within the consumer retail market.  Absent direct evidence of a conspiracy in the relevant market, the plaintiff cannot rely on merely parallel conduct, but must present "additional facts or circumstances" that "lead to an inference of conspiracy."  *Mayor & City Council of Balt.*, 709 F.3d at 137.

defendants' market can be said to have suffered antitrust injury").[7]  Thus, the *Nypl* plaintiffs'

own assertions that they transacted in an entirely separate market from the one in which the

alleged manipulation occurred preclude them from asserting antitrust injury here.

    Nor do the *Nypl* plaintiffs allege facts sufficient to meet *Aluminum Warehousing*'s

"narrow exception" permitting antitrust injury for plaintiffs with injuries "'inextricably

intertwined' with the injury the conspirators ultimately intended to inflict."  2016 WL 4191132,

at *5, 7.  The Second Circuit cautioned that "not every collusive scheme will yield plaintiffs that

can claim injury" under this exception.  *Id.* at *8.  To fall within this narrow exception, a plaintiff

must allege that "the conspirators used the plaintiff's injury as the 'means,' 'fulcrum,' 'conduit,'

or 'market force' to realize their illegal ends."  *Id.* at *7.  The *Nypl* plaintiffs do not and cannot

allege that their purported injuries in the "collateral" consumer retail market were a "necessary

step in effectuating the alleged conspiracy" in the FX spot trading market, or "the very means"

by which the defendants engaged in the alleged conspiracy to manipulate the spot trading

market.  *Id.* at *8 (quotation marks omitted).  As in *Aluminum Warehousing*, "[a]ll of the alleged

anticompetitive acts" in the FX spot trading market "were within the defendants' power to do;

they did not need or use injury" to the *Nypl* plaintiffs "as a 'fulcrum' or 'conduit'" in effecting

the alleged manipulation of the FX spot trading market.  *Id.*  Furthermore, as in *Aluminum

Warehousing*, "none of these [alleged anticompetitive] acts inflicted direct injury" on the *Nypl*

plaintiffs—their alleged injury, if any, "was a purely incidental byproduct of the alleged

scheme."  *Id.*

---

[7]    This is especially true for certain foreign defendants, who do not participate in any way in
the U.S. retail market.

The *Nypl* plaintiffs are not saved by their conclusory allegation that "[t]he purpose of the agreement among and between Defendants is to extract inflated foreign currency exchange rates from Plaintiffs and the class."  SAC ¶ 38.  The *Nypl* plaintiffs offer no factual allegations to support this conclusion.  To the contrary, if anything, the documents the *Nypl* plaintiffs cite support the inference that the defendants allegedly directed their conduct at participants in the FX spot trading market, not the consumer retail market.  *See, e.g.*, SAC, Ex. A at 3-4 (defendants "used an exclusive electronic chat room and coded language to manipulate benchmark exchange rates . . . used to price orders for many *large customers*." (emphasis added));  SAC, Ex. B at 20 (discussing alleged attempted manipulation of "the EUR/USD currency pair exchanged in the FX Spot Market");  SAC, Ex. G at 5 (defendants "shared private information about clients including pension funds, hedge funds and big asset management firms").

Even if the *Nypl* plaintiffs' alleged injury conceptually fit under *Aluminum Warehousing*'s general rule or its "narrow exception," 2016 WL 4191132, at *5, the *Nypl* plaintiffs would still lack antitrust standing because they fail to allege facts supporting a plausible inference that manipulation in the FX spot trading market caused each or any of them injury in the consumer retail market.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (an antitrust violation requires, at minimum, a showing that the illegal conduct is "a material cause of the injury").  The *Nypl* plaintiffs' purely conclusory allegations that they "exchanged foreign currency at exchange rates fixed by Defendants," "paid inflated overcharges," were injured by "rigged foreign currency exchange rates," or "purchased supracompetitive foreign currency exchange rates," *e.g.*, SAC ¶¶ 1, 5, 13, 19, 34, do not satisfy this requirement.  *See, e.g.*, *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980) (allegations by copper scrap purchaser regarding manipulation in the refined copper

