```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
JOHN NYPL, et al.,                                           :
                                    Plaintiffs,              :
                                                             :
            -against-                                        :
                                                             :
JPMORGAN CHASE & CO., et al.,                                :
                                    Defendants.              :
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/24/2017__

15 Civ. 9300 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

Plaintiffs,[1] a group of individuals and businesses that purchased foreign currency in the end-user market, bring this putative class action against eighteen banks and their affiliates[2] under the Sherman Antitrust Act, 15 U.S.C. § 1 et seq.  Plaintiffs allege that they paid inflated foreign currency exchange rates caused by Defendants' alleged conspiracy to fix prices in the foreign exchange ("FX") or foreign currency market.  Defendants move to dismiss the Second Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the reasons stated below, Defendants' motion to dismiss is granted.

I.   BACKGROUND

   A.   Factual Allegations

   The following facts are taken from the Second Amended Complaint, the operative complaint, and assumed to be true for the purposes of this motion.  *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

---

[1] The named plaintiffs are John Nypl; Lisa McCarthy; Mad Travel, Inc., a.k.a. Travel Leaders; Valarie Jolly; Go Everywhere, Inc.; and William Rubinsohn, d.b.a. Rubinsohn Travel.

[2] Defendants are JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Bank, N.A.; Bank of America Corporation; Bank of America, N.A.; HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; Citicorp; Citigroup, Inc.; Citibank, N.A.; UBS AG; Barclays PLC; Barclays Capital, Inc.; Royal Bank of Scotland Group plc; and Royal Bank of Scotland, plc.

On May 20, 2015, the United States Department of Justice ("DOJ") announced that Defendants Citicorp, JPMorgan Chase & Co., Barclays PLC, Royal Bank of Scotland plc and UBS AG were pleading guilty to conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange spot market.  According to the DOJ press release, traders at these banks used a chat room called "The Cartel" to manipulate benchmark exchange rates.  Those exchange rates are set, among other ways, through two major daily "fixes" -- the 1:15 P.M. European Central Bank fix and the 4:00 P.M. World Markets/Reuters fix.  Third parties collect trading data at these times to calculate and publish a daily "fix rate," which in turn is used to price orders for many large customers.  Members of The Cartel allegedly coordinated their trading of U.S. dollars and euros to manipulate benchmark rates set at the 1:15 P.M. and 4:00 P.M. fixes in an effort to increase their profits.

The DOJ press release stated that the traders also used The Cartel chat room to manipulate the euro-dollar exchange rate in other ways.  For example, the traders agreed to withhold bids or offers for euros or dollars to avoid moving the exchange rate in a direction adverse to open positions held by co-conspirators.  In this way, the traders protected each other's trading positions by withholding supply of or demand for currency and suppressing competition in the FX market.

Based on this and other press releases and the plea agreements entered into by the defendants named in the May 20 press release, Plaintiffs allege that Defendants have entered into illegal price-fixing agreements to "fix and rig" the foreign currency exchange rates.  The alleged purpose of the price-fixing agreements is to extract inflated currency exchange rates from Plaintiffs, who purchased foreign currency "for their own end use."  Plaintiffs claim that the

price-fixing agreements are per se violations of § 1 of the Sherman Antitrust Act and caused them to pay more for the foreign currency they purchased than they otherwise would have paid.

### B. Procedural History

Plaintiffs filed suit on May 21, 2015, in the Northern District of California. On November 25, 2015, the case was transferred to this district pursuant to 28 U.S.C. § 1404(a), in part because Defendants are litigating similar claims in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*FOREX*"), No. 13 Civ. 7789 (S.D.N.Y.).

On January 29, 2016, Defendants moved to stay this action pending completion of the settlements reached in *FOREX* or in the alternative to consolidate this action with *FOREX*. On June 8, 2016, the Court denied Defendants' motion to stay and granted in part Defendants' motion to consolidate. The Court concluded that Plaintiffs are not included in the *FOREX* settlement classes because Plaintiffs engaged in "end-user purchases" of foreign currency, which Plaintiffs say are "completely different" from the electronic FX spot trading in which the *FOREX* plaintiffs participated. *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2016 WL 3211440, at *3 (S.D.N.Y. June 8, 2016).

