UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
  JOHN NYPL, et al.,
                              Plaintiffs,
                -against-
  JPMORGAN CHASE & CO., et al.,
                              Defendants.
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8/3/2017

15 Civ. 9300 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs[1] commenced this putative class action under the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1 et seq., alleging that they paid inflated foreign currency exchange rates caused by an alleged conspiracy among Defendants[2] to fix prices in the foreign exchange ("FX") or foreign currency market. Plaintiffs' Second Amended Complaint was dismissed in its entirety because it did not sufficiently plead antitrust standing. *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017 WL 1133446, at *3 (S.D.N.Y. Mar. 24, 2017). Plaintiffs move for leave to file their Proposed Third Amended Complaint (the "PTAC") pursuant to Federal Rule of Civil Procedure 15(a)(2). The PTAC asserts claims under the Sherman Act and California state law. For the following reasons, Plaintiffs' motion is granted in part.

---

[1] The named plaintiffs are John Nypl; Lisa McCarthy; Mad Travel, Inc., a.k.a. Travel Leaders; Valarie Jolly; Go Everywhere, Inc.; and William Rubinsohn, d.b.a. Rubinsohn Travel.
[2] Defendants are JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; J.P. Morgan Bank, N.A.; Bank of America Corporation; Bank of America, N.A.; HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; Citicorp; Citigroup, Inc.; Citibank, N.A.; UBS AG; Barclays PLC; Barclays Capital, Inc.; Royal Bank of Scotland Group plc; and Royal Bank of Scotland, plc.

## I. BACKGROUND

Familiarity with the procedural history and the allegations contained in the Second Amended Complaint is assumed.  *See Nypl*, 2017 WL 1133446, at *1–2.  The following facts are taken from the PTAC and accepted as true for the purposes of this motion.  *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

On May 20, 2015, the United States Department of Justice ("DOJ") announced that Defendants Citicorp, JPMorgan Chase & Co., Barclays PLC, Royal Bank of Scotland plc and UBS AG were pleading guilty to conspiring to manipulate FX benchmark rates.  Those benchmark rates are derived daily from trading in the FX spot market.  Two major benchmark rates that Defendants were accused of manipulating are the European Central Bank ("ECB") rate and the World Markets/Reuters rate.  According to an order about the manipulation from the Commodity Futures Trading Commission, the World Markets/Reuters rates "are the most widely referenced FX benchmark rates in the United States and globally" and "are used to establish the relative values of different currencies, and reflect the rates at which one currency is exchanged for another currency."

Plaintiffs, a group of individuals and businesses, purchased foreign currency from Defendants in the consumer retail market.  Plaintiffs allege that there is a "mechanical, direct correlation" between the FX benchmark rates that Defendants allegedly manipulated and the prices that Defendants charged Plaintiffs.  Specifically, Plaintiffs allege that the prices Defendants charged for foreign currency in the consumer retail market were the benchmark rates on the day of the transaction plus a small handling fee or commission.

Plaintiffs base this allegation primarily on a comparison of the prices Defendants JPMorgan Chase Bank, N.A., Citibank, N.A. and Bank of America, N.A. charged for foreign

currency in the consumer retail market and the benchmark rates published in the Wall Street Journal. On twelve occasions between March 28 and April 13, 2017, Plaintiffs' counsel purchased foreign currency from San Francisco branches of JPMorgan Chase, Citibank and Bank of America. Plaintiffs' counsel then compared the prices he paid to the "foreign-exchange rates in late New York trading" published in the Wall Street Journal for the same dates and currencies. Plaintiffs' counsel calculated that the prices he paid in the consumer retail market were between 5.56% and 7.69% (on average, 6.98%) higher than the exchange rates reported in the Wall Street Journal. Plaintiffs allege that this differential reflects a handling fee charged in the consumer retail market.

