**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
JOHN NYPL, an individual; LISA MCCARTHY, an
individual; MAD TRAVEL, Inc. a.k.a. Travel Leaders;
VALARIE JOLLY, an individual; GO EVERYWHERE,
INC., a corporation; WILLIAM RUBINSOHN doing
business as Rubinsohn Travel on behalf of themselves and
those similarly situated,

                    Plaintiffs,

     v.

JP MORGAN CHASE & CO; J.P. MORGAN CHASE
BANK, N.A.; BANK OF AMERICA CORPORATION;
BANK OF AMERICA N.A.;  HSBC FINANCE
CORPORATION; HSBC BANK USA, N.A.; HSBC
NORTH AMERICAN HOLDINGS, INC.; HSBC
HOLDINGS, PLC; CITIGROUP, INC.; CITIBANK, N.A.;
CITICORP.; UBS AG, BARCLAYS PLC; BARCLAYS
CAPITAL, INC.; ROYAL BANK OF SCOTLAND GROUP
PLC; ROYAL BANK OF SCOTLAND, PLC.

                  Defendants.

Case No. 15 Civ. 9300 (LGS)

**THIRD AMENDED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF THE
SHERMAN ACT (*15 USC § 1*)**

**DEMAND FOR JURY TRIAL**

      Plaintiffs bring this action, on behalf of themselves and all  other persons, similarly

situated, who purchased foreign currency from Defendants at Benchmark exchange rates fixed,

rigged and manipulated by Defendants pursuant to their conspiracy, combination and agreement

to fix, rig and manipulate foreign currency Benchmark exchange rates and who paid inflated

overcharges therefor and have been injured by the conspiracy bring this action  under Section 4

of the Clayton Act (15 U.S.C. § 26) to obtain damages, treble damages, restitution, and

injunctive relief against Defendants Bank of America Corporation; Bank of America, N.A.;

(hereafter "Bank of America"); JP Morgan Chase & Co; J.P. Morgan Bank, N.A. (hereafter "J.P.

Morgan Chase"); HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North American

Holdings; HSBC Holdings, plc ("HSBC"), Citigroup, Inc.; UBS AG, Barclays PLC and Royal

Bank of Scotland due to their violations of section 1 of the Sherman Act (15 U.S.C. § 1).

Plaintiffs demand a trial by jury, allege and complain as follows:

      1.      Plaintiffs on behalf of a nationwide class of consumers and end user businesses

who have been injured by rigged foreign currency Benchmark exchange rates, similarly situated,

seek injunctive relief, and monetary damages, including treble damages, to compensate them for

overcharge damages based on price-fixed, rigged foreign currency Benchmark exchange rate overcharges caused to them by the conspiracy among Defendants to set, fix and establish the Benchmark exchange rates of U.S. dollars for foreign currency and foreign currency for U.S. dollars (hereafter "foreign currency Benchmark exchange rates) resulting in supracompetitive foreign currency Benchmark exchange rate overcharges imposed on and paid by plaintiffs and the class to Defendants and their co-conspirators. This price-fixing conspiracy is ongoing and overcharged amounts are extracted from Plaintiffs and the Class members pursuant to the conspiracy on a continuing basis.

2.      This case is about the continuing combination, agreement and conspiracy to set, fix and establish foreign currency Benchmark exchange rates agreed upon by Defendants, and charged to Plaintiffs and the Class by Defendants resulting in overcharges, that were forced upon and paid by Plaintiffs and the class directly to Defendants and their co-conspirators.

3.      As Bank of America Corporation; Bank of America, N.A.; (hereafter "Bank of America"); JP Morgan Chase & Co; J.P. Morgan Bank, N.A. (hereafter "J.P. Morgan Chase"); HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North American Holdings; HSBC Holdings, plc ("HSBC"), Citigroup, Inc.; UBS AG, Barclays PLC and Royal Bank of Scotland are competitors, their horizontal combination, agreement and conspiracy to set, fix and establish foreign currency exchange rates nationwide in the 50 United States plus the District of Columbia is per se illegal and in violation of Section 1 of the Sherman Act.

4.      Defendants are members of and participants in and enablers of a continuing combination, agreement and conspiracy to set, fix and establish inflated supracompetitive foreign currency Benchmark exchange rates in transactions throughout the 50 United States, plus D.C. that has operated continuously since at least January 1, 2007.  Defendants have set, fixed and established foreign currency Benchmark exchange rates and imposed them on plaintiffs and the class. In its plea agreement dated May 20, 2015, J.P. Morgan Chase & Co. agreed to plead guilty to violation of section 1 of the Sherman Act.

5.      Plaintiffs and the consumer and business end-user class(hereafter "Plaintiffs")

purchased price-fixed foreign currency from Defendants at the Benchmark exchange rates, derived from spot trading, plus a small handling fee.  Defendants sold foreign currency to Plaintiffs and the putative consumer and end-user business class at supracompetitive Benchmark exchange rates, derived from trading in the FX spot market, plus a small handling fee.

6.      The foreign currency exchange rates paid by Plaintiffs and the putative class of consumers and business end-users are the FX Benchmark exchange rates or "Fix Rates" that are derived daily from FX spot trading, plus a small handling fee. Since the foreign currency exchange rates paid by Plaintiffs and the consumer and business end-user class  are the FX Benchmark exchange rates or "Fix Rates" that are derived daily from FX spot trading, the Benchmark exchange rates or "Fix Rates" directly impact the Benchmark exchange rates paid by Plaintiffs and the class. There is a mechanical, direct correlation between the supracompetitive FX Benchmark exchange rates Defendants manipulated and the supracompetitive Benchmark exchange rates, plus a small handling fee that  Defendants charged Plaintiffs and the Class in their purchases of  price-fixed foreign currency from Defendants. The FX Benchmark rates manipulated by Defendants move virtually in tandem with the exchange rates Defendants charged Plaintiffs, which flowed directly from Defendants manipulation of the FX Benchmark exchange rates or "Fix Rates." Defendants each  utilize computer programs that regularly, at least daily, transmit updated Benchmark exchange rates derived from FX spot trading plus a small fee for handling to each of their bank branches for retail sales of foreign currency to Plaintiffs and consumers and business end-users.

7.      When FX Benchmark exchange rates go up or down, retail  foreign currency exchange rates paid by consumers and business end-users go up or down  in tandem.  And when FX Benchmark exchange rates due to  price-fixing go up, Benchmark exchange rates plus a small handling fee charged to Plaintiffs and the consumer and business end-users  go up the in tandem.

8.      In addition to describing manipulation of the FX Spot Market in ¶¶4(e) and 4(f) of the almost identical Plea Agreements, ¶4(f) of the Plea Agreements describes the manipulation of

the Benchmark exchange rates market or "fix rates" market as follows:

> A dealer may also take and execute orders from customers such as "fix orders," which are orders to trade at a subsequently determined "fix rate." When a dealer accepts a fix order from a customer, the dealer agrees to fill the order at a rate to be determined at a subsequent fix time based on trading in the interdealer market. Two such "fixes" used to determine a fix rate are the European Central Bank fix, which occurs each trading day at 2:15 PM (CET) and the World Markets/Reuters fix, which occurs each trading day at 4:00 PM (GMT).[1]

The Plea Agreements are attached hereto as Exhibits A-1 to A6.