market were "too tenuous and conjectural for a valid causal finding of anticompetitive effect and

damages").  The *Nypl* plaintiffs allege no facts regarding how consumer retail exchange rates are

set, how often they are set, and what role, if any, FX spot trading benchmarks play in the setting

of consumer retail exchange rates.  The *Nypl* plaintiffs' failure to allege that their injury flows

from the defendants' alleged actions at all—let alone "from that which makes defendants' acts

unlawful," *Aluminum Warehousing*, 2016 WL 4191132, at *4 (quotation marks and citation

omitted)—is fatal to their claim.

 For these reasons, the *Nypl* plaintiffs do not and cannot allege that they suffered antitrust

injury and their claims should be dismissed on this basis alone.

## II. THE *NYPL* PLAINTIFFS ARE NOT EFFICIENT ENFORCERS OF THE ANTITRUST LAWS AS TO MANIPULATION IN THE FX SPOT TRADING MARKET.

 The *Nypl* plaintiffs also lack antitrust standing because they are not efficient enforcers of

the antitrust laws with respect to purported FX spot trading market manipulation.  To have

antitrust standing, in addition to meeting the antitrust injury requirement, the *Nypl* plaintiffs must

establish that they are the "proper part[ies] to bring a private antitrust action."  *AGC*, 459 U.S. at

535 n.31.  Although "[a]n antitrust violation may be expected to cause ripples of harm to flow

through the Nation's economy," *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476-77 (1982),

permitting every potential plaintiff to pursue treble damages is not necessary to deter

anticompetitive conduct.  *See Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 587

(3d Cir. 1979) (cautioning against "overkill recoveries, whose punitive impact may unduly

cripple a defendant and lead to an overall deleterious effect upon competition" (quotation marks

and footnote omitted)); *see also Gelboim*, 823 F.3d at 778-79 (citing *Mid-West Paper* for a

similar point).  As the Second Circuit recently stressed, the "efficient enforcer" analysis is an

important threshold inquiry at the pleading stage.  *See Gelboim*, 823 F.3d at 778-80 (remanding

the *LIBOR* cases for consideration of the *AGC* factors).  The four efficient enforcer factors are:

> (1) the "directness or indirectness of the asserted injury," which
> requires evaluation of the "chain of causation" linking [plaintiffs']
> asserted injury and the Banks' alleged price-fixing;
>
> (2) the "existence of more direct victims of the alleged
> conspiracy";
>
> (3) the extent to which [plaintiffs'] damages claim is "highly
> speculative"; and
>
> (4) the importance of avoiding "either the risk of duplicate
> recoveries on the one hand, or the danger of complex
> apportionment of damages on the other."

*Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540-45); *see also Gatt Commc'ns*, 711 F.3d

at 78 (similar).  None of these factors weighs in favor of antitrust standing here, and collectively

they demonstrate that the *Nypl* plaintiffs are not efficient enforcers of the antitrust manipulation

they allege.

### A.    The SAC Does Not Allege That The *Nypl* Plaintiffs Suffered A Direct Injury From Alleged Manipulation In The FX Spot Trading Market.

In assessing the "directness" factor, plaintiffs must show more than "vaguely defined

links" in the chain of causation to plead adequately that they suffered a direct injury as a result of

defendants' alleged anticompetitive conduct.  *AGC*, 459 U.S. at 540.  Courts in the Second

Circuit routinely dismiss antitrust claims that depend upon reconstructing the choices of multiple

independent decision-makers and the operation of independent market variables, including where

the defendants' purportedly anticompetitive conduct targeted a separate market from the one in

which the plaintiffs allegedly suffered harm.  *See Reading*, 631 F.2d at 13-14 ("where countless

other market variables could have intervened to affect [] pricing decisions," antitrust laws