## II. STANDARD

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal quotation marks and citation omitted). "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue. In assessing the plaintiff's assertion of standing, we accept as true all material allegations of the complaint and construe the

complaint in favor of the complaining party." *Id.* at 417 (internal quotation marks, citations and alterations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn*, 795 F.3d at 306. "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2015) (citation omitted); *see also Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

### III. DISCUSSION

The Court has subject matter jurisdiction, but Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted because the Complaint fails to plead sufficient facts to establish antitrust standing. The arguments concerning subject matter jurisdiction are addressed first. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (assuming subject matter jurisdiction to reach the merits "carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers."); *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("Normally, in cases involving the issue of Article III subject matter jurisdiction, this issue would have to be addressed first.").

### A.     Subject Matter Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over this dispute because Plaintiffs lack Article III standing. As explained below, this argument is rejected.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element.

*Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citation omitted).

The Complaint sufficiently pleads Article III standing. Each named Plaintiff is alleged to have suffered injury because he "paid more in bank foreign currency exchange rates than he would have paid in the absence of Defendants' violations." The Complaint plausibly alleges that these losses can be traced to Defendants' alleged manipulation of the price of U.S. dollars and euros exchanged in the foreign currency exchange spot market, which allegedly affected the retail foreign currency exchange rate that Plaintiffs paid. Finally, the named Plaintiffs' injuries would be redressed by any decision of this Court holding that they were entitled to either damages or equitable relief as a result of Defendants having violated the law.

Defendants argue that the Complaint fails to satisfy the "traceability" requirement of Article III standing because the causal connection between the challenged conduct in the FX spot trading market and the asserted injury in the consumer retail market is too attenuated. As explained in the following section, the separation between these markets raises questions about Plaintiffs' antitrust standing. For Article III standing, however, it suffices that the Complaint

5

alleges that Defendants manipulated the foreign currency exchange rates and that Plaintiffs paid more for foreign currency as a result.  *See In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum III*"), 833 F.3d 151, 157 (2d Cir. 2016) ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.") (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 n.31 (1983)).

Because the Complaint sufficiently pleads Article III standing, Defendants' motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction is denied.

### B.     Antitrust Standing

The Complaint does not sufficiently plead antitrust standing.  A plaintiff asserting an antitrust claim must establish antitrust standing in addition to Article III standing.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 814 (2017).  The issue of antitrust standing is evaluated at the pleading stage based on the allegations in the complaint.  *Aluminum III*, 833 F.3d at 157.  To plead antitrust standing, a private antitrust plaintiff must plausibly allege that (1) it suffered an antitrust injury, and (2) it is a suitable plaintiff in that it satisfies the so-called "efficient enforcer" factors.  *Gelboim*, 823 F.3d at 772; *Aluminum III*, 833 F.3d at 157.  As explained below, the Complaint does not sufficiently plead either of these requirements.

#### 1.  Antitrust Injury

The Complaint does not sufficiently plead antitrust injury because it does not allege facts supporting a reasonable inference that Defendants' alleged anticompetitive acts directly restrained the end-user transactions in which Plaintiffs participated.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer [antitrust injury]." *Gelboim*, 823 F.3d at 772 (citing *Brunswick*, 429 U.S. at 489). However, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* (quoting *AGC*, 459 U.S. at 534).