To confirm the correlation observed in the data he gathered, Plaintiffs' counsel engaged Carl Saba, a Certified Valuation Analyst. Mr. Saba compared the prices charged to Plaintiffs' counsel at JPMorgan Chase[3] to the ECB spot market fix rate, as published on the ECB's website, for the same days. Mr. Saba applied a linear regression to the data and derived an equation that can predict with 99.8% accuracy the consumer retail price paid by Plaintiffs' counsel based on the ECB rate from the same day. Based on this analysis, Mr. Saba concluded that "the ECB Fix Rate on the foreign exchange spot market appears to be strongly correlated with and an accurate predictor of the End-user rates charged by JP Morgan Chase to Counsel." However, Mr. Saba cautioned that his analysis was based on "the limited data" provided by Plaintiffs' counsel and that "in order to reach a conclusive determination of whether the ECB Fix Rate is a predictor of

---

[3] Mr. Saba excluded from his analysis the data from Citibank and Bank of America because there was data from only two transactions at each of those banks.

the End-user rate charged by Defendants, significantly more data must be analyzed over the time period in which Defendants engaged in price manipulation."[4]

Because they purchased foreign currency from Defendants at the allegedly rigged benchmark rates plus a small handling fee or commission, Plaintiffs allege that they participated in the price-fixed, manipulated benchmark rates market. The PTAC asserts claims under the Sherman Act and California's Cartwright Act and Unfair Competition Law ("UCL").

## II. STANDARD

"Leave to amend should be 'freely give[n] . . . when justice so requires,' Fed. R. Civ. P. 15(a)(2), but should generally be denied in instances of futility [or] undue delay . . . ." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (some internal quotation marks omitted). "A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." *F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017). In reviewing such a motion, a court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations of fraud or mistake must meet the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b). "In determining the adequacy of the complaint, the court [also] may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distribs. Corp. v. Subaru of*

---

[4] Plaintiffs were allotted only six weeks after the dismissal of the prior complaint to file a proposed PTAC.

*Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005); *accord Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

## III. DISCUSSION

Plaintiffs' motion for leave to file the PTAC is granted in substantial part as explained below because the PTAC adequately alleges antitrust standing such that neither the Sherman Act claim nor the California state law claims are futile.[5]

### A. Sherman Act

Based on the facts alleged in the PTAC, Plaintiffs have antitrust standing to bring a Sherman Act claim. A plaintiff asserting an antitrust claim under federal law must establish antitrust standing in addition to Article III standing. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016). The issue of antitrust standing is evaluated at the pleading stage based on the allegations in the complaint. *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum III*"), 833 F.3d 151, 157 (2d Cir. 2016). To plead antitrust standing, a private antitrust plaintiff must plausibly allege that (1) it suffered an antitrust injury, and (2) it is a suitable plaintiff in that it satisfies the so-called "efficient enforcer" factors. *Gelboim*, 823 F.3d at 772; *Aluminum III*, 833 F.3d at 157. As explained below, the PTAC sufficiently pleads each of these requirements.

---

[5] Although they focus on futility, Defendants also argue in passing that Plaintiffs' motion should be denied because of undue delay. Although undue delay is a potential ground for denying leave to amend, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008). Because Plaintiffs' additional factual allegations are in response to the Court's recent decision dismissing the Second Amended Complaint and discovery has not begun in this case and only recently commenced in earnest in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789 (S.D.N.Y.), Defendants have not shown bad faith or undue prejudice.

### 1. Antitrust Injury

The PTAC, unlike its predecessor, sufficiently pleads antitrust injury because it alleges facts supporting a reasonable inference that the foreign currency consumer retail market in which Plaintiffs participated was directly restrained by Defendants' alleged manipulation of FX benchmark rates.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer [antitrust injury]." *Gelboim*, 823 F.3d at 772 (citing *Brunswick*, 429 U.S. at 489). However, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983)). "[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Aluminum III*, 833 F.3d at 161. Usually the directly restrained market "is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant." *Id.* Sometimes, however, "the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target." *Id.*; *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 483–84 (1982) (holding that plaintiff had suffered antitrust injury because although she was not a competitor or customer of defendants, her injury was "inextricably intertwined" with the injury defendants sought to inflict on their target market).