9.       On May 20, 2015, JP Morgan Chase & Co., Citicorp, Citibank, N.A., Citigroup, Inc., UBS AG, Barclays PLC and Royal Bank of Scotland, PLC also entered into Plea Agreements agreeing to plead guilty to the same violation of section 1 of the Sherman Act with respect to fixing and rigging foreign currency Benchmark exchange rates containing similar terms.

10.      The supracompetitive foreign currency Benchmark exchange rates set, fixed and established by Defendants and paid by plaintiffs and the class are traceable through the application of economic analyses to the computerized bank records of Defendants.

11.      The continuing contract, combination, conspiracy, and agreement entered into by Defendants harm competition and have imposed upon Plaintiffs and the class members supra-competitive, exorbitant, and collectively set, fixed and established foreign currency Benchmark exchange rates. The agreements, combination, and conspiracy in restraint of trade, are illegal under Section 1 of the Sherman Act.

## JURISDICTION AND VENUE

12.      This is an action under Section 4 of the Clayton Act (15 U.S.C. § 15(a) to recover damages, treble damages and to obtain injunctive and equitable relief under Section 16 of the Clayton Act (15 U.S.C. § 26) against Defendants Bank of America Corporation; Bank of America, N.A.; (hereafter "Bank of America"); JP Morgan Chase & Co; J.P. Morgan Bank, N.A.

---

[1] For UBS AG, the language is contained in ¶9 of Exhibit 1 to the UBS AG Plea Agreement. The first sentence states: "A fix order is an order to trade at a subsequently determined 'fix rate.'"

(hereafter "J.P. Morgan Chase"); HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North American Holdings; HSBC Holdings, PLC ("HSBC"), Citigroup, Inc., Citibank, N.A., Citicorp (hereafter "Citibank"); UBS AG, Barclays PLC and Royal Bank of Scotland and their co-conspirators due to their violations of Section 1 of the Sherman Act (15 U.S.C. § 1) arising from Defendants' illegal combination, agreement, and conspiracy to fix the price of foreign currency exchange rates and impose anti-competitive Trade Restraints. Jurisdiction of this Court is based on violations of the Sherman Act (15 U.S.C. § 1).

13.     This Court has subject matter jurisdiction under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1) and Title 28, United States Code, Sections 1331 and 1337.

14.     Venue is proper in this Judicial District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Title 28, United States Code, Section 139 l (b), (c), and (d), because a substantial part of the events giving rise to plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants has an agent, maintains an office or does business in this District.

15.     Defendants conduct business throughout the United States, including in this jurisdiction, and they have purposefully availed themselves of the laws of the United States, as well as the laws of the State of California.  Defendants' products and services are sold in the flow of interstate commerce, and defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

16.     Defendants' engaged in conduct in combination and conspiracy to fix foreign currency exchange rates  prices and impose Trade Restraints in the State of California that substantially affected interstate commerce throughout the United States.

17.     Defendants have availed themselves of the laws of the State of California relating to the production, marketing, and sale of  products and services.  Defendants produced, promoted, sold, marketed, and/or distributed  products and services in California and throughout

the 50 United States plus D.C., thereby purposefully profiting from access to plaintiffs and the class  in California and in each of the 50 United States plus D.C.  As a result of the activities described herein, Defendants:

       a.     Caused injury and  damage  to plaintiffs and the class in the Northern District of California and each of the 50 states plus the District  of Columbia by overt acts of combination, agreement, and conspiracy to fix the prices of foreign currency exchange rates and enforcement thereof and by adopting and ratifying  price-fixing agreements and Trade Restraints in California and enforcing price-fixing agreements and Trade Restraints from California;

       b.     Engaged in continuing courses of conduct within California and each of the 50 States plus D.C.  and/or derived substantial revenue in California from the marketing of  products and services from California used in each of the 50 United States plus D.C.; and

       c.     Committed acts or omissions in California that they knew or should have known would cause damage and that did, in fact, cause such damage, while regularly soliciting business from California in each State nationwide, engaging in continuing courses of conduct, and/or deriving substantial revenue from the marketing of  products and services in the 50 United States plus D.C. nationwide.

18.     The  New York and California-based conspiracy of Defendants has resulted in injury or damage to Plaintiffs and the members of the nationwide class in each of the 50 United States, plus D.C. who paid supracompetitiveforeign currency Benchmark exchange rates in the Benchmark exchange rates market inflated by the price-fixed foreign currencyBenchmark exchange rate scheme.

19.     Prices of foreign currency exchange rates nationwide and in the 50 United States, plus D.C., were raised to supra-competitive levels by the foreign currency Benchmark exchange rate price-fixing conspiracy among Defendants.  Defendants made price-fixing agreements and engaged in conduct to effect and implement their illegal conspiracy to fix foreign currency

Benchmark exchange rate prices.  Jurisdiction of this Court is based on the Sherman Act (15

U.S.C. § 1). Venue as to each defendant is proper in the Southern District of New York.  The

conspiracy to set, fix and establish foreign currency Benchmark exchange rates and impose

Trade Restraints was implemented in California and New York and the Defendants have

enforced their price-fixing conspiracy and Trade Restraints in California and New York and

Defendants are subject to the jurisdiction of this Court. The illegal conduct allegedly undertaken

has resulted in injury and damage to plaintiffs and the class within the States of California and

New York and throughout the United states, and the trade described herein is carried on in

interstate commerce.

## THE PLAINTIFFS

20.     Plaintiff, John Nypl, a California resident, has purchased foreign currency  from

Defendants and paid foreign currency Benchmark exchange rates  inflated by the foreign

currency Benchmark exchange rates in the Benchmark exchange rates market as a result of the

Benchmark exchange rate price-fixing conspiracy over many years.  Plaintiff  and others

similarly situated, has been injured in that he has paid more in bank foreign currency exchange

rates than he would have paid in the absence of Defendants' violations.

21.     Valarie Jolly, resident of the State of Texas and  Go Everywhere, Inc., a Texas

corporation, doing business as Riverside Travel , a resident of the State of Texas, have purchased

foreign currency  from Defendant Citibank and paid foreign currency Benchmark exchange rates

inflated by the foreign currency Benchmark exchange rates in the Benchmark exchange rates

market as a result of the Benchmark exchange rates  price-fixing conspiracy over many years.

Plaintiffs and others similarly situated, has been injured in that she has paid more in bank foreign

currency exchange rates than she would have paid in the absence of Defendants' violations.

22.     Lisa McCarthy is a resident of the State of Florida; MAD Travel, Inc. a.k.a.

Travel Leaders is a Florida Corporation, a Florida corporation have purchased foreign currency

from Defendant J.P. Morgan Chase and Chase Bank and paid foreign currency Benchmark

exchange rates in the Benchmark exchange rates market at prices inflated by the foreign

currencyBenchmark exchange rates in the Benchmark exchange rates market as a result of the Benchmark exchange rates  price-fixing conspiracy over many years.  Plaintiffs and others similarly situated, has been injured in that she has paid more in bank foreign currency exchange rates than she would have paid in the absence of Defendants' violations.