"exclude claims based on conjectural theories of injury and attenuated economic causality that

would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 484 (S.D.N.Y. 2012) (subscribers to standard TV or Internet package who did not also purchase an out-of-market sports package lacked standing to bring antitrust claims relating to manipulation of distribution of out-of-market sports package); *De Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 515-18 (S.D.N.Y. 1985) (dismissing antitrust claims of purchasers of silver futures on one exchange based on manipulation of silver futures on a different exchange where other market variables could have intervened to affect pricing decisions).[8]

In another recent financial benchmark case, *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014), plaintiffs alleged that Yen-LIBOR affected Euroyen TIBOR, which, in turn, allegedly affected Euroyen TIBOR futures prices. Judge Daniels found "too attenuated" the link between alleged manipulation of Yen-LIBOR and prices in the Euroyen TIBOR futures market, observing that "the degree to which these different rates actually

---

[8]     Similarly, courts outside the Second Circuit regularly find antitrust standing lacking where the link between the alleged injury and alleged misconduct is insufficiently direct. *See, e.g.*, *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 741-42 (3d Cir. 2004) (investors in hotel could not sue for Clayton Act violation based upon bribery scheme because the vendors who were prevented from selling goods as a result of the scheme "are far more direct victims" than the investors); *Or. Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (injury too remote for antitrust standing where "without any injury to smokers, plaintiffs would not have incurred the additional expenses in paying for the medical expenses of those smokers"); *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1053 (6th Cir. 1986) ("plaintiffs' loss of employment was, at best, simply a byproduct of the publisher's alleged wrongful conduct" in attempting to monopolize the Cleveland newspaper market); *Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, 123 F. Supp. 3d 1219, 1232 (C.D. Cal. 2015) (direct injury insufficiently alleged by Union plaintiffs because Union plaintiffs "provide[d] only the conclusory statement that the Union Plaintiffs were the target of Defendants' unlawful conduct and therefore have standing"); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *14 (E.D. Mich. Apr. 9, 2013) (the "causal nexus between the alleged conspiracy in the hermetic compressor market and the IP Plaintiffs' alleged injury (paying inflated prices for finished goods that contain hermetic compressors) is too remote and attenuated to support antitrust standing").

influenced prices is uncertain" and concluding that "[t]his attenuated causation between the alleged conspiracy and the asserted injury [was] too indirect to support antitrust standing." *Id.* at *9.  Similarly, in *In re Dig. Music Antitrust Litig.*, the court dismissed for lack of antitrust standing claims by purchasers of CDs who alleged that restraints on Internet music affected the price of CDs, where the CD purchasers failed to allege sufficiently "how the CD market operated generally, what considerations affected CD pricing, or any kind of tie—contractual, historical, or correlative, for example—between CD pricing and Internet Music pricing."  812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011).

The *Nypl* plaintiffs allege even less here.  They fail to allege any link between the defendants' purported manipulation of the FX spot trading market and the *Nypl* plaintiffs' purported injury in the consumer retail market.  The *Nypl* plaintiffs offer only conclusory allegations that they paid "supracompetitive" or "rigged" exchange rates and "inflated overcharges," *e.g.*, SAC ¶¶ 1, 5, 13, 19, 34, none of which supports an inference of a direct link between pricing in the two markets.  *See Dig. Music*, 812 F. Supp. 2d at 402 (allegations that plaintiff paid "'supracompetitive'" prices are "nothing more than *ipse dixit*" and "do not suffice to establish [] antitrust standing").  Stripped of these conclusory allegations, nothing in the SAC connects the pricing in these two "completely different" markets.  *Nypl* Pl. Transfer Opp. (ECF 40) at 2-3; *Nypl* Pl. Stay Opp. (ECF 99) at 3; *see Dig. Music*, 812 F. Supp. 2d at 402 ("Absent a physical and economic nexus between the alleged violation and the harm to the plaintiff, antitrust standing is difficult to come by." (quotation marks and citation omitted)).  Because the alleged "*conduct* was directed at an entirely separate group of plaintiffs"—and the effects of that alleged conduct were experienced directly by that entirely separate group—the *Nypl* plaintiffs' alleged injury is "at best indirect."  *Id.* at 403 (emphasis in original).