"[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Aluminum III*, 833 F.3d at 161. Usually the directly restrained market "is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant." *Id.* Sometimes, however, "the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target." *Id.* In the latter situation, courts determine whether the plaintiff's injury is "inextricably intertwined" by asking whether the plaintiff was "'manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market.'" *Id.* (quoting *Province v. Cleveland Press Publ'g Co.*, 787 F.2d 1047, 1052 (6th Cir. 1986)); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483–84 (1982) (holding that the plaintiff had suffered antitrust injury because although she was not a competitor or customer of the defendants, her injury was "inextricably intertwined" with the injury the defendants sought to inflict on their target market); IIA Areeda & Hovenkamp, Antitrust Law ¶ 339, at 145 (4th ed. 2014) (concluding that *McCready* "clearly limited" the meaning of the "inextricably intertwined"

exception "to those whose injuries are the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace").

In *Aluminum III*, the Second Circuit held that indirect purchasers of physical aluminum lacked antitrust standing to challenge an alleged conspiracy to manipulate the cost of aluminum storage.  833 F.3d at 162–63.  The directly restrained market in that case was the aluminum storage market, which is distinct from the physical aluminum market.  *Id.* at 161–62.  Because the indirect purchasers admittedly did not participate in the aluminum storage market, they could not establish antitrust injury under either the "usual" or "inextricably intertwined injury" theories described above.  *Id.*  Although the conspiracy in the aluminum storage market allegedly affected prices in the physical aluminum market, thereby injuring the indirect purchasers, the Second Circuit concluded that this was not an antitrust injury because it "was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme."  *Id.* at 162.

The Complaint here does not plausibly allege that the end-user (i.e., consumer) retail foreign currency market in which Plaintiffs participated was directly restrained by Defendants' alleged anticompetitive acts.  All of the Complaint's allegations of wrongdoing are based on the DOJ press release and relate to Defendants' manipulation of the FX spot market and the benchmark exchange rates derived from trades in the FX spot market.  Plaintiffs admitted in their opposition to Defendants' earlier motion to stay this action that the FX spot market is "completely different" from the end-user market.  *Nypl*, 2016 WL 3211440, at *3.  Consequently, any injury Plaintiffs suffered was in a market separate from the one that Defendants allegedly manipulated, and therefore does not qualify as an antitrust injury.

Plaintiffs' contrary arguments fail. First, Plaintiffs attempt to distinguish *Aluminum III* on the ground that they purchased foreign currency directly from Defendants, whereas *Aluminum III* involved indirect purchasers. The relevant inquiry is not whether Defendants directly transacted with Plaintiffs, but whether Defendants directly restrained the market in which Plaintiffs participated. *See Aluminum III*, 833 F.3d at 161 ("The upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained."). Accordingly, after the Second Circuit's decision in *Aluminum III*, the defendants in that case moved to dismiss the antitrust claims brought by another class of plaintiffs who were direct purchasers of aluminum. *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum IV*"), No. 13-MD-2481, 2016 WL 5818585, at *1 (S.D.N.Y. Oct. 5, 2016). Despite allegations that both the direct purchasers and the defendants participated in the physical aluminum market, the district court held that the direct purchasers had not suffered antitrust injury because they did not participate in the directly restrained market. *Id.* As the district court explained, "the fact that the parties may compete in a market into which competitive effects trickle down is not equivalent to competing in the market in which the anticompetitive conduct occurred (warehouse services) or the market(s) intended to be most directly affected (also warehouse services)." *Id.* Similarly here, Plaintiffs' allegation that they purchased foreign currency directly from Defendants in the end-user market is no substitute for factual allegations showing that Defendants' alleged anticompetitive conduct directly restrained the end-user market.

Second, Plaintiffs argue that they can establish antitrust injury under the "inextricably intertwined injury" theory that the Supreme Court recognized in *McCready*. Plaintiffs contend that the purpose of Defendants' alleged conspiracy was "to extract inflated foreign currency exchange rates from Plaintiffs" and that Defendants' manipulation of the FX spot market

9

"operated as a mechanism or fulcrum through which Plaintiffs' prices became supracompetitive." The indirect purchasers made the same argument in *Aluminum III*, and the Second Circuit explained that "[t]his gets *McCready* backwards." 833 F.3d at 162. If the end-user market was the target and the FX spot market was the means, then under *McCready* participants in the FX spot market would have antitrust injury, but not Plaintiffs. *See id.* at 162–63. Injury to Plaintiffs "remains collateral damage." *Id.* at 163.