The Second Circuit has held that a complaint alleging manipulation of a benchmark can sufficiently allege antitrust injury. In *Gelboim*, the plaintiffs purchased financial instruments with a rate of return pegged to LIBOR, largely from defendant banks that were responsible for setting LIBOR. The Second Circuit held that the plaintiffs had suffered antitrust injury when they received a lower rate of return on account of defendants' collusion to depress LIBOR. 823 F.3d at 764. "[E]ven if none of [plaintiffs'] financial instruments paid interest *at* LIBOR, *Socony-Vacuum* allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices." *Id.* at 776 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)). That other variables besides LIBOR affected the plaintiffs' return did not undermine their assertion of antitrust injury. Although the plaintiffs "remained free to negotiate the interest to particular financial instruments . . . , antitrust law is concerned with influences that corrupt market conditions, not bargaining power." *Id*. at 773. The plaintiffs included bondholders, as well as derivatives holders and others; but the Second Circuit's analysis and conclusion regarding antitrust injury were the same without regard to type of financial instrument purchased, each by definition purchased in a different market. *See id.* at 767, 774–75.

Following *Gelboim*, the district courts have similarly found antitrust injury in other cases alleging manipulation of financial or commodities benchmarks. *See, e.g.*, *Sullivan v. Barclays PLC*, 2017 WL 685570, at *1, *14 (S.D.N.Y. Feb. 21, 2017) (alleged manipulation of Euribor benchmark caused antitrust injury to plaintiffs that purchased several types of derivatives for which "a price or payment term derived from the Euribor"); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 644, 653 (S.D.N.Y. 2016) (alleged manipulation of the "Gold Fixing," which served as a daily benchmark for gold, caused antitrust injury to plaintiffs who purchased physical gold and gold derivatives, "all of which were correlated to the Fix Price in one way or another");

7

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131, at *6 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*") (plaintiffs who entered into an FX instrument on an exchange sufficiently pleaded antitrust injury based on allegation that "FX benchmark rates directly impact the prices of FX futures contracts traded on exchanges, and that prices for currency futures move in virtual lockstep to the spot price"); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 59 (S.D.N.Y. 2016) ("[T]his Court and the [*FOREX*] Court are not alone in concluding that collusion in the setting of a benchmark rate (or its functional equivalent) that is then used as a component of price results in antitrust injury." (collecting cases)). Whether a complaint sufficiently alleges antitrust injury in a benchmark or any other case depends on the allegations in the complaint. *See, e.g.*, *In re N. Sea Brent Crude Oil Futures Litig.*, 13-MD-2475, 2017 WL 2493135, at *9 (S.D.N.Y. June 8, 2017) ("The Court must examine the facts alleged in the Complaints to determine what market or markets allegedly were restrained based on Plaintiffs' theory of the case.").

Here, the PTAC remedies the deficiencies of its predecessor. The PTAC plausibly alleges that Plaintiffs were consumers in a market where competition was restrained. The PTAC claims that the manipulated FX benchmark rates were the primary component of the prices Plaintiffs paid for foreign currency in the consumer retail market. The PTAC supports that claim with factual allegations that the prices in the consumer retail market consistently track and are on average approximately 7% higher than the published benchmark rates for the same date and currency. Accepting these allegations as true for purposes of this motion, the PTAC plausibly alleges that the manipulated FX benchmark rates restrained trade in the consumer retail market and that consequently Plaintiffs suffered antitrust injury.