23.     William Rubinsohn doing business as Rubinsohn Travel, doing business in Jenkintown, Pennsylvania, has purchased foreign currency from Defendant Citibank and paid foreign currency Benchmark exchange rates in the Benchmark exchange rates market  inflated by the foreign currency Benchmark exchange ratesas a result of the Benchmark exchange rates price-fixing conspiracy over many years.  Plaintiff and others similarly situated, has been injured in that he has paid more in bank foreign currency exchange rates than he would have paid in the absence of Defendants' violations.

## PLAINTIFF CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action under Federal Rule of Civil Procedure Rule 23, on behalf of themselves and a class defined as follows:

> All consumers and businesses in the United States who directly purchased  supracompetitive foreign currency at Benchmark exchange rates from Defendants and their co-conspirators for their own end use at least since  January 1, 2007 to and including class certification, herein. Excluded from the class are Defendants, competitors of the Defendants who are in the FX Spot Market, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, federal and state government entities and agencies, cities, counties, and other municipalities, and any judge, justice or judicial officer presiding over this matter and members of their immediate family.

25.     The anticompetitive conduct of Defendants herein has imposed, and threatens to impose, a common antitrust injury on Plaintiffs and the Class members. The number of potential Plaintiff Class members is so numerous that joinder is impracticable.

26.     Plaintiffs, as representatives of the Plaintiff  Class will fairly and adequately protect the interests of the class members and have engaged counsel experienced and competent in litigation of this type.  The interests of plaintiffs are coincident with, and not antagonistic to, those of the class members.  " Class" as used herein means all consumers and businesses who

purchased  foreign currency for their own end use at price-fixed exchange rates resident in the 50 United States plus D.C. since January 1, 2007.

27.     The anticompetitive conduct of Defendants has been substantially uniform. Plaintiff's claims are typical of those to be asserted by the  Class. Except as to the amount of damages each member of the class has sustained, all other questions of law and fact are common to the class, including, but not limited to, the combination and conspiracy and acts of unfair competition hereinafter alleged, and the effects of such violation.

28.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members of the class. Among the questions of law and fact common to the class are the following:

a.     Whether Defendants illegally combined, agreed and conspired to set, fix and establish foreign currency Benchmark exchange rates in the Benchmark exchange rates market , which were imposed on Plaintiffs and the Class, thereby extracting supra-competitive foreign currency Benchmark exchange rates from them in the Benchmark exchange rates market.

b.     All questions of law and fact relating to Defendants are common to all members of the class especially since Defendants  have participated in a common combination, agreement and conspiracy to adopt, ratify, implement and enforce the payment of foreign currency Benchmark exchange rates by Plaintiffs and the class of consumers and business end-users in the Benchmark exchange rates market.

c.     Plaintiffs claims against Defendants are typical of the claims against, Defendants by class members.  The separate prosecution of individual class members would create risks of inconsistency or varying adjudications respecting the validity, scope, and enforceability of Defendants' foreign currency Benchmark exchange rates price-fixing conspiracy and would establish incompatible standards.

29.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, as joinder is impracticable.  Since the damages suffered by many Class

Members are small in relation to the expense and burden of individual litigation, it is highly impractical for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## THE DEFENDANTS

30.     Defendant J.P. Morgan Chase & Co. and Defendant J.P. Morgan Chase N.A. (hereafter "J.P. Morgan Chase") Delaware corporations with their principal place of business in New York, New York, doing business as Chase Bank, and their affiliates do business  in this judicial district, and do business in California and in interstate commerce.  J.P. Morgan Chase and its affiliates have had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

31.     Bank of America Corporation and its wholly owned subsidiary Defendant Bank of America NA (hereafter "Bank of America") are a Delaware Corporation that had their principal place of business in San Francisco, California during the development of its corporate practices including the implementation of price-fixed foreign currency exchange rates with the other Defendants.  Bank of America later relocated its principal place of business to Charlotte, North Carolina, and subsequently acquired Countrywide Bank and MBNA Bank, which significantly increased its capacity and power, and it is doing business and has done business in this judicial district, in California since it was founded in San Francisco, California by A. P. Giannini, and does business in interstate commerce. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

32.     Defendant HSBC Finance Corporation is a Delaware corporation with its principal place of business in Prospect Heights, Illinois.  It is a subsidiary of Defendant HSBC Bank USA, NA, a Delaware corporation with its principal place of business in Wilmington, Delaware, which is a subsidiary of Defendant HSBC North America Holdings, Inc. which is a subsidiary of defendant HSBC Holdings, PLC, a United Kingdom corporation with its principal place of business in London, England.  Each of these entities are collectively referred to as "HSBC."  It has had actual knowledge of, and has knowingly participated in the conspiracy

alleged in this Complaint.

33.     Citigroup, Inc. and Citicorp are Delaware Corporations whose principal place of business is New York, New York.  Citigroup and its affiliates, including its wholly owned subsidiary Citibank N.A. (hereafter "Citibank") do business in this judicial district and in California and in interstate commerce. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

34.     Barclays PLC is a United Kingdom corporation with principal offices in London, England and does business in this judicial district through its affiliate BARCLAYS CAPITAL, INC. and in California and in interstate commerce. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

35.     Royal Bank of Scotland PLC and Royal Bank of Scotland Group PLC are United Kingdom corporations doing business in this judicial district and California and does business in interstate commerce.  RBS Securities, Inc. is a Delaware corporation headquartered at 600 Washington Blvd., Stamford, Conn.  It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

36.     UBS, AG is a Swiss corporation doing business in this judicial district and Connecticut and does business in interstate commerce. It has had actual knowledge of, and has knowingly participated in the conspiracy alleged in this Complaint.

37.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators in the violations alleged and have performed acts in furtherance of the conspiracies.  Plaintiffs may seek leave to amend this complaint to add the co-conspirators, known and unknown as Defendants.

38.     **Plaintiffs Participated In The FX Benchmark Exchange Rates Market That Was Price-Fixed And Rigged By Defendants**

39.     Since at least January 1, 2007, Defendants have entered into a combination and conspiracy to fix, manipulate and rig the Benchmark exchange rates or "Fix" rates in the Benchmark exchange rates  market. The U.S. Department of Justice  entered into Plea

Agreements regarding manipulation of the FX Benchmark exchange rates market by Defendants, The Royal Bank of Scotland PLC, UBS AG, JP Morgan Chase & Co. Barclays  PLC,  Citicorp, and a Deferred Prosecution Agreement with HSBC USA, N.A. and HSBC Holdings, PLC.

40.     Plaintiffs and the consumer and business end-user class(hereafter "Plaintiffs") purchased price-fixed foreign currency from Defendants at the FX Benchmark exchange rates derived from FX spot trading plus a small commission.  Defendants sold foreign currency to Plaintiffs and the putative consumer and end-user business class at supracompetitive Benchmark exchange rates, derived from trading in the FX spot market, plus a small handling fee.