Further, the *Nypl* plaintiffs make no allegations about a link between FX benchmarks and consumer retail exchange rates, much less allegations that would permit the Court to assess, as Judge Daniels did in *Laydon*, the nature of the link.  The *Nypl* plaintiffs have contended the opposite, insisting that these markets and any impacts on prices were "distinct and non-aligned." *Nypl* Pl. Stay Opp. (ECF 99) at 11-12, 15.

The *Nypl* plaintiffs also do not allege that the market dynamics in the two markets are the same.  Nor could they, given their past characterizations of the two markets.  For example, although there are a limited number of "dealers" in the FX spot market, *see Nypl* Pl. Stay Opp. (ECF 99) at 9, there are a wide variety of actors in the retail currency market—consumers and businesses, banks that have retail operations, and numerous other vendors.  The size of transactions also varies within these separate markets.  According to the *Nypl* plaintiffs, FX spot market transactions are conducted by "big currency traders," *id*. at 11, while *Nypl* allegedly involves ordinary retail currency exchanges conducted by "the regular person" "for the purpose of buying services."  Tr. of Jan. 7, 2016 Hr'g (ECF 92) at 4:12-13.

The FX consumer retail market therefore is subject to its own market dynamics, which the *Nypl* plaintiffs have failed to link to FX benchmark manipulation in the spot trading market. *See US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 288 (S.D.N.Y. 2015) (Schofield, J.) (noting that the online travel agency "market is subject to its own competitive forces, and there is no necessary link between the fee for those bookings and the fee for [Global Distribution System] travel bookings").  "Not only is there no nonconclusory connection alleged between" the two markets, but the consumer retail "market could have been affected by . . . other economic factors wholly unrelated to" FX benchmarks.  *See Dig. Music*, 812 F. Supp. 2d at 403; *see also Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 245 (S.D.N.Y. 2008) (denying antitrust

standing where a "myriad of other factors" affecting the domestic wheat farming market, such as "foreign and domestic market conditions . . . and other factors affecting global supply and demand," prevented plaintiffs from showing a connection to alleged manipulation in the wheat export market beyond mere but-for causation).

In addition to the lack of any causal connection, the *Nypl* plaintiffs' claim fails for the independent reason that any injury is "'indirect or incidental'" to the alleged goals of the purported conspiracy. *Reading*, 631 F.2d at 12 (citation omitted); *see also Dig. Music*, 812 F. Supp. 2d at 403 (denying antitrust standing for purchasers of CDs alleging anticompetitive restrictions on digital music because "there is nothing in the [complaint] to show how any conduct was directed at the CD market"). Here, there is no allegation that the alleged manipulation in the FX spot market was intended to advantage the defendants in the exchange of money with retail consumers. Instead, the SAC copies the DOJ press release in alleging that the defendants intended their manipulation to advantage their "open positions" in the FX spot trading market itself. SAC ¶ 33. There is no allegation that the direction of the manipulation of FX benchmarks bore any relationship to the defendants' net exchanges in the consumer retail market. Nor do the *Nypl* plaintiffs allege that the defendants have any power or prescience as to whether the consumers who walk in the door of a bank branch that day are, on net, seeking to exchange dollars for foreign currency or vice versa.

Finally, the *Nypl* plaintiffs' allegation that "foreign currency exchange rates . . . paid by plaintiffs and the class are traceable through the application of economic analyses to the computerized bank records of the Defendants," SAC ¶ 5, cannot cure these defects. Even if the *Nypl* plaintiffs can document their purported transactions, that merely shows that the *Nypl* plaintiffs exchanged currency at a retail bank at some point; it says nothing about whether the

prices of those transactions are directly linked to the alleged conspiracy in the FX spot trading market.