Third, Plaintiffs argue that the Complaint sufficiently pleads antitrust injury under the standard the Second Circuit set forth in *Gelboim*. *Gelboim* does not address the situation where, as here, the alleged anticompetitive acts occurred in one market and the plaintiffs were injured in a different market. The plaintiffs in *Gelboim* were purchasers of financial instruments that carried a rate of return indexed to the London Interbank Offered Rate ("LIBOR"). 823 F.3d at 764. They alleged that the defendants involved in setting LIBOR colluded to depress it, which negatively impacted the returns the plaintiffs received on their LIBOR-based instruments. *Id.* Significantly, the market that the defendants allegedly restrained and the market in which the plaintiffs participated was the same -- the market for LIBOR-based instruments. *See id.* at 771 ("LIBOR forms a component of the return from various LIBOR-denominated financial instruments, and the fixing of a component of price violates the antitrust laws."). *Gelboim* is therefore distinguishable from this case.

Finally, Plaintiffs argue that a single antitrust conspiracy in the FX spot market may inflict compensable injury in the separate, related foreign currency end-user market. For support, Plaintiffs rely on *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver Fixing*"), --- F. Supp. 3d ----, No. 14-MD-2573, 2016 WL 5794777, at *11 (S.D.N.Y. Oct. 3, 2016), and this Court's September 20, 2016, opinion in *FOREX*, No. 13 Civ. 7789, 2016 WL 5108131, at *10 (S.D.N.Y.

10

Sept. 20, 2016). As an initial matter, the cited portions of those opinions address whether the plaintiffs in those cases would be efficient enforcers, not whether they suffered antitrust injury. More fundamentally, in both *Silver Fixing* and *FOREX* there were allegations that the alleged anticompetitive conduct directly restrained the separate market in which the plaintiffs participated.

In *Silver Fixing*, the defendants were accused of suppressing the "Fix Price," and the plaintiffs alleged that the Fix Price served as the reference point for the price of physical silver, which in turn "directly impacted" the price of silver derivatives. 2016 WL 5794777, at *10. The court in *Silver Fixing* concluded that both the plaintiffs who participated in the physical silver market and those who participated in the silver derivatives market had pleaded a sufficiently direct injury to be efficient enforcers because of the close relationship between the Fix Price and the prices in each market. *Id.* at *10–11.

Similarly, in the September 20 *FOREX* opinion, the relevant class of plaintiffs -- the so-called Exchange Class -- alleged that the prices they paid for FX futures traded on exchanges "flow[ed] directly from Defendants' manipulation of the FX spot prices, since the two prices move virtually in tandem." 2016 WL 5108131, at *9. Distinguishing the *Aluminum* case on the ground that "Plaintiffs here plead a more direct (and nearly mechanical) relationship viewed in light of the 'chain of causation' between the prices in the FX spot and futures market," the Court concluded that the Exchange Plaintiffs' injury was sufficiently direct for them to be efficient enforcers. *Id.* at *10. Here, in contrast, the Complaint does not allege facts showing a direct relationship between the FX spot market prices and benchmark rates, which were the focus of the alleged conspiracy, and prices in the foreign currency end-user market, in which Plaintiffs participated.

The Complaint fails to plead antitrust injury. Because a plaintiff must show antitrust injury to have antitrust standing, Defendants' motion to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim is granted.