Defendants' contrary arguments are unpersuasive. First, Plaintiffs' prior statement that the FX spot market is "completely different" from the consumer retail market is not necessarily inconsistent with the allegations in the PTAC. So long as the prices Plaintiffs paid in the consumer retail market were based, at least in significant part, on the manipulated FX benchmark rates, Plaintiffs have suffered antitrust injury regardless of other differences between the two markets. *See, e.g.*, *In re Commodity Exch.*, 213 F. Supp. 3d at 642, 652–53 (antitrust injury sufficiently pleaded as to plaintiffs who transacted in physical gold as well as plaintiffs who transacted in gold derivatives because the allegedly manipulated "Fix Price" serves as "the dominant price benchmark" for all types of gold trading); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 272–73 (D. Conn. 2003) (antitrust injury sufficiently pleaded as to plaintiffs in the milk and cream market based on alleged manipulation of butter prices, which were a component of a federally regulated formula for minimum milk prices).

Second, the shortcomings Defendants identify in the methodology used by Plaintiffs' counsel and Mr. Saba to document the alleged influence of the FX benchmark rates on prices in the consumer retail market are unavailing at this stage of the litigation. "As is well established, '[a] court ruling on . . . a motion [to dismiss] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version,' . . . equally or even 'more plausible.'" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 597 (S.D.N.Y. 2015) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012)). Also, Defendants' reliance on *In re North Sea Brent Crude Oil* is misplaced. There the court dismissed one of the plaintiff's claims for lack of antitrust injury because the plaintiff did not adequately allege that the defendants manipulated the benchmark relevant to his market. 2017 WL 2493135, at *10 ("[T]he Landowner Plaintiff . . . does not allege that the

9

[manipulated benchmark] was the benchmark for . . . the U.S. crude oil benchmark that allegedly affected the prices of his own interests."). "The fact that [two oil benchmark] prices consistently have tracked Brent crude oil prices over time does not mean that Brent crude oil dictated [those two benchmark] prices. Correlation is not the same as causation." *Id*. Here, in contrast, Plaintiffs allege not only that a correlation exists between FX benchmark rates and consumer retail prices, but also that the FX benchmark rates are the principal component of consumer retail prices. "Plaintiffs . . . purchased price-fixed foreign currency from Defendants at the Benchmark exchange rates, derived from spot trading, plus a small commission."

Finally, that same allegation -- that FX benchmark rates are a component of consumer retail prices -- distinguishes this case from *Aluminum III*. In *Aluminum III*, commercial and consumer purchasers of physical aluminum brought antitrust claims based on an alleged conspiracy to manipulate the cost of aluminum storage. 833 F.3d at 155–57. Although the conspiracy in the aluminum storage market allegedly affected prices in the physical aluminum market, thereby injuring the indirect purchasers, the Second Circuit concluded that this was not an antitrust injury because it "was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." *Id.* at 162. Here, the PTAC alleges that the FX benchmark rates did not merely trickle down or have an incidental effect but instead directly influenced the foreign exchange retail market as the primary price component. Thus, the PTAC plausibly alleges that the manipulated FX benchmark rates directly restrained the market in which Plaintiffs participated. The PTAC therefore adequately pleads antitrust injury.

### 2. The Efficient Enforcer Factors

The PTAC sufficiently pleads that Plaintiffs are efficient enforcers. "A showing of antitrust injury is necessary, but not always sufficient, to establish standing." *Gelboim*, 823 F.3d

at 778.  An antitrust plaintiff also must be an "efficient enforcer" of the antitrust laws.  *Id.* at

777–78.  The four efficient enforcer factors are:

> (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking [the plaintiffs'] asserted injury and the [defendants'] alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which [the plaintiffs'] damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Id.* at 778 (quoting *AGC*, 459 U.S. at 540–45).  The Supreme Court discussed these factors in the context of the Lanham Act, noting that the first factor "must be met in every case" but the third and fourth factors are "problematic," and the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014); *see also In re Commodity Exch.*, 213 F. Supp. 3d at 653 (citing *Lexmark* in connection with claims under the Sherman Act); *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (same).