41.     The foreign currency exchange rates paid by Plaintiffs and the putative class of consumers and business end-users are the FX Benchmark exchange rates or "Fix Rates" that are derived daily from FX spot trading, plus a small handling fee. Since the foreign currency exchange rates paid by Plaintiffs and the consumer and business end-user class  are the FX Benchmark exchange rates or "Fix Rates" that are derived daily from FX spot trading, the Benchmark exchange rates or "Fix Rates" directly impact the Benchmark exchange rates paid by Plaintiffs and the class. There is a mechanical, direct correlation between the supracompetitive FX Benchmark exchange rates Defendants manipulated and the supracompetitive Benchmark exchange rates, plus a small handling fee that Defendants charged Plaintiffs and the Class in their purchases of price-fixed foreign currency from Defendants. The FX Benchmark rates manipulated by Defendants move virtually in tandem with the exchange rates Defendants charged Plaintiffs, which flowed directly from Defendants manipulation of the FX Benchmark exchange rates or "Fix Rates." Defendants each utilize computer programs that regularly, at least daily, transmit updated Benchmark exchange rates derived from FX spot trading plus a small fee for handling to each of their bank branches for retail sales of foreign currency to Plaintiffs and consumers and business end-users.

42.     When FX Benchmark exchange rates go up or down, retail foreign currency exchange rates paid by consumers and business end-users go up or down in tandem.  And when FX Benchmark exchange rates due to price-fixing go up,Benchmark exchange rates plus a small

handling fee charged to Plaintiffs and the consumer and business end-users go up in tandem.

43.     In addition to describing manipulation of the FX Spot Market in ¶¶4(e) and 4(f) of

the almost identical Plea Agreements, ¶4(f) of the Plea Agreements describes the manipulation of

the Benchmark exchange rates market or "fix rates" market  as follows:

44.     A dealer may also take and execute orders from customers such as "fix orders," which  are orders to trade at a subsequently determined "fix rate."

45.     When a dealer accepts a fix order from a customer, the dealer agrees to fill the order at a rate to be determined at a subsequent fix time based on trading in the interdealer market.  Two such "fixes" used to determine a fix rate are the European Central Bank fix, which occurs each trading day at 2:15 PM (CET) and the World Markets/Reuters fix, which occurs each trading day at 4:00 PM (GMT).[2]

46.      Attached hereto as Exhibits A-1 through A-6 are the Plea Agreements in *United States v. JP Morgan Chase & Co.* , D. Conn. No. 3:15 Cr 79 (SRU) ( Exhibit A-1); *United States v. Citicorp,* D. Conn No. 3:15 Cr 78 (SRU) (Exhibit A-2); *United States v. Barclays PLC*, D. Conn No. 3:15 Cr 77 (Exhibit A-3); *United States v. The Royal Bank of Scotland PLC*, D. Conn No. 3:15 Cr 80 (SRW) (Exhibit A-4); *United States v.UBS AG*, D. Conn No. 3:15 Cr 76 (SRW)(Exhibit A-5),and the Deferred Prosecution Agreement in *United States v. HSBC Bank, N.A.; HSBC Holdings PLC* Cr. No. 12-763 (2012 E.D.N.Y.) ( Exhibit A-6).

47.     The Commodity Trading Futures Commission ("CTFC") entered Orders

regarding manipulation of the FX Benchmark exchange rates by Defendants HSBC Bank plc ,

The Royal Bank of Scotland, plc, UBS AG, JP Morgan Chase Bank, N.A., Citibank, N.A. and

Barclays Bank PLC in the following identical language in each Order, and in doing so described

the FX Benchmark exchange rates as "used to establish the relative values of the different

currencies and reflect the rates at which one currency is exchanged for another currency" as

follows:

48.     "One of the primary FX Benchmark rates that the FX traders attempted to manipulate was the World Markets/Reuters Closing Spot Rates ("WM/R Rates"). The WM/R Rates are used to establish the relative values of different currencies, and reflect the rates at which one currency is exchanged for another currency." (at p.2 ¶2).

49.     Attached hereto as Exhibits B-1 through B-6 are the  CFTC Orders  *In the Matter of Citibank, N.A.*,CFTC Docket No. 15-03, Order Instituting Proceeding Pursuant to Sections

---

[2] For UBS AG, the language is contained in ¶9 of Exhibit 1 to the UBS AG Plea Agreement.  The first sentence states: "A fix order is an order to trade at a subsequently determined 'fix rate.'"

6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at p.2 (Nov. 11, 2014)(Exhibit B-1); *In the Matter of HSBC Bank* CFTC Dkt. No. 15-07 at p.2 (Nov. 11, 2014 (Exhibit B-2); *In the Matter of The Royal Bank of Scotland, plc,* CFTC Dkt. No. 15-05 at p.2 (Nov. 11, 2014)(exhibit B-3); *In the Matter of UBS AG,* CFTC Dkt. No. 15-06 at p.2 (Nov. 11, 2014. (Exhibit B-4); *In the Matter of JP Morgan Chase Bank, N.A.*, CFTC Dkt. No. 15-04 at p.2 (Nov. 11, 2014)(Exhibit B-5); *In the Matter of Barclays Bank PLC,* CFTC Dkt. No. 15-24 ( May 20, 2015). (Exhibit B-6).

50.     The CFTC's finding that FX Benchmark exchange rates are "used to establish the relative values of the different currencies and reflect the rates at which one currency is exchanged for another currency" defines the Benchmark exchange rates market and supports Plaintiff's allegation herein  that Defendants sold foreign currency to Plaintiffs and the putative consumer and end-user business class at supracompetitive Benchmark exchange rates, derived from trading in the FX spot market, plus a small handling fee.  As purchasers of foreign currency from Defendants at Benchmark exchange rates manipulated and price-fixed by Defendants in the Benchmark exchange rates market,  Plaintiffs and the consumer and business end-user putative class of consumers and business end-users participate in the FX Benchmark exchange rates market that was rigged by Defendants.

51.     The Board of Governors of the Federal Reserve System ("Fed") also  entered Orders regarding manipulation of the FX Benchmark exchange rates market by Defendants, The Royal Bank of Scotland PLC, UBS AG, JP Morgan Chase Bank, N.A., Barclays Bank PLC, CITIGROUP INC., and Bank of America Corporation in the following identical language in each Order, as follows:

52.     WHEREAS, the FX Benchmarks published by the World Markets Company plc/Reuters ("WM/R"), the European Central Bank ("ECB"), and other reference rate providers *affect the prices of certain currency transactions in the United States* and international financial markets. These reference rates are set using different methodologies and, in the case of the reference rates published by WM/R and ECB, can  be affected by FX trading at or around the time the Benchmark is calculated." (Orders at p.1 ¶3).  (Emphasis added).