### B.   More Direct Alleged Victims Pursued Antitrust Claims Long Before The *Nypl* Plaintiffs Filed Their Complaint.

The "existence of other parties that have been more directly harmed" is a critical factor in determining whether a plaintiff is an "efficient enforcer." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986). This is true *even if* the *Nypl* plaintiffs had shown they suffered an antitrust injury. *See AGC*, 459 U.S. at 534 ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." (quotation marks and citation omitted)).

This Court has indicated that the OTC plaintiffs in *FOREX* are efficient enforcers of the alleged manipulation of benchmarks in the FX spot trading market. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 n.10 (S.D.N.Y. 2015). The OTC plaintiffs in *FOREX* allegedly traded directly with defendants in the market where the manipulation allegedly occurred. Moreover, the *FOREX* plaintiffs would have suffered the direct harm of the alleged misconduct, because it was the *FOREX* plaintiffs who would have traded at the benchmarks or in the spot trading market that the defendants allegedly manipulated. Therefore, even if the *Nypl* plaintiffs could show the alleged misconduct caused them to suffer antitrust injury, the OTC *FOREX* plaintiffs would be far more proximate private plaintiffs to assert claims based on that alleged manipulation. *See Boyd*, 544 F. Supp. 2d at 250 ("domestic wheat *exporters* who actually attempted to sell wheat" in the allegedly manipulated wheat export market would be more direct plaintiffs than domestic wheat *farmers* who brought antitrust claims (emphasis in original)).

**C.       The *Nypl* Plaintiffs' Damages Would Be Highly Speculative.**

The existence of "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779.  To make damages anything other than "highly speculative," *id.*, plaintiffs would need to prove some reliable connection between changes in FX benchmark rates and changes in retail currency exchange prices.  *See id.* (the evidence must "support a just and reasonable estimate of damages" (quotation marks and citation omitted)).  The *Nypl* plaintiffs do not allege facts that, if true, would establish this.

Even if the *Nypl* plaintiffs plausibly alleged a link between prices in those two markets, damages would still be speculative.  Plaintiffs would have to engage in a complex multi-step process to show what the FX benchmark rates and prices in the FX spot trading market "should" have been on any given day on which they exchanged currency.  They would then need to demonstrate how any manipulation of the FX benchmark rates on those days affected the prices of their currency exchanges.  The *Nypl* plaintiffs have not established, in even the most basic sense, how the retail rates at which they exchanged currency were calculated, let alone how alleged misconduct in an entirely different market would affect those calculations.  As in *Gelboim*, on the bare facts alleged in the SAC "it is difficult to see how" a "just and reasonable estimate of damages" could be developed, "even with the aid of expert testimony." *Id.* (quotation marks and citation omitted).

To avoid forcing this Court to engage in "hopeless speculation," the *Nypl* plaintiffs would also need to distinguish between the effects of the alleged misconduct on consumer retail prices and the effects of "countless other market variables." *Reading*, 631 F.2d at 13-14.  Numerous factors, including inflation, interest rates, trade deficits, global macroeconomic conditions, markups applied by vendors, and supply and demand for physical retail currency could impact foreign exchange rates in the consumer retail market.  This analysis would be particularly

difficult given that the period 2007 to the present (the SAC's alleged time period) encompassed the global financial crisis, the European sovereign debt crisis, and many countries' fiscal and monetary responses thereto.  Even apart from financial crises, FX prices are influenced by multiple, complex variables independent of the FX market, such as the recent vote related to Brexit.  *See, e.g.*, *De Atucha*, 608 F. Supp. at 517 (finding alleged damages too speculative at the pleading stage where they "would require determining the cause of the price decline on the United States market, and then, the impact of the United States market decline, if any, on the price decline on the LME").