### 2. The Efficient Enforcer Factors

The Complaint is dismissed for a second, independent reason -- that Plaintiffs are not efficient enforcers, as required for antitrust standing. *See Aluminum III,* 833 F.3d at 157. In assessing whether a private antitrust plaintiff satisfies the efficient enforcer requirement, courts consider four factors:

> (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking [the plaintiffs'] asserted injury and the [defendants'] alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which [plaintiffs'] damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540–45). The Supreme Court recently discussed these factors in the context of the Lanham Act, noting that the first factor "must be met in every case" but the third and fourth factors are "problematic" and the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014); *see also Silver Fixing*, 2016 WL 5794777, at *10 (citing *Lexmark* in connection with claims under the Sherman Antitrust Act); *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (same).

As to the first factor, the Complaint fails to show that Plaintiffs' injury has a sufficiently direct relationship to the alleged conspiracy. "Directness in the antitrust context means close in

the chain of causation." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013). The Complaint does not allege facts regarding how the FX spot market, where Defendants allegedly manipulated prices, relates to the end-user market, where Plaintiffs purchased foreign currency. The Complaint therefore does not support a reasonable inference that Plaintiffs are direct victims of the alleged conspiracy. *See AGC*, 459 U.S. at 540 (finding the directness factor not pleaded where "the chain of causation between the Union's injury and the alleged restraint in the market . . . contains several somewhat vaguely defined links"); *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011) (finding that CD purchasers did not plead a sufficiently direct relationship between prices in the CD market and alleged misconduct in the Internet Music market because they failed to allege "how the pricing of Internet Music affected CD pricing, how the CD market operated generally . . . or any kind of tie . . . between CD pricing and Internet Music pricing").

The second factor -- whether there are more direct victims of the alleged conspiracy -- weighs against finding that Plaintiffs are efficient enforcers based on the allegations in the Complaint. As participants in the FX spot market, the plaintiffs in *FOREX* are more direct victims of the alleged conspiracy to manipulate prices in that market than Plaintiffs in this case. *See FOREX*, 2016 WL 5108131, at *9 (holding that Exchange Plaintiffs, in addition to Over-the-Counter Plaintiffs, are efficient enforcers with respect to the alleged conspiracy in the FX spot market).

The third and fourth factors also weigh against Plaintiffs. Regarding the third factor, the Complaint's lack of allegations regarding how prices in the end-user market are determined and the relationship between the FX spot market and the end-user market means that Plaintiffs' alleged damages "would necessarily be 'highly speculative.'" *Gelboim*, 823 F.3d at 780 (quoting

*AGC*, 459 U.S. at 542).  Under the fourth factor, the Complaint's failure to allege facts showing a direct relationship between the alleged conspiracy and Plaintiffs' injuries raises the risk that Plaintiffs' damages are derivative of the *FOREX* plaintiffs' damages, and therefore would be duplicative and excessive in light of the settlement in *FOREX*.  *See id.* at 780 (noting that existence of other actions seeking damages on behalf of victims raises issue of duplicate recovery).  Based on the allegations in the Complaint, none of the efficient enforcer factors weigh in Plaintiffs' favor.  The fundamental problem for Plaintiffs in pleading efficient enforcer status is the same as in the previous section regarding antitrust injury -- the Complaint does not allege facts regarding the relationship between the FX spot market and the end-user market.

### C. Leave to Replead

Plaintiffs ask, in the event of dismissal, for leave to file a Third Amended Complaint.  Leave to amend should be freely given when justice so requires.  Fed. R. Civ. P. 15(a).  "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  Leave to amend also may be denied where the plaintiff "fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Any motion for leave to replead shall be filed as provided below.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim is GRANTED.  Should Plaintiffs choose to attempt to replead, they must file a motion to do so, a supporting memorandum of law

and proposed Third Amended Complaint, together with a redline showing how it differs from the Second Amended Complaint dismissed here, within 21 days.

Defendants Barclays PLC, HSBC Holdings plc, Royal Bank of Scotland Group plc, Royal Bank of Scotland plc and UBS AG's separate motion to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is denied as moot.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 123 and 131.

Dated: March 24, 2017
       New York, New York

                                   _____
                                          **LORNA G. SCHOFIELD**
                                       **UNITED STATES DISTRICT JUDGE**