As to the first factor, directness, the PTAC alleges facts that, if proven, show that Plaintiffs' injury flows directly from Defendants' alleged manipulation of FX benchmark rates.  "Directness in the antitrust context means close in the chain of causation."  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013).  This efficient enforcer factor "is essentially a proximate cause analysis that hinges upon 'whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.'"  *In re Commodity Exch.*, 213 F. Supp. 3d at 654 (quoting *Lexmark*, 134 S. Ct. at 1390).  Where the chain of causation between the asserted injury and the alleged restraint in the market "contains several somewhat vaguely

defined links," the claim may be insufficient to provide antitrust standing. *AGC*, 459 U.S. at 540; *see also In re Commodity Exch.*, 213 F. Supp. 3d at 654.

Assuming for purposes of this motion that the FX benchmark rates are a component of consumer retail prices (as the PTAC plausibly alleges), a clear and direct link connects the alleged anticompetitive conduct and Plaintiffs' injury; an orchestrated increase in the FX benchmark rate for a currency pair necessarily would trigger an increase in the price paid by consumers such as Plaintiffs. *See FOREX*, 2016 WL 5108131, at *9 (directness factor satisfied where rates in the market in which plaintiffs participated allegedly "track" and "move in virtual lockstep" with rates in the manipulated market).

The cases Defendants cite are inapposite as they involve separate markets not linked by a benchmark that is both derived from one market and determinative of price in the other market. *See, e.g.*, *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980) ("[Plaintiff's] theory of antitrust injury depends upon a complicated series of market interactions between the two sources of copper: the refined copper market in which defendants acted and the copper scrap market in which [plaintiff] allegedly sustained injuries."); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *9 (S.D.N.Y. Mar. 28, 2014) (plaintiff's asserted injury was too indirect to support antitrust standing where "the allegations of collusive submissions involve[d] two different benchmarks" and plaintiff alleged "a causal chain with at least four discrete links, requiring a complicated series of market interactions"). Plaintiffs have alleged sufficient facts to satisfy the directness factor of the efficient enforcer inquiry.

The PTAC also satisfies the second factor, whether there are more direct victims of the alleged conspiracy. Again assuming that the allegations in the PTAC are true, the consumer retail market for foreign currency was directly restrained by Defendants' manipulation of the FX

benchmark rates.  There are no more direct victims in the consumer retail market than Plaintiffs, who purchased foreign currency from Defendants.  Contrary to Defendants' argument, FX spot market participants who transacted directly at spot trading prices are not more direct victims, but rather victims in a different market.  *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002) ("[D]ifferent injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus . . . differently situated plaintiffs might be able to raise claims."); *FOREX*, 2016 WL 5108131, at *11 (rejecting argument that plaintiffs in the over-the-counter market were more direct victims than plaintiffs in the exchange market).

Regarding the third factor, Plaintiffs' damages are not highly speculative because, at least according to the PTAC, they are based on a mathematical relationship between the FX benchmark rates and the prices Plaintiffs paid, and arise from identifiable transactions in which Plaintiffs paid inflated prices due to Defendants' manipulation.  Although Defendants may be correct that the relationship between the rates is more complicated than the PTAC alleges, or that demonstrating what price Plaintiffs would have paid but for the collusion will be difficult, those issues are for a later stage of the litigation.  *See FOREX*, 2016 WL 5108131, at *11 ("At the motion to dismiss stage, any holding that [plaintiffs'] damages would be speculative is premature."); *In re Commodity Exch.*, 213 F. Supp. 3d at 658 ("Because the Court finds that the PM Fixing was a price altering event, because exogenous factors affect price movements in most antitrust cases, and because the existence of such factors does not alone defeat standing, questions regarding the extent of Plaintiffs' injuries can best be resolved at a later stage.").

As to the fourth factor, there is no danger of duplicate recoveries or complex apportionment because Plaintiffs' claims are tied to specific transactions in which they

participated and, based on the alleged direct influence the manipulated FX benchmark rates had on consumer retail prices, are not derivative of the *FOREX* plaintiffs' injuries.