53.     Attached hereto as Exhibits C-1 through C-6 are the Fed Orders in  *In the Matter of CITIGROUP INC., Fed Docket No. 15-008-B-HC, Order To Cease And Desist ETC. at p.2 (May 20, 2015)(Exhibit  C-1); In the Matter of Bank of America Corporation,* Fed Dkt. No. 15-010-B-HC at p.2 (May 20, 2015)(Exhibit C-2); *In the Matter of The Royal Bank of Scotland, PLC,* Fed Dkt. No. 15-007-B-FBat p.2

(May 20, 2015)(Exhibit C-3); *In the Matter of UBS AG,* Fed Dkt. No. 15-005-B-FB at p.2 (May20,2015)( Exhibit C-4); *In the Matter of JP Morgan Chase &Co.*, Fed Dkt. No. 15-009-B-HC at p.2 (May 20, 2015)(Exhibit C-5); *In the Matter of Barclays Bank PLC,* Fed Dkt. No. 15-006-B-FB p.2( May 20, 2015)(Exhibit C-6).

54.     The Fed's language that "the FX Benchmarks...affect the prices of certain FX currency transactions in the United States." lends plausability  to the allegations herein that Plaintiffs and the consumer and business end-user putative class  purchased foreign currency from Defendants at Benchmark exchange rates, and that  Plaintiffs and the consumer and business end-user putative class participate in the FX Benchmark exchange rates market that was rigged by Defendants.

55.     The U.S. Comptroller of the Currency also entered Consent Orders For A Civil Money Penalty  in *In the Matter of Citibank, N.A.*(Exhibit D-1)*,* No. AA-EC-14-101; *In the Matter of JP Morgan Chase Bank, N.A.* No. AA-EC-14-100 (Exhibit D-2); and *In the Matter of Bank of America*, No. AA-EC-14-99 (Exhibit D-3), Standardized Article I (3)-(5) at p. 2 ¶3 through p.3 ¶2. of which further describe the Benchmark exchange rates market as follows:

> (3)  WM/Reuters ("WM/R") publishes a series of hourly intraday spot rates ("Benchmarks" or "fixes") for certain currency pairs, including a "closing" rate at end of the trading day in London at 4:00 p.m. London Time, for certain currency pairs, WM/R calculates the published rate using the trading activity on a particular electronic trading platform during a one minute window ("fixing window") thirty seconds before and thirty seconds after the end of each hour. (4)The European Central Bank ("ECB") also establishes reference rates for various currency pairs generally at 2:15 Central European Time.
>
> (5) *Rates established at these fixes are used* by global financial participantsto execute trades and *by others* such as corporations, asset managers, and pension funds to value their portfolios and *transact at a published Benchmark rate.*(Emphasis supplied).

56.     Together the Plea Agreements and CFTC, Fed and Comptroller of the Currency Orders describe the Benchmark exchange rates market in which Plaintiff´s participate as follows: "Two such "fixes" used to determine a fix rate are the European Central Bank fix, which occurs each trading day at 2:15 PM (CET) and the World Markets/Reuters fix, which occurs each trading day at 4:00PM (GMT)." (Plea Agreements ¶4(f)). The World Markets/Reuters fix is a

primary Benchmark exchange rate in the Benchmark exchange rate market, which "is used to establish the relative values of the different currencies and reflect the rates at which one currency is exchanged for another currency," (CFTC Orders at p.2 ¶2) and "the FX Benchmarks...affect the prices of certain FX currency transactions in the United States..." (Fed Orders at p.1 ¶3), and *Rates established at these fixes* are used *by others...to transact at a published Bench mark rate.*(Comptroller of the Currency Orders Article I (3)-(5) at p. 2 ¶3 through p.3¶2). Thus, the FX Benchmark exchange rate market includes currency exchanges at the published Benchmark rate, including currency purchases by Plaintiffs and the putative class of consumers and business end-users, who participate in the Benchmark exchange rate market.

57.   **Plaintiffs and the Putative Consumer And Business End-User Class Participated In The Price-Fixed Manipulated Benchmark Exchange Rates Market Since They Purchased Foreign Currency From Defendants At The Rigged Benchmark Exchange Rates Plus A Small Commission**

58.   Defendants sold foreign currency to Plaintiffs and the consumers and business end-users price-fixed at the Benchmark exchange rates that derived from price-fixed FX spot trading, which are published daily in the Wall Street Journal in its Business & Finance section under "CURRENCIES- U.S.-dollar foreign-exchange rates in late New York trading." Since Defendants sold foreign currency to consumers and business end-users at the price-fixed Benchmark exchange rates derived from trading in the FX spot market, Defendants sold foreign currency to consumers and business end-users in the rigged Benchmark exchange rates market.

59.   **The Allegations That Plaintiffs And The Putative Class Of Consumers And Business End-Users Participated In The Rigged Benchmark Exchange Rate Market Are Plausibly Supported By *Nypl* Counsel's Investigation That Shows That Defendants Sell Foreign Currency To Consumers And Business End-Users At Benchmark Exchange Rates Published In The Wall Street Journal Plus A Small Handling Fee**

60.   The allegations that Plaintiffs and the putative class of consumers and business end-users participated in the rigged Benchmark exchange rate market is plausibly supported by *Nypl* counsel's investigation that shows that Defendants sell foreign currency to consumers and

business end-users at Benchmark exchange rates plus a small handling fee.  In preparation of the TAC, *Nypl* counsel recently conducted an investigation of the exchange rates at which Defendants sell foreign currency to consumers and end-users by purchasing foreign currency from three Defendant banks, JP Morgan Chase Bank, N.A., Citibank, N.A. and Bank of America, N.A.  *Nypl* counsel's  investigation supports the allegation in the TAC that Defendants sell foreign currency to consumers and business end-users at  Benchmark exchange rates or "Fixes", derived from trades in the FX spot market, which are  published daily in the Wall Street Journal[3], plus a small fee for handling.

61.     At all times herein  Benchmark exchange rates were and are published daily in the Wall Street Journal in its Business & Finance section under "CURRENCIES- U.S.-dollar foreign-exchange rates in late New York trading." As shown in the following table of purchases of euros in *Nypl* counsel's investigation, actual euro-dollar  exchange rates offered by Bank of America, Citibank, and JP Morgan Chase during the period March 28, 2017 to April 13, 2017 were the Benchmark exchange rates published in the Wall Street Journal ("WSJ"), on the following day,  plus a small handling fee of $0.0744, or 6.98%, on average.  When FX Benchmark exchange rates go up, retail  foreign currency exchange rates paid by consumers and business end-users go up  in tandem, as the chart below shows. And when the price goes up for FX Benchmark exchange rates due to  price-fixing, foreign currency exchange rates   for consumer and business end-user go up in tandem.