The damages analysis is further complicated by the multidirectional nature of both the alleged misconduct and consumer retail exchanges.  The alleged manipulation was in both directions (sometimes raising a currency price, other times lowering it) and plaintiffs may well have exchanged currency in multiple directions (such as exchanging Euros back to dollars after a vacation).  Plaintiffs would have to calculate this double-netting on their transactions as a whole.  *See Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 489 (S.D.N.Y. 1987) ("'An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.'" (quoting *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1367 (9th Cir. 1986))).[9]  Unlike the motion to dismiss in the *FOREX* case, the issue here is not whether a plaintiff must allege such a net injury at the pleading stage.  Rather, the eventual need

_____

[9]      Plaintiffs admit that such netting must occur for transactions in the FX spot market, *see Nypl* Pl. Stay Opp. (ECF 99) at 14, but suggest that they could not have benefitted from the alleged manipulation in the consumer retail market.  This suggestion lacks any basis because the *Nypl* plaintiffs do not allege any facts from which one could infer that they only exchanged currency in the direction that was injured by the alleged manipulation (nor do they allege what that direction is at various times).

for a complex net injury determination at trial weighs against finding that these plaintiffs have adequately alleged that they are efficient enforcers in the first place.

### D.   The *Nypl* Plaintiffs' Claim Threatens Excessive And Duplicative Damages.

Damages must bear some proportionality to the defendants' alleged conduct.  *See Gelboim*, 823 F.3d at 779 (noting the "concern of damages disproportionate to wrongdoing").  The OTC *FOREX* plaintiffs have already collected nearly $2 billion in settlement monies from the defendants in this action.  The *FOREX* plaintiffs may also recover from non-settling defendants (who are not defendants here).  In addition, investigations by numerous government agencies in multiple countries have yielded nearly $10 billion in fines and penalties.[10]

Indeed, the SAC's only allegations of misconduct are drawn from such investigations; in fact, the *Nypl* plaintiffs simply copy and paste a DOJ press release into the SAC.  SAC ¶ 33.  The SAC thus appears to rely entirely on public investigations and private actions that have been underway for many years.  The need for additional private attorneys general is substantially diminished where, as here, government agencies are *already* enforcing the antitrust laws, as are private FX spot market plaintiffs who allegedly suffered far more direct injuries.  *See Gelboim*, 823 F.3d at 778 (noting that the existence of "other enforcement mechanisms . . . bears upon the need for appellants as instruments for vindicating the Sherman Act").  That need is even more diminished where, as here, other plaintiffs—including the OTC *FOREX* plaintiffs that this Court recognized as being efficient enforcers—have obtained settlements from the same defendants for claims stemming from the same alleged misconduct.  There is no basis to suggest that the *Nypl*

---

[10]     Although the SAC pegs the penalties and fines at $2.7 billion (most of which came from the defendants here), SAC ¶ 33, the actual number is over $10 billion.  Either way, there can be no dispute that regulators have collected significant sums from the defendants.

plaintiffs are proper parties to "'perform the office of a private attorney general'" and "'vindicate the public interest in antitrust enforcement.'" *Gatt Commc'ns*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542).

*     *     *

In sum, the *Nypl* plaintiffs' repeated efforts to distinguish the FX spot trading market that they allege was manipulated from the consumer retail market where they allegedly transacted thwart their antitrust claim.  Their injury in the consumer retail market is remote from the allegedly manipulated market, more direct alleged victims (the OTC *FOREX* plaintiffs) assert injury in the very same market that the *Nypl* plaintiffs claim was manipulated, and any attempt to calculate the *Nypl* plaintiffs' damages would be highly speculative and duplicative of monies the defendants have already paid with respect to the alleged conspiracy.

## III.    THE *NYPL* PLAINTIFFS LACK ARTICLE III STANDING.

The *Nypl* plaintiffs' bare-bones pleading fails to meet even Article III's causation requirement.  To plead standing to sue in federal court, "'[a] plaintiff must allege personal injury *fairly traceable to the defendant's allegedly unlawful conduct* and likely to be redressed by the requested relief.'"  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (emphasis added).