Because the PTAC sufficiently pleads that Plaintiffs suffered antitrust injury and are efficient enforcers, Plaintiffs have antitrust standing. Accordingly, Plaintiffs' motion for leave to file the PTAC is granted as to the Sherman Act claim.

### B. State Law Claims

The PTAC also asserts claims under California's Cartwright Act and UCL. Contrary to Defendants' arguments, the PTAC adequately alleges facts to establish Plaintiffs' standing to bring a Cartwright Act claim and Plaintiff John Nypl's standing to bring a UCL claim.

"The Cartwright Act prohibits combinations in restraint of trade. Under the Act, '[a]ny person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor.'" *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 (1995) (quoting Cal. Bus. & Prof. Code § 16750(a)). Antitrust standing is required to sue under the Cartwright Act, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000), but the California Supreme Court has not decided whether the efficient enforcer factors that the Supreme Court announced in *AGC* apply to determine whether a plaintiff has antitrust standing for purposes of the Cartwright Act, *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 257 (E.D.N.Y. 2016), *aff'd*, 663 F. App'x 71 (2d Cir. 2016). At least one California intermediate appellate court and the Ninth Circuit have applied the efficient enforcer factors to Cartwright Act claims. *See Vinci*, 36 Cal. App. 4th at 1814; *Knevelbaard Dairies*, 232 F.3d at 987–92. The Ninth Circuit also has noted in the context of the Cartwright Act that "California law affords standing more liberally than does federal law." *Knevelbaard Dairies*, 232 F.3d at 987. Because, as explained above, Plaintiffs satisfy the efficient enforcer

14

factors, and the decisions in *Vinci* and *Knevelbaard Dairies* suggest that the California Supreme Court would adopt the efficient enforcer factors or a more lenient test for antitrust standing, Plaintiffs have antitrust standing to bring a claim under the Cartwright Act.

"To pursue either an individual or a representative claim under the California [UCL], a plaintiff must have suffered an injury in fact and lost money or property as a result of such unfair competition." *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 919 (N.D. Cal. 2013) (internal quotation marks and alterations omitted) (quoting *Hall v. Time Inc.*, 158 Cal. App. 4th 847, 849 (2008)). Because the PTAC alleges that Plaintiffs paid artificially inflated prices for foreign currency due to Defendants' manipulation of the FX benchmark rates, both the injury-in-fact and lost-money requirements are satisfied. The UCL, however, "does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California." *Meridian Project Sys., Inc. v. Hardin Const. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (citing *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (1999)); *see also Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011) ("Neither the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the UCL in full force."). The PTAC does not allege that any misconduct occurred in California, and only Plaintiff John Nypl is a California resident. Therefore, Plaintiff John Nypl and a putative class of California residents may bring a claim under the UCL, but the other Plaintiffs may not.[6]

---

[6] Defendants briefly argue that Plaintiffs' UCL claim is futile because the PTAC fails to plead fraudulent practices with specificity as required by Rule 9(b), Fed. R. Civ. P. For support, Defendants cite *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *6 (N.D. Cal. Nov. 6, 2009). However, the decision in *In re Actimmune* notes that "a business act or practice need only meet one of the three criteria -- unlawful, unfair, or fraudulent -- to be considered unfair competition under the UCL," and "[t]o the extent a plaintiff alleges that a defendant engaged in

15

Plaintiffs' motion for leave to file the PTAC is granted with respect to the Cartwright Act claim and granted as to Plaintiff John Nypl with respect to the UCL claim.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for leave to file the PTAC is GRANTED IN PART. Plaintiffs shall file the PTAC, revised such that the UCL claim is limited to Plaintiff John Nypl and a putative class of California residents, within 7 days. The parties' requests for oral argument are DENIED as moot.

The Clerk of Court is respectfully directed to close the motion at Docket No. 166.

Dated: August 3, 2017
      New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

---

unfair business practices or acts that are not fraudulent, those allegations need not satisfy Rule 9(b)." *Id.* at *7, *14.