---

[3] The New York Times also publishes the U.S. dollar foreign exchange rates from trading   in its Business section under "Market Gauges" under "Foreign Exchange."

| Date | Bank | Benchmark Exchange Rate (WSJ)[4] | | Handling Fee ($) | | Bank Rate[5] | Handling Fee (%) |
|---|---|---|---|---|---|---|---|
| 3/28/2017 | JPM Chase | 1.0814 | + | 0.0803 | = | 1.1617 | 7.43% |
| 3/30/2017 | JPM Chase | 1.0675 | + | 0.0814 | = | 1.1489 | 7.63% |
| 3/31/2017 | JPM Chase | 1.0656 | + | 0.0819 | = | 1.1475 | 7.69% |
| 4/4/2017 | JPM Chase | 1.0675 | + | 0.0777 | = | 1.1452 | 7.28% |
| 4/5/2017 | JPM Chase | 1.0665 | + | 0.0770 | = | 1.1435 | 7.22% |
| 4/6/2017 | Citi | 1.0645 | + | 0.0695 | = | 1.1340 | 6.53% |
| 4/6/2017 | BofA | 1.0645 | + | 0.0592 | = | 1.1237 | 5.56% |
| 4/7/2017 | Citi | 1.0591 | + | 0.0710 | = | 1.1301 | 6.70% |
| 4/7/2017 | BofA | 1.0591 | + | 0.0638 | = | 1.1229 | 6.03% |
| 4/10/2017 | JPM Chase | 1.0596 | + | 0.0795 | = | 1.1391 | 7.50% |
| 4/12/2017 | JPM Chase | 1.0668 | + | 0.0719 | = | 1.1387 | 6.74% |
| 4/13/2017 | JPM Chase | 1.0615 | + | 0.0790 | = | 1.1405 | 7.44% |
| **Average** | | | | **0.0744** | | | **6.98%** |

[4] The Benchmark Exchange Rates set forth on this chart are the Benchmark exchange rates listed in the Wall Street Journal daily for the preceding day.  For example, since the dates set forth in the chart above are the dates of purchase of euros such as April 5, 2017, the  Benchmark exchange rate for Wednesday April 5, 2017 appears in the Wall Street Journal dated Thursday April 6, 2017. under the reference "--Wed.--". Copies of the Wall Street Journal containing the above Benchmark Exchange Rates are attached hereto as Exhibit E-1 through E-4.
[5] The bank rates charged by JP Morgan Chase Bank, N.A., Citibank, N.A. and Bank of America, N.A. in *Nypl* counsel's investigation set forth on the this chart are supported by the bank rates set forth on  the receipts for purchases of euros, attached hereto as Exhibits E-1 through E-4 and incorporated by reference.

62.     Copies of the  detailed  bank receipts for the above purchases of euros from JP
Morgan Chase Bank, N.A. Market & Kearny Branch, San Francisco, CA the Citibank, N.A.
branch at 590 Market St., San Francisco, CA and the Bank of America branch at 50 California
St. San Francisco, CA, which are also graphed  below are attached hereto as Exhibits E-1
through  E-4. Copies of the Wall Street Journal  "Benchmark Exchange Rates (WSJ) published
in the Wall Street Journal the day after each purchase are attached hereto as Exhibits E-1 through
E-4.

63.     As shown in the following graph, the exchange rates charged to *Nypl* counsel in
his investigation  by JP Morgan Chase Bank, N.A., Citibank, N.A. and Bank of America N.A.
exhibited a statistically significant linear relationship with the Benchmark exchange rates
published in the Wall Street Journal in that they increased and decreased in tandem, lending
plausability to the allegation herein that the exchange rates charged to Plaintiffs and the putative
class of consumers and business end-users by Defendants for foreign currency purchases in the
Benchmark exchange rates market increased and decreased in tandem with changes in the
Benchmark exchange rates.

### *Nypl* Counsel's Recent Investigation And His Expert's  Regression Analysis   And Opinion That The ECB Fix Rate Is Strongly Correlated To And Would Have A Direct Impact On Retail Exchange Rates For Consumers And  Business End-UsersSupport The  Allegations In The TAC

64.     By way of confirmation of the correlation between the Benchmark exchange rates
or "Fix" Rate in the foreign exchange spot market, *Nypl* counsel engaged Carl S. Saba, MBA,
CVA to perform an analysis to determine whether the spot market fix rates have any relationship
to the rates charged to retail consumers and businesses ("End-users").  Attached hereto as
Exhibit F is a true and correct copy of the Declaration of Carl S. Saba.  Mr. Saba "compared the
European Central Bank spot market fix rate ("ECB Fix Rate") to the exchange rates offered *Nypl*
counsel  by JP Morgan Chase in the above purchases (Saba Decl. ¶¶1-4) and then applied a
simple linear regression to the two rates and determined that  the ECB Fix rate is closely

correlated to the exchange rates offered *Nypl* counsel. (Saba Decl. ¶¶5-10) as shown in the following chart:

| Financial Institution | Date | ECB Fix Spot Rate | End User Bank Rate | Regression Predicted End User Bank Rate | % Difference Between Actual and Regression Predicted End User Rate |
|---|---|---|---|---|---|
| JPM Chase | 3/28/2017 | 1.0859 | 1.1617 | 1.1606 | 0.0950% |
| JPM Chase | 3/30/2017 | 1.0737 | 1.1489 | 1.1505 | -0.1373% |
| JPM Chase | 3/31/2017 | 1.0691 | 1.1475 | 1.1467 | 0.0729% |
| JPM Chase | 4/4/2017 | 1.0651 | 1.1452 | 1.1433 | 0.1621% |
| JPM Chase | 4/5/2017 | 1.0678 | 1.1435 | 1.1456 | -0.1821% |
| JPM Chase | 4/10/2017 | 1.0578 | 1.1391 | 1.1373 | 0.1590% |
| JPM Chase | 4/12/2017 | 1.0605 | 1.1387 | 1.1395 | -0.0729% |
| JPM Chase | 4/13/2017 | 1.0630 | 1.1405 | 1.1416 | -0.0968% |

From his analysis,  Mr. Saba concluded:

> My review of the limited data provided to me indicates that the ECB Fix Rate on the foreign exchange spot market appears to be strongly correlated with and an accurate predictor of the End-user rates charged by JP Morgan Chase to Counsel. The ECB Fix Rate and the End-user rate appear to move in tandem up and down, in a formulaic manner as predicted by the regression equation. To the extent that Defendants manipulated the European Central Bank fix rate for the EUR / USD pair on the spot market, it is plausible that this would have a direct impact on the exchange rate for the same currency pair charged to retail consumers and businesses by Defendants. (Saba Decl. ¶11; Exhibit F hereto).

As Mr. Saba concluded , as shown in the following graph, the end-user  rates charged by JPMorgan Chase & Co.  exhibited a statistically significant arithmetic and mechanical correlation and linear relationship with FX Benchmark exchange rates, increasing and decreasing in tandem with daily changes in the FX Benchmark exchange rates.



65.     Defendants utilize computer programs that regularly, at least daily, transmit updated Benchmark exchange rates derived from trading plus a small fee for handling to each of their bank branches for retail sales of foreign currency to consumers and business end-users such as Plaintiffs. When *Nypl* counsel made retail purchases of foreign currency in euros at JP Morgan Chase Bank, N. A., Citibank and Bank of America as set forth above, there were special computer screens for the tellers with the programs that enable the nationwide branches of Defendants regularly, at least daily, to receive updated Benchmark exchange rates derived from FX spot trades, plus a small fee for handling, for retail sales of foreign currency to Plaintiffs and consumers and business end-users.