The *Nypl* plaintiffs make no attempt to allege that any purported injury is traceable to the defendants' alleged misconduct.  Indeed, they have not even alleged any individual FX transactions.  *See Allen*, 2016 WL 4446373, at *4 (acknowledging the *Allen* plaintiffs' alleged several hundred transactions as one reason Article III standing was sufficiently pleaded).[11]  Even

---

[11]    This Court's recent decision in *Allen* denying the Rule 12(b)(1) motion of certain banks highlights the traceability shortcomings in *Nypl*.  In contrast to the *Nypl* plaintiffs, the *Allen* plaintiffs do not disavow transacting in the FX spot trading market.  In addition, the *Allen* (continued...)

22

if the *Nypl* plaintiffs had alleged specific transactions in the consumer retail market, the *Nypl*

plaintiffs repeatedly maintain that the consumer retail market is "completely different," *Nypl* Pl.

Transfer Opp. (ECF 40) at 2-3; *Nypl* Pl. Stay Opp. (ECF 99) at 3, from the FX spot trading

market in which the "putatively illegal conduct" occurred. *Gladstone Realtors v. Vill. of

Bellwood*, 441 U.S. 91, 99 (1979). Thus, "[t]he links in the chain of causation between the

challenged . . . conduct" in the FX spot trading market "and the asserted injury are far too weak

for the chain as a whole to sustain . . . standing." *Wright*, 468 U.S. at 759. The *Nypl* plaintiffs

cannot rely on *FOREX* or *Allen* for traceability, as the *Nypl* plaintiffs have insisted that the

injuries allegedly suffered by consumer end-users "are not economically aligned" with the

injuries allegedly suffered by participants in the FX spot trading market. *Nypl* Pl. Stay Opp.

(ECF 99) at 3, 12; *see also id.* at 15 ("the economic interests between the traders and the end-

user consumers are distinct and non-aligned"). For these reasons, the Court should dismiss the

SAC for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

## IV.   THE *NYPL* PLAINTIFFS' ALLEGATIONS DO NOT SUPPORT THE ASSERTED TEMPORAL SCOPE OF THEIR CLAIMS.

In the alternative, the *Nypl* plaintiffs' claims should be significantly narrowed because the

*Nypl* plaintiffs fail to allege any facts supporting an inference that the alleged conspiracy

extended beyond January 2013.

Courts routinely limit the temporal scope of antitrust suits on Rule 12 motions when they

find no plausible allegations that an alleged conspiracy was active during a particular time

period. *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2015 WL

---

plaintiffs specifically alleged hundreds of individual transactions with the defendants in that
case. *See Allen*, 2016 WL 4446373, at *3, 4 (noting that the *Allen* complaint "pleads Article III
standing insofar as each named Plaintiff . . . is alleged to have suffered personal losses caused by
(and traceable to) specific transactions ").

4987751, at *5 (E.D.N.Y. Aug. 19, 2015) (dismissing a portion of plaintiffs' claims due to "the absence of specific allegations of conspiratorial activity" after a certain date); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 309192, at *12 (N.D. Cal. Jan. 21, 2014) (dismissing antitrust claim prior to 2002 because of a lack of supporting factual allegations); *Korea Kumho Petrochemical v. Flexsys Am. LP*, 2008 WL 686834, at *8 (N.D. Cal. Mar. 11, 2008) (dismissing a portion of plaintiff's claims because "Plaintiff's own allegations render it implausible that a continuing conspiracy extended past 2001").

Here, the *Nypl* plaintiffs allege, without any factual support, that the purported conspiracy "operated continuously since at least January 1, 2007." SAC ¶ 4.  The *Nypl* plaintiffs likewise define the class period as "January 1, 2007 to and including class certification."  SAC ¶ 19. However, the *Nypl* plaintiffs' conclusory allegations that the alleged conspiracy continued after January 2013 are directly contradicted by the plea agreements and press releases that they attach as exhibits to the SAC.  *See DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *25 (S.D.N.Y. July 27, 2009) (granting motion to dismiss where plaintiffs' claim was "not supported by the documents upon which Plaintiffs rely"); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (granting motion to dismiss because, where documents incorporated by reference "contradict the allegations of the . . . complaint, the documents control and this court need not accept [the allegations] as true").  For example, the DOJ press release, which the *Nypl* plaintiffs attached as an exhibit to their SAC, states that the alleged wrongdoing occurred until "January 2013."  SAC ¶ 33; Ex. A.  Likewise, the CFTC and Federal Reserve press releases, which the *Nypl* plaintiffs also attached to their SAC, state that the alleged conduct continued until 2012 and 2013, respectively.  SAC Exs. C, D.  Because the *Nypl* plaintiffs do not allege any plausible facts that the alleged conspiracy continued past January 2013, the Court