66.     The end-users' overcharge damages from purchases of foreign currency from Defendants at the Benchmark exchange rates are not speculative because they are specifically ascertainable from Defendants' detailed bank records and receipts for retail sales of foreign currency, as exemplified by the detailed bank receipts for euro purchases attached hereto as Exhibits E-1 through E-4. And the overcharge can be readily measured by comparing the actual Benchmark exchange rates against the 'but for' Benchmark exchange rates.

67.     The end-users' damages from purchases of foreign currency from Defendants are not duplicative because the consumers and business end-users' foreign currency purchase transactions are separate and segregated apart from the traders' FX spot purchases as shown in the bank receipts for euro purchases attached hereto as Exhibits E-1 through E-4 and because the end-users' damages from purchases of foreign currency were not included in the FX settlements. (Hausfeld Decl. ¶4, ¶7 *Nypl* ECF No. 101-1, Exhibit G hereto).   The Plea Agreements deferred restitution for the instant civil cause of action and avoided duplication of damages by providing in ¶9(b) of the Plea Agreements: "In light of the availability of civil causes of action, which potentially provide for a recovery of a multiple  of actual damages, the Recommended Sentence does not include a restitution order  for the offenses charged in the information,"

68.     No Defendant or co-conspirator has made any affirmative withdrawal from the conspiracy, combination and agreement to fix and rig foreign currency exchange rates of U.S. dollars for foreign currency and foreign currency for U.S. dollars. ("foreign currency exchange rates") resulting in supracompetititve foreign currency exchange rate overcharges imposed on and paid by plaintiffs and the class to Defendants and their co-conspirators.

69.      The  Exhibits hereto are true and correct copies of the original documents and are incorporated herein by reference.

70.     In furtherance of the conspiracy, Defendants have engaged in the conspiracy to fix foreign currency exchange rates and engaged in various anticompetitive acts, including Trade Restraints within the State of California that are related to plaintiffs' injuries. *AT & T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106 (9th Cir. 2013); *United States v. Visa U.S.A., Inc., et al.*, 163 F.Supp.2d 322 at pp. 384-387 *aff'd* 344 F.3d 229 at 240 (2nd Cir. 2003); *cert. den'd.*160 L.Ed.2d 14.

71.     By engaging in their combination, agreement and conspiracy to fix foreign currency exchange rates and committing other anticompetitive acts in California,  Defendants engaged in a California-based horizontal scheme to fix  and obtain inflated foreign currency exchange rates, exclude competition  and impose Trade Restraints in California.

**PURPOSE AND EFFECT**

72.     The purpose of the agreement among and between Defendants is to extract

inflated foreign currency exchange rates from Plaintiffs and the class.  Defendants know and

understand that the prices charged for foreign currency exchange rates, in the United States,

including California, are excessive and they would not be able to charge such high non-

competitive fees were it not for the illegal agreement, combination and conspiracy between and

among themselves to set, fix and establish and maintain the higher foreign currency exchange

rate prices charged.

73.     The combination, agreement and conspiracy is aimed at restraining competition,

from competing with the price-fixed foreign currency exchange rate, and in fact harms

competition by:

  a.  Causing increased prices for foreign currency exchange rates;

  b.  Denying consumers information about the relative costs of Defendants'

foreign currency exchange rates compared to other exchange rates that would cause more

consumers to choose lower cost payment methods;

  c.  Harming the competitive process and disrupting the proper functioning of

the price-setting mechanism of a free market;

  d.  Stifling innovation in foreign currency exchange rate offerings that would

emerge if competitors were forced to compete for business;

  e.  Restraining banks from competing and offering lower prices;

  f.  Insulating each Defendant from competition from competitors;

  g.  Causing increased prices for foreign currency exchange rates paid by

Plaintiffs and the class.

**FRAUDULENT CONCEALMENT**

74.     Until shortly before the filing of this complaint, Plaintiffs and members of the

Plaintiff Class had no knowledge that Defendants were violating the antitrust laws as alleged

herein.  Plaintiffs and the members of the class could not have discovered any other violations at

any time prior to this date by the exercise of due diligence because of fraudulent and active concealment of the conspiracy by Defendants.

75.     The affirmative actions of Defendants hereinbefore alleged were wrongfully concealed and carried out in a manner which precluded detection.  Plaintiffs had no knowledge of the antitrust violations herein alleged or any facts that might have led to their discovery. Plaintiffs could not have uncovered the violations alleged herein at an earlier date inasmuch as the means for discovering their causes of action were not reasonably ascertainable due to the fraudulent concealment of activities through various means and methods designed to avoid detection.  Defendants secretly conducted activities in furtherance of the conspiracy and attempted to confine information concerning the conspiracy to key officials and engaged in conduct giving rise to an estoppel to assert the statute of limitations.

## DAMAGES

76.     During the period of time covered by the antitrust violations by Defendants, Plaintiffs and each member of the class paid supracompetitive price-fixed foreign currency exchange rates to Defendants.

77.     By reason of the antitrust violations herein alleged, Plaintiffs and each member of the Plaintiff Class paid more than they would have paid in the absence of such antitrust violations.  As a result, Plaintiff and each member of the class have been injured and damaged in an amount presently undetermined.

78.     As a result Plaintiffs  and all other Class members similarly situated, in the 50 states of the United States have been injured by being forced to pay higher foreign currency exchange rates than they would have paid in the absence of the price-fixing conspiracy alleged herein.

79.     Plaintiffs and the Class are entitled to damages, treble damages, attorneys' fees and costs and an injunction against defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS ALLEGED

## FIRST CLAIM FOR RELIEF

### (Price-Fixing, Per Se Violation of Section 1 of the Sherman Act)

80.     Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

81.     Beginning at a time currently unknown to plaintiffs, but at least as early as January 1, 2007, and continuing through class certification, the exact dates being unknown to plaintiffs, Defendants entered into a continuing combination, agreement, and conspiracy in restraint of trade artificially to set, fix, rig and establish, raise, stabilize, and peg prices for foreign currency exchange rates in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

82.     By engaging in their combination, agreement and conspiracy to fix foreign currency exchange rates and committing other anticompetitive acts in the United States including California, Defendants engaged in a California-based horizontal conspiracy and scheme to fix and obtain inflated foreign currency exchange rates, exclude competition and impose Trade Restraints in interstate commerce.  Defendants did those things that they combined, agreed and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

> a.     Setting, fixing and establishing, raising, stabilizing, rigging and pegging the prices of foreign currency exchange rates;

> b.     Imposing Trade Restraints to Protect their Combination, Agreement and Conspiracy to fix the prices of foreign currency exchange rates;

> c.     Allocating market share among themselves and collusively excluding competition.