should dismiss claims that are based on conduct after that date.  *See Precision*, 2015 WL 4987751, at *5 (dismissing antitrust claims based on the lack of factual allegations after a certain date).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed in its entirety, with prejudice.[12]

Dated: New York, New York                                    Respectfully submitted,
       September 2, 2016

---

[12]     Dismissal with prejudice is proper because the *Nypl* plaintiffs elected not to amend the SAC after Defendants' pre-motion letter explained the basis for concluding that the SAC should be dismissed.  (ECF 124-2).  That letter "'put [plaintiffs] on the plainest notice of what was required,'" and yet plaintiffs made the choice not to "cure the identified deficiencies."  *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2009 WL 3346674, at *2 n.14 (S.D.N.Y. Oct. 15, 2009) (citing *Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978)).  Moreover, the *Nypl* plaintiffs already have amended their complaint, with the benefit of other FX-related complaints that had been pending for years.

COVINGTON & BURLING LLP

By: /s/ Andrew A. Ruffino

Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
Facsimile:  (202) 841-1010
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile:  (202) 662-6291
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com

***Attorneys for Defendants Citicorp,
Citigroup Inc., and Citibank, N.A.***

SHEARMAN & STERLING LLP

By: /s/ Adam S. Hakki*

Adam S. Hakki
Richard F. Schwed
Jeffrey J. Resetarits
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7179
ahakki@shearman.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com

***Attorneys for Defendants Bank of America
Corporation and Bank of America, N.A.***

DAVIS POLK & WARDWELL LLP

By:  /s/ Joel M. Cohen*

Joel M. Cohen
Melissa King
Jennifer Kan
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-4800
joel.cohen@davispolk.com
melissa.king@davispolk.com
jennifer.kan@davispolk.com

***Attorneys for the Defendants
The Royal Bank of Scotland Group plc
and The Royal Bank of Scotland plc***

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Joel S. Sanders*

Joel S. Sanders
555 Mission Street, Suite 3000
San Francisco, CA 94105-2933
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
jsanders@gibsondunn.com

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile:  (202) 530-9527
jarp@gibsondunn.com
mkatsur@gibsondunn.com

Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile:  (212) 716-0875
isur@gibsondunn.com

***Attorneys for Defendant UBS AG***

LOCKE LORD LLP

By:  /s/ Edwin R. DeYoung*

Edwin R. DeYoung
Gregory T. Casamento
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
edeyoung@lockelord.com
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2200
Dallas, Texas  75201-6776
Telephone: (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 S. Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 443-0472
jmgoodin@lockelord.com
jwebb@lockelord.com

***Attorneys for Defendants HSBC Finance
Corporation, HSBC Bank USA, N.A.,
HSBC North America Holdings, Inc., and
HSBC Holdings plc***

SULLIVAN & CROMWELL LLP

By: /s/ Yvonne S. Quinn*

Yvonne S. Quinn
Matthew A. Schwartz
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4197
Facsimile: (212) 291-9481
quinny@sullcrom.com
schwartzmatthew@sullcrom.com

***Attorneys for Defendants
Barclays PLC and Barclays Capital, Inc.***

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Peter E. Greene*

Peter E. Greene
Boris Bershteyn
Peter S. Julian
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
peter.greene@skadden.com
boris.bershteyn@skadden.com
peter.julian@skadden.com

***Attorneys for Defendants JPMorgan Chase
& Co. and JPMorgan Chase Bank, N.A***

* Signature used with permission pursuant to SDNY ECF Rule 8.5(b).