83.     The combination and conspiracy alleged herein has had the following effects, among others:

> a.     Benchmark exchange rates in the benchmark exchange rates market have

been set, fixed and established, raised, rigged, maintained and stabilized at artificially high, non-competitive levels throughout the 50 United States by Defendants;

b.     Price competition in the 50 United States plus D.C. has been restrained, suppressed, and/or eliminated with respect to benchmark exchange rates;

c.     Prices for benchmark exchange rates have been set, fixed and established, raised, rigged, maintained and stabilized at artificially high, non-competitive levels throughout the United States by Defendants; and

d.     Plaintiffs and the class have been deprived of the benefits of free and open competition in the benchmark exchange rate market in which they participate by Defendants.

84.     Plaintiffs and other Class members have been injured and will continue to be injured in their businesses and property by paying higher benchmark exchange rates in the benchmark exchange rates market than they would have paid and will pay in the absence of the combination and conspiracy.

85.     Plaintiffs and the Class are entitled to damages, treble damages, attorneys' fees and costs, and an injunction against defendants, preventing and restraining the combination and conspiracy.

86.     As a result Plaintiffs and all other Class members similarly situated, in the 50 states of the United States have been injured by being forced to pay higher foreign currency exchange rates than they would have paid in the absence of the price-fixing conspiracy alleged herein.

87.     Plaintiffs and the Class are entitled to damages, treble damages, attorneys' fees and costs and an injunction against defendants, preventing and restraining the violations alleged herein.

///

///

///

## SECOND CLAIM FOR RELIEF

### (California Cartwright Act)

### (Trust To Set, Fix and Establish Prices And Restrain Trade)

88.     Plaintiffs incorporate and re-allege all paragraphs in this Complaint, as though fully set forth below.

89.     Plaintiffs allege this Claim on behalf of themselves and the class of all others similarly situated.

90.     Beginning at least as early as 2007 and continuing up to and including the date of the filing of this Complaint, Defendants continuously combined, conspired, and agreed among themselves and others, and are members of, acted with or in pursuance of, or aided or assisted in carrying out a combination of acts with the purpose and effect to create or carry out restriction of commerce and restraints of trade by agreeing to fix high non-competitive, supracompetitive Benchmark exchange rates  for foreign currency, which inflated Benchmark exchange rates, were  imposed on Plaintiffs and the Class  in the 50 States of  the United States plus D.C..

91.     Defendants, acting by and through their Co-conspirators, engaged in a California-based horizontal scheme to fix and obtain foreign currency exchange rates paid by Plaintiffs and the Class to exclude competition  from offering competitive foreign currency exchange rates and impose Trade Restraints  in California to protect the conspiracy to fix foreign Benchmark exchange rates, subjected  themselves to California law, including the California Cartwright Act and the California Unfair Competition Law.

92.     In furtherance of the aforesaid combination and conspiracy, Defendants have taken action in concert to enforce the maintenance of higher non-competitive Benchmark exchange rates in their sales of foreign currency to Plaintiffs and the Class in the United States, by, inter alia, agreeing to maintain high artificial Benchmark  exchange rates in the United States and by taking collective action to stop potential erosion of the high non-competitive fees.

93.     Said combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants to maintain the high supra-competitive

prices of foreign currency Benchmark exchange rates imposed on Plaintiffs and the Class.

94.     Defendants participated in overt acts in furtherance of the conspiracy alleged and have participated in conspiratorial activities and attended conspiratorial meetings and price-fixing and bid rigging on a frequent and regular basis. These anti-competitive agreements were forged and implemented by personal  communications and meetings among and between Defendants.

95.     The specific conduct of Defendants as alleged in this Complaint violates Section 16700 et seq., 16720 et seq. of the California Business and Professions Code.

96.     As a result Plaintiffs and all other Class members similarly situated, in the 50 states of the United States have been injured by being forced to pay higher foreign currency exchange rates than they would have paid in the absence of the price-fixing conspiracy alleged herein.

97.     Plaintiffs and the Class are entitled to damages, treble damages, attorneys' fees and costs and an injunction against defendants, preventing and restraining the violations alleged herein.

### THIRD CLAIM FOR RELIEF

### (California Unfair Competition Act Calif. Bus. & Prof. C. sec. 17200 et seq.)

98.     Plaintiff John Nypl  re-alleges each and every one of the allegations   above.

99.     Plaintiff John Nypl  brings this action under Federal Rule of Civil Procedure Rule 23, on behalf of himself and a California class defined as follows:

> All consumers and businesses in the State of California  who directly purchased  supracompetitive foreign currency at Benchmark exchange rates from Defendants and their co-conspirators for their own end use at least since  January 1, 2007 to and including class certification, herein. Excluded from the class are Defendants, competitors of the Defendants who are in the FX Spot Market, any co-conspirators of Defendants, Defendants' predecessors, successors, parent, subsidiaries, affiliates, officers and directors, federal and state government entities and agencies, cities, counties, and other municipalities, and any judge, justice or judicial officer presiding over this matter and members of their immediate family.

///

100.     Said conduct of Defendants constitutes acts of unfair competition and violations of law and fraudulent conduct under the California Unfair Competition Act Bus. & Prof. C. sec. 17200 et seq.  and  Plaintiff John Nypl and the following class of California end-users have suffered injury in fact and have lost money and property as the result of such unfair competition:

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand:

A.     That the Court determines that this action may be maintained as a class action pursuant to the Federal Rules of Civil Procedure Rule 23;

B.     With respect to the First and Second Claims:

a.     that the alleged combination and conspiracy among Defendants be adjudged and decreed to be an illegal combination and trust, and an unreasonable restraint of trade in violation of the Sherman Act sections 1 and 2, and California Business & Professions Code § 16700 et seq., 16720 et seq., §16727 et seq.;

b.     that judgment be entered against Defendants and in favor of Plaintiffs and each member of the class they represent for injunctive relief;

c.     that judgment be entered against Defendants and in favor of Plaintiffs and each member of the class they represent for threefold the damages determined to have been sustained by them;

d.     that Defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, and adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

e.     that Plaintiffs be awarded reasonable attorneys' fees and costs.

D.     That Plaintiffs and members of the class be allowed to recover pre-judgment and

Post-judgment interest on the above sums at the highest rate allowed by law; and

   E.  With respect to the Third Claim that Plaintiff John Nypl and the California class of end users be awarded restitution, injunctive relief and attorneys fees and costs.

   F.  That the Court order such other and further relief as may appear necessary and appropriate.

Dated:  August 8, 2017

ALIOTO LAW FIRM

By: *s/ Joseph M. Alioto*
Joseph M. Alioto, Esq. (SBN 42680)
Theresa D. Moore, Esq. (SBN 99978)
Jamie Miller, Esq. (SBN 271452)
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:  (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmiller@aliotolaw.com
Email:  tmoore@aliotolaw.com

***Attorneys for Plaintiffs***
***And All Others Similarly Situated***

LAW OFFICES OF LINGEL H. WINTERS
A Professional Corporation

By:  *s/ Lingel H. Winters*
Lingel H. Winters, Esq. (State Bar No. 37759)
388 Market St. Suite 900
San Francisco, California 94111
Tel:  (415) 398-2941
Fax:  (415) 393-9887
Email:  sawmill2@aol.com

***Attorneys for Plaintiffs***
***And All Others Similarly Situated***