**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------- x
JOHN NYPL, *et al.*,                                         :
                                                            :
                              *Plaintiffs*,        :     No. 15 Civ. 9300 (LGS)
                                                            :
                                                            :     [related to No. 13 Civ. 7789 (LGS)]
v.                                                          :
                                                            :     ORAL ARGUMENT REQUESTED
JPMORGAN                                                    :
CHASE & CO., *et al.*,                                      :
                                                            :
                              *Defendants*.        :
---------------------------------------------------- x


**FOREIGN DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION**
**TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ......................................................................................................... 5

LEGAL STANDARD ................................................................................................. 9

ARGUMENT ............................................................................................................. 10

I.      GENERAL PERSONAL JURISDICTION IS LACKING IN THIS
        FORUM. ......................................................................................................... 10

II.     SPECIFIC PERSONAL JURISDICTION IS LACKING IN THIS
        FORUM ON THESE NAMED PLAINTIFFS' CLAIMS. ............................. 11

        A.      A "Purposeful Availment" Theory Fails Because Plaintiffs Do Not Allege
                In-Forum Transactions Or Conduct By The Foreign Defendants Causally
                Connected To The Specific Claims Asserted. ....................................... 13

        B.      The "Effects" Test Fails Because Plaintiffs Do Not Allege That The
                Foreign Defendants Intentionally Targeted This Forum. .................... 20

        C.      The Conspiracy Alleged In *FOREX* Cannot Sustain Vicarious Specific
                Jurisdiction Over The Foreign Defendants. .......................................... 23

III.    THE FOREIGN DEFENDANTS HAVE NOT CONSENTED TO
        JURISDICTION. ............................................................................................ 24

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*7 W. 57th St. Realty Co. v. Citigroup, Inc.*,
 No. 13 Civ. 981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ...................16, 17, 21, 22, 24

*Beach v. Citigroup Alt. Invs. LLC*,
 No. 12 Civ. 7717, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) .................................................9

*Best Van Lines, Inc. v. Walker*,
 490 F.3d 239 (2d Cir. 2007)...............................................................................................13

*BNSF Ry. Co. v. Tyrrell*,
 137 S. Ct. 1549 (2017) ........................................................................................................11

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.* ("*BMS*"),
 137 S. Ct. 1773 (2017)..............................................2, 3, 10, 12, 14, 15, 17, 18, 19

*Brown v. Lockheed Martin Corp.*,
 814 F.3d 619 (2d Cir. 2016)................................................................................................11

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985)......................................................................................................17, 24

*Calder v. Jones*,
 465 U.S. 783 (1984)......................................................................................................12, 21

*Daimler AG v. Bauman*,
 134 S. Ct. 746 (2014) ...........................................................................................2, 10, 11, 21

*In re Foreign Exchange Benchmark Rates Antitrust Litig.* ("*FOREX*"),
 No. 13 Civ. 7789,
 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ...............................1, 2, 9, 10, 11, 18, 19, 20, 21

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
 16 Civ. 5263, 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ...........................4, 16, 17, 22, 24

*Galope v. Deutsche Bank Nat'l Tr. Co.*,
 No. 12-00323, 2014 WL 8662645 (C.D. Cal. Nov. 14, 2014),
 *aff'd*, 666 Fed. App'x 671 (9th Cir. Dec. 14, 2016) .............................................................22

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
 564 U.S. 915 (2011)...............................................................................................10, 11, 12, 20

*Gucci Am., Inc. v. Weixing Li*,
   768 F.3d 122 (2d Cir. 2014)..........................................................................10, 11

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)......................................................................................10, 11

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2011).............................................................................................10

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984)....................................................................................9, 19, 20

*Klinghoffer v. S.N.C. Achille Lauro*,
   937 F.2d 44 (2d Cir. 1991)...................................................................................25

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.* ("*Laydon II*"),
   No. 12 Civ 3419, 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ..........................4, 22, 23, 24

*Laydon v. Mizuho Bank, Ltd.* ("*Laydon I*"),
   No. 12 Civ. 3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) ....................................22, 25

*Leasco Data Processing Equip. Corp. v. Maxwell*,
   468 F.2d 1326 (2d Cir. 1972)................................................................................23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"),
   No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ............................................22

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"),
   No. 11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).............4, 12, 16, 19, 20, 24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MDL 2262, 2016 WL 1558504 (S.D.N.Y. Apr. 14, 2016)........................................24

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017)................................................................................10

*Nypl v. JPMorgan Chase & Co.* ("*NYPL I*"),
   15 Civ. 9300, 2016 WL 3211440 (S.D.N.Y. June 8, 2016)...................................3, 5, 6, 16, 18

*Nypl v. JPMorgan Chase & Co.* ("*NYPL II*"),
   15 Civ. 9300, 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ..............................3, 6, 8, 16, 18

*Nypl v. JPMorgan Chase & Co.* ("*NYPL III*"),
   15 Civ. 9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ............................3, 6, 7, 8, 13, 24

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*,
   714 F.3d 659 (2d Cir. 2013)..............................................................4, 9, 13, 21, 23

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*,
    484 U.S. 97 (1987)..................................................................................................10

*In re Papst Licensing GMBH & Co. KG Litig.*,
    590 F. Supp. 2d 94 (D.D.C. 2008)...........................................................................25

*Peay v. BellSouth Med. Assistance Plan*,
    205 F.3d 1206 (10th Cir. 2000) ................................................................................10

*In re Platinum & Palladium Fix Antitrust Litig.* ("*Platinum Fix*"),
    No. 14 Civ. 9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ...................4, 16, 20, 22, 24

*Republic of Panama v. BCCI Holdings (Lux.) S.A.*,
    119 F.3d 935 (11th Cir. 1997) ..................................................................................10

*Rush v. Savchuk*,
    444 U.S. 320 (1980)...........................................................................................9, 11

*Selman v. Harvard Med. Sch.*,
    494 F. Supp. 603 (S.D.N.Y. 1980)............................................................................10

*Shaffer v. Heitner*,
    433 U.S. 186 (1977)................................................................................................19

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)..................................................................................................16

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)............................................................................................16

*Sullivan v. Barclays PLC*,
    13 Civ. 2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)....................................4, 17, 19, 23

*United States v. 51 Pieces of Real Prop., Roswell, New Mexico*,
    17 F.3d 1306 (10th Cir. 1994) ..................................................................................25

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..................................................................................................20

*United States v. Rosenblatt*,
    554 F.2d 36 (2d Cir. 1977)........................................................................................24

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014).................................................................3, 9, 12, 15, 16, 17, 18, 24

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)..........................................................4, 11, 12, 14, 15, 16, 21, 23

## PRELIMINARY STATEMENT

Plaintiffs are consumers and businesses that allegedly exchanged U.S. dollars and foreign currency, and took immediate physical delivery of such currencies for their own end use, at their local banks in the United States.  They have expressly disclaimed having any involvement in currency trading in the foreign exchange ("FX") spot market.  That limitation was necessary to avoid being covered by the settlements and releases in *In re Foreign Exchange Benchmark Rates Antitrust Litigation* ("*FOREX*").  But that same limitation again precludes Plaintiffs in their Third Amended Class Action Complaint ("TAC" or "Complaint") from pleading personal jurisdiction against the Foreign Defendants.  The Foreign Defendants include foreign parent holding companies (with no FX trading or consumer retail operations), and other foreign entities that do not engage in *any* FX consumer retail transactions (with Plaintiffs or otherwise) in the United States.[1]  Accordingly, the Foreign Defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(2), because Plaintiffs have again failed to make a *prima facie* showing of personal jurisdiction.

This Court's March 31, 2016 decision in *FOREX* addressing motions to dismiss by The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU"), Société Générale, and Standard Chartered plc ("New Defendants") supports dismissal of the claims against the Foreign Defendants for lack of personal jurisdiction.  *First*, the Foreign Defendants are not subject to general jurisdiction

---

[1]  The Foreign Defendants moving to dismiss under Federal Rule of Civil Procedure 12(b)(2) ("Foreign Defendants") are:  Barclays PLC ("Barclays"); HSBC Holdings plc ("HSBC"); The Royal Bank of Scotland Group plc and The Royal Bank of Scotland plc (collectively, "RBS"); and UBS AG ("UBS").  This motion also is supported by the accompanying declarations of Lawrence Dickinson (Barclays); Mark Chambers and Gavin Francis (HSBC); William Gougherty (RBS); and John Connors (UBS).  For the Court's convenience, the Foreign Defendants also submit Appendix A hereto, which summarizes the operative jurisdictional facts set forth in the declarations.  The Foreign Defendants, along with all other Defendants in this action, also will file a separate motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), supported by a separate memorandum of law.

because they are all incorporated and have their principal places of business outside the United States. *See FOREX*, 2016 WL 1268267, at *3-4 (S.D.N.Y. Mar. 31, 2016); App.; *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014).

*Second*, this Court lacks specific jurisdiction over the Foreign Defendants. The Foreign Defendants include foreign parent holding companies that do not have FX trading or consumer retail operations in the United States or elsewhere,[2] and which therefore are similar to the one New Defendant dismissed in *FOREX*. *See FOREX*, 2016 WL 1268267, at *7 (Standard Chartered plc). The remaining Foreign Defendants[3] do not engage in the FX consumer retail transactions in the United States upon which the Complaint is based. As the Supreme Court phrased it recently, "[w]hat is needed—and what is missing here—is a connection between the forum *and the specific claims* at issue." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1781 (2017) ("*BMS*") (emphasis added).

To be sure, in *FOREX*, this Court found sufficient an averment of specific jurisdiction over two banks based on the operative pleading taken as a whole, including because the *FOREX* plaintiffs alleged that they were directly injured by a conspiracy in the FX spot market, and the *FOREX* plaintiffs included nonconclusory allegations indicating that two New Defendants had routinely entered into FX *spot trades* within the forum. See *FOREX*, 2016 WL 1268267, at *5-6 (BTMU and Société Générale). But, unlike *FOREX*, this case is not about FX spot sales to customers in the United States. Rather, this case is about alleged transactions in which Plaintiffs

---

[2] Foreign Defendants HSBC Holdings plc and The Royal Bank of Scotland Group plc are foreign parent holding companies that do not operate FX trading or consumer retail businesses, in the United States or elsewhere. *See* App. A-2-3.

[3] Foreign Defendants Barclays PLC, The Royal Bank of Scotland plc, and UBS AG do not participate in the alleged "consumer retail market" in the United States. *See* App. A-1, 3-4.

took physical delivery of currency at their local banks in the United States,[4] also called the "consumer retail market." *Nypl v. JPMorgan Chase & Co.*, 15 Civ. 9300, 2017 WL 3309759, at *1-2 (S.D.N.Y. Aug. 3, 2017) ("*Nypl III*"). And Plaintiffs have asserted, and this Court has accepted, that Plaintiffs' consumer retail market transactions are "completely different" from the FX spot market conduct at issue in *FOREX*.[5]

Now, having asserted that distinction, Plaintiffs have not pleaded the required causal connection between the Foreign Defendants' conduct and the "specific claims at issue" in *this* litigation in *this* forum sufficient to support specific jurisdiction. *BMS*, 137 S. Ct. at 1781. Tellingly, the Complaint itself suggests that the Foreign Defendants did not function as Plaintiffs' local banks in the consumer retail market. No Plaintiff alleges transacting with a Foreign Defendant in this alleged market. TAC ¶¶ 20-23. Although Plaintiffs' counsel has described his inquiry into FX consumer retail rates allegedly charged at San Francisco branches of three banks, none of those banks was a Foreign Defendant. TAC ¶¶ 61-62. Moreover, the fact that some of the Foreign Defendants may have engaged in FX *spot* transactions in the United States is not a sufficient basis to support personal jurisdiction absent allegations (missing here) that, at a minimum, the Foreign Defendants' FX spot transactions in the FX spot market were a "but for" cause of Plaintiffs' injuries in the FX "consumer retail market."

Plaintiffs therefore allege no "suit-related" contacts between the Foreign Defendants and New York (or California, or the United States) adequate to support specific jurisdiction.[6] That is,

---

[4] *See* Pls.' Stay Opp., Dkt. 99 at 3, 9, 10, 16.

[5] *Nypl v. JPMorgan Chase & Co.*, 15 Civ. 9300, 2017 WL 1133446, at *2 (S.D.N.Y. Mar. 24, 2017) ("*Nypl II*") (quoting *Nypl v. JPMorgan Chase & Co.*, 15 Civ. 9300, 2016 WL 3211440, at *3 (S.D.N.Y. June 8, 2016) ("*Nypl I*")).

[6] *See Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014) ("The proper question [for specific jurisdiction] is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum

the Complaint fails to allege *any* sufficient facts connecting purposeful, in-forum activity of the Foreign Defendants with either (i) the allegations giving rise to the named Plaintiffs' claims, or (ii) the "wrongs for which the [P]laintiffs here seek redress." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 342 (2d Cir. 2016).

Nor can Plaintiffs establish personal jurisdiction over Foreign Defendants by contending that the alleged conspiracy to fix FX benchmarks, centered in the United Kingdom and Continental Europe, had an "effect" on Plaintiffs in this forum.  The Complaint fails to allege that any Foreign Defendant directed any action into this forum intentionally causing such an effect on Plaintiffs in the FX "consumer retail market."  At most, the Complaint merely alleges "foreseeable" effects from out-of-forum operations—which are "insufficient for the purpose of establishing specific personal jurisdiction."  *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d 659, 674 (2d Cir. 2013).

The Court should therefore follow the weight of authority demonstrated by numerous recent decisions in this District that have dismissed foreign defendants from financial benchmark cases based on lack of personal jurisdiction.  In those decisions, the courts concluded that in-forum trading, marketing, or other business activities not causally connected to the claims asserted do not show "purposeful availment," and that alleged manipulation of benchmarks centered abroad does not constitute "expressly aimed" conduct at the United States.[7]

---

in a meaningful way."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2016 WL 7378980, at *8 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") ("[S]pecific jurisdiction requires no less than a 'but for' connection between the defendant's forum-directed activities and the claim." (some quotation marks omitted)).

[7]  *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263, 2017 WL 3600425, at *5, 7 (S.D.N.Y. Aug. 18, 2017); *In re Platinum & Palladium Fix Antitrust Litig.*, No. 14 Civ. 9391, 2017 WL 1169626, at *44-45 (S.D.N.Y. Mar. 28, 2017) ("*Platinum Fix*"); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 12 Civ. 3419, 2017 WL 1113080, at *4-6 (S.D.N.Y. Mar. 10, 2017) ("*Laydon II*"); *Sullivan v. Barclays PLC*, 13 Civ. 2811, 2017 WL 685570, at *45 (S.D.N.Y. Feb. 21, 2017).

## BACKGROUND

**1. Plaintiffs and Their FX Consumer Retail Purchases at Local Banks.**  Plaintiff
John Nypl is a California resident who, together with five other named individuals and
businesses in Texas, Florida, and Pennsylvania (TAC ¶¶ 20-23), asserts injury on behalf of a
putative class from "purchas[ing] foreign currency from" Defendants and from "pa[ying] foreign
currency Benchmark exchange rates . . . as a result of the Benchmark exchange rate price-fixing
conspiracy."  TAC ¶¶ 20-23; *see id.* ¶¶ 30-36 (listing Defendants, all of whom, or whose
affiliates, are defendants in *FOREX*).

Plaintiffs define the *Nypl* putative class as "[a]ll consumers and businesses in the United
States who *directly purchased* supracompetitive foreign currency at Benchmark exchange rates
from Defendants and their co-conspirators for [putative class members'] own end use" at "least
since January 1, 2007 to and including class certification, herein"—excluding, among other
persons, Defendants' "competitors . . . in the FX Spot Market."  TAC ¶ 24 (emphasis added).
The exchange rates at issue are "the Benchmark exchange rates of U.S. dollars for foreign
currency and foreign currency for U.S. dollars."  TAC ¶ 1.  Plaintiffs do not allege the
occurrence of any unlawful conduct after January 2013.   *See* TAC Ex. A-1 at ¶ 2.

Plaintiffs have asserted that putative class members engaged in "purchases of foreign
currency for end-uses"; that is, they "[took] *delivery* of foreign currency for purchasing goods
and services."  *Nypl I*, 2016 WL 3211440, at *3 (quoting Pls.' Stay Opp., Dkt. 99 at 3) (emphasis
added).  These buyers allegedly made those transactions for physical delivery of currency at their
local banks.  *See* Pls.' Stay Opp., Dkt. 99 at 3 ("physical delivery"); *id.* at 9 ("delivery . . . at their
local banks"); *id.* at 10 ("immediate delivery"); *id.* at 16 ("purchased foreign currency for dollars
. . . at their local banks").  Plaintiffs also have asserted a red-line distinction from the *FOREX*
putative class of "traders."  *See, e.g.*, *id.* at 10 (labeling *FOREX* plaintiffs as "traders engaged in

trading in the *FX* market . . . not end user *consumers* such as the *Nypl* class") (emphasis added); *see also id.* at 12-16.  Similarly, the *FOREX* plaintiffs have represented that *Nypl* putative class members are "'end users' who purchased currencies *at the retail level*."  *Nypl I*, 2016 WL 3211440, at *3 (quoting *FOREX* Pls.' Opp., Dkt. 101 at 1) (emphasis added).[8]

In declining to stay this action pending further proceedings concerning settlement in *FOREX*, this Court relied on two conclusions about the putative *Nypl* class that fence off the putative classes.  *First*, this Court accepted Plaintiffs' contention that the putative *Nypl* class members did not transact in the FX spot market:  "While the SAC discusses *Defendants'* conduct in the FX spot market, it does so *only* to describe the alleged mechanism through which Plaintiffs' prices became 'supracompetitive,' and *does not imply* that the *Nypl* class members were themselves participants in that market."  *Id.* at *2 (second and third emphases added).  *Second*, this Court relied on testimony of counsel for the *Nypl* and *FOREX* putative classes that they "did not intend for their class[es] to overlap."  *Id.* at *3 (quoting Hausfeld Decl., Dkt. 101-1, ¶¶ 5-6).  This Court thus accepted the representation of counsel that the FX consumer "retail" transactions "at their local banks" in which the *Nypl* putative class engaged "are *completely different from* . . . FX spot trading *in the FX market*."  *Id.* (quoting Pls.' Stay Opp., Dkt. 99 at 3) (emphases added).

This Court dismissed the Second Amended Complaint under Rule 12(b)(6), and denied as moot the Foreign Defendants' Rule 12(b)(2) motion.  *Nypl II*, 2017 WL 1133446, at *7-8.

---

[8]  Plaintiffs also have asserted that FX spot market transactions are conducted in "currency pairs" via "electronic communications network[s]" or telephones, quite different from an in-person, FX consumer retail transaction at Plaintiffs' local banks.  *See* Pls.' Stay Opp., Dkt. 99 at 2-3.  Plaintiffs thus have made clear that their claims do not arise from electronic transactions in foreign currency.  *See id.* at 3 ("An ECN is a computer system that customers can use to execute orders with dealers over a network . . . . The *Nypl* end-user purchases of foreign currency for end-uses, who take delivery of foreign currency for purchasing goods and services are *completely different* from the computer generated ECN FX spot trading in the FX market.") (emphasis added) (citations omitted).

Plaintiffs filed the TAC after the Court granted them leave to replead in part under Rule 15(a). *Nypl III*, 2017 WL 3309759, at *8.  In this new Complaint, although Plaintiffs attempted to fortify their allegations concerning the FX "consumer market," they elected not to fortify their prior factual allegations as to specific jurisdiction over the Foreign Defendants, notwithstanding that the prior Rule 12(b)(2) motion identified particular deficiencies in those allegations.[9]

**2.  The Foreign Defendants' Absence from the Consumer Retail FX Market in the United States.**  The Foreign Defendants, or their foreign affiliates, are among the defendants in *FOREX*.  All are headquartered and organized abroad.  HSBC Holdings plc, Barclays PLC, The Royal Bank of Scotland Group plc, and The Royal Bank of Scotland plc are incorporated and maintain their principal places of business in the United Kingdom.  *See* TAC ¶¶ 32, 34-35.  UBS AG is incorporated and maintains its principal place of business in Switzerland.  *See* TAC ¶ 36. The Foreign Defendants' declarations supporting this Rule 12(b)(2) motion—attached as exhibits to the declaration of Eric J. Stock filed today and summarized for the Court's convenience in the appendix to this memorandum—confirm that these financial institutions are incorporated and maintain their headquarters in those respective foreign locations.  *See* App.

Throughout the putative class period ("at least since January 1, 2007" (TAC ¶ 24)), the Foreign Defendants did not engage in consumer retail sales of foreign currency in exchange for dollars or vice versa in the United States.  Some Foreign Defendants are holding companies with no retail locations at all; others have no retail locations in the United States that offer immediate physical delivery of foreign currency.  *See* Dickinson Decl. ¶ 8; Chambers Decl. ¶ 5; Gougherty Decl. ¶¶ 5, 9; Connors Decl. ¶ 6.  The filed declarations thus are clear that the Foreign

---

[9]  In opposing Plaintiffs' motion for leave to file, the Foreign Defendants expressly reserved their right to assert their Rule 12(b)(2) defense to Plaintiffs' claims in the event that the Court granted the motion.  Defs.' Rule 15 Opp. 25 & n.28 (Dkt. 179) (June 14, 2017).

Defendants were *not* the Defendants who "sold foreign currency to Plaintiffs and the putative consumer and end-user business class at supracompetitive Benchmark exchange rates, derived from trading in the FX spot market, plus a small handling fee" (TAC ¶ 5) in the alleged "consumer retail market" FX transactions in the United States.

Although the Complaint relies extensively on the same government enforcement actions cited in *FOREX* (*Nypl II*, 2017 WL 1133446, at *1), no government agency asserted that Foreign Defendants had transacted in the United States in what Plaintiffs have called the FX "consumer retail market" (*Nypl III*, 2017 WL 3309759 at *1).  Instead, those government enforcement actions concerned certain alleged conduct by the Foreign Defendants, or their subsidiaries or affiliates, with respect to the "trading" of foreign currencies in the FX *spot* market.[10]

**3. Plaintiffs' Jurisdictional Allegations.**  Plaintiffs do not (and cannot) allege the occurrence of any particular FX "consumer retail market" transactions between any named Plaintiff and any of the Foreign Defendants, whether in New York, California, or elsewhere

---

[10]  In particular:  The Federal Reserve allegations concerned trades "executed" in "the spot market" and transactions in related "[e]lectronic [t]rading" and activities in the "wholesale markets."  *See* Order, *In re UBS AG et al.*, Fed. Reserve No. 15-005-B-FB, at 2 (May 20, 2015) (TAC Ex. C-4) (Dkt. 190-17); Order, *In re Barclays Bank PLC et al.*, Fed. Reserve No. 15-006-B-FB, at 1-2 (May 20, 2015) (TAC Ex. C-6) (Dkt. 190-19); Order, *In re Royal Bank of Scotland PLC et al.*, Fed. Reserve No. 15-007-B-FB, at 1-2 (May 20, 2015) (TAC Ex. C-3) (Dkt. 190-16). The out-of-district plea agreements likewise described spot market and "wholesale" conduct.  *See* Plea Agreement, *United States v. Barclays PLC*, No. 3:15-cr-77, Dkt. 6 ¶ 4(b), 4(c), 4(g) (D. Conn. filed May 20, 2015) (TAC Ex. A-3) (Dkt. 190-3) (in plea to a one-count felony charge of conspiring to fix prices and rig bids for U.S. dollars and euros exchanged in the FX spot market in the United States and elsewhere, defining "FX Spot Market" as an "over-the-counter market" and alleging participation in "conspiracy . . . in the FX Spot Market"); Plea Agreement, *United States v. The Royal Bank of Scotland PLC*, No. 3:15-cr-80, Dkt. 9 ¶ 4(b), 4(c), 4(g) (D. Conn. filed May 20, 2015) (TAC Ex. A-4) (Dkt. 190-4) (same); *see also* Factual Basis, Ex. 1 to Plea Agreement, *United States v. UBS AG*, No. 3:15-cr-76, Dkt. 6, at 4-8, ¶¶ 8, 10-15 (D. Conn. filed May 20, 2015) (TAC Ex. A-5) (Dkt. 190-5) (in plea to a one-count felony charge of wire fraud in connection with a scheme to manipulate LIBOR and other benchmark interest rates, describing FX "spot trades, forwards, options and swaps," and alleging "Misrepresentations about Sales Markups" in "electronic chat with a customer"; "Agreements to Add Sales Markups" in "open line" telephonic communications with customers; transactions in "Limit Orders at Altered Prices"; and "Collusive Conduct" "in an FX spot market").  As to HSBC, the deferred prosecution agreement Plaintiffs rely on described anti-money laundering compliance issues wholly *unrelated* to any FX markets.  *See* Statement of Facts, *United States v. HSBC Bank USA, N.A.*, No. 1:12-cr-763, Dkt. 3-2 (TAC Ex. A-6)  (Dkt. 190-7) (E.D.N.Y. filed Dec. 11, 2012) (deferred prosecution agreement concerning non-compliance with anti-money laundering statutes).

within the United States.  *See* TAC ¶¶ 20-23.

The segment of the Complaint headlined "Jurisdiction And Venue" (TAC ¶¶ 12-19) contains generic language reciting the legal standards for personal jurisdiction.  *Without* differentiating among defendants, Plaintiffs recite the conclusory statements that "Defendants . . . have *purposefully availed* themselves of the laws of the United States," and also that "defendants' activities had a direct, substantial and *reasonably foreseeable effect*" on United States commerce.  TAC ¶ 15 (emphasis added).

## LEGAL STANDARD

Plaintiffs here "bear[] the burden of showing that the court has jurisdiction over the [D]efendant[s]."  *FOREX*, 2016 WL 1268267, at *1.  Under Rule 12(b)(2), "[e]ach defendant's contacts with the forum State must be assessed individually," *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984), and allegations against defendants *as a group* are insufficient, *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980).  That defendant-specific analysis is *mandatory* even when measuring personal jurisdiction over a group of affiliated entities.  *See, e.g.*, *Walden*, 134 S. Ct. at 1122-23.  Plaintiffs bear the burden of alleging "facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *O'Neill*, 714 F.3d at 673 (citation and internal quotation marks omitted).  Under Rule 12(b)(2), "[c]ourts will not . . . resolve 'argumentative inferences in the plaintiff's favor,' or 'accept as true a legal conclusion couched as a factual allegation.'"  *FOREX*, 2016 WL 1268267, at *1 (quoting *O'Neill*, 714 F.3d at 673).  Importantly, in an action brought as a class action, "personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the *named plaintiffs'* causes of action.  Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified."  *Beach v. Citigroup Alt. Invs.*

*LLC*, No. 12 Civ. 7717, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) (emphasis added)

(citing *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1980)).

## ARGUMENT

The critical question here is "whether . . . the exercise of personal jurisdiction would

violate constitutional due process." *FOREX*, 2016 WL 1268267, at *1.  The answer—as with

each previous complaint filed by the same counsel—is yes.  The Foreign Defendants are not

subject to general or specific personal jurisdiction in this forum as to these Plaintiffs' claims

based on their alleged "consumer retail market" FX transactions at their local banks.  Nor have

any Foreign Defendants consented to the exercise of such jurisdiction.  Personal jurisdiction over

the claims in the Complaint is therefore unavailable because it would "offend traditional notions

of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)

(internal quotation marks omitted).[11]

## I.    GENERAL PERSONAL JURISDICTION IS LACKING IN THIS FORUM.

As this Court has already recognized, *see FOREX*, 2016 WL 1268267, at *3-4, general

jurisdiction is appropriate "only when the corporation's affiliations with the State in which suit is

brought are so constant and pervasive 'as to render [it] essentially at home in the forum State,'"

*Daimler*, 134 S. Ct. at 751 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S.

---

[11]  Because the Complaint fails to allege any transactions between Plaintiffs and any Foreign Defendant in New York or *anywhere* in the United States, there is no need to examine the constitutionality of the so-called "nationwide contacts" approach here.  *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014); *see BMS*, 137 S. Ct. at 1783–84 (again reserving question, citing *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 102 n.5 (1987)); *cf. FOREX*, 2016 WL 1268267, at *3 n.2, 5 n.3 (relying on "contacts throughout the United States" where that approach was *not* "dispute[d]").  In any event, even if there were a need to reach the constitutional question, the Due Process Clause—as construed in recent decisions such as *Daimler* and *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 884-85 (2011) (plurality)—compels focusing on the forum state (New York), and necessitates rejection of the "nationwide contacts" approach.  *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 n.6 (D.C. Cir. 2017) (recognizing that some courts have reasoned that "under the Fifth Amendment, even if the defendant has sufficient nationwide contacts, a plaintiff must additionally justify jurisdiction in the particular state") (citing *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211 (10th Cir. 2000); *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997)).

915, 919 (2011)).  "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are

the corporation's place of incorporation and its principal place of business," and those are the

forums where the corporate defendant is subject to personal jurisdiction for claims that arise

outside the forums.  *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler*,

134 S. Ct. at 760); *see Gucci*, 768 F.3d at 135.  The correct inquiry is thus whether a defendant's

contacts with the forum are so extensive that they "shift the company's primary place of business

(or place of incorporation) away from" its home country.  *Brown v. Lockheed Martin Corp.*, 814

F.3d 619, 629 (2d Cir. 2016).  This Complaint is missing any allegation that would support such

general jurisdiction over the Foreign Defendants in New York or anywhere else in the United

States.  *See* App. The Foreign Defendants simply are not "at home" or "centered" in—and hence

are not subject to general jurisdiction in—New York or anywhere else in the United States for

claims unrelated to their contacts with the forum.  *See Waldman*, 835 F.3d at 333-34; *Gucci*, 768

F.3d at 135.  Plaintiffs have not come close to meeting their burden to show otherwise.

Additionally, nothing in the Complaint would support classifying this action as a "truly

'exceptional' case" warranting exercise of general personal jurisdiction outside of *Daimler*'s

rule.  *FOREX*, 2016 WL 1268267, at *3 (quoting *Brown*, 814 F.3d at 627).[12]

## II.     SPECIFIC PERSONAL JURISDICTION IS LACKING IN THIS FORUM ON THESE NAMED PLAINTIFFS' CLAIMS.

Specific jurisdiction "depends on in-state activity that '*gave rise to the episode-in-suit*.'"

*Waldman*, 835 F.3d at 331 (quoting *Goodyear*, 564 U.S. at 923) (in turn quoting *Int'l Shoe*, 326

---

[12]   Although the Complaint names as Defendants an affiliate of Barclays PLC and affiliates of HSBC Holdings plc, that does not change the assessment of personal jurisdiction over any Foreign Defendant, because Plaintiffs do not allege conduct specific to U.S.-based subsidiaries or affiliates of the Foreign Defendants.  Nor does it "provide sufficient facts . . . in support of a veil-piercing or alter ego analysis." *FOREX*, 2016 WL 1268267, at *7.  Allegations about a subsidiary or affiliate say nothing about the parent corporation for purposes of personal jurisdiction.  *Rush*, 444 U.S. at 331-32.  Indeed, *Daimler* rejected an agency-based personal jurisdiction theory that would "subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate." 134 S. Ct. at 760; *see id.* at 759, 761.

U.S. at 317) (emphasis in original).  For a court to exercise specific jurisdiction over a defendant, "the defendant's *suit-related* conduct must create *a substantial connection with the forum State*," "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the contacts must be "with the forum State itself, not . . . with persons who reside there."  *Walden*, 134 S. Ct. at 1121-22 (first emphasis added) (citation omitted); *see Waldman*, 835 F.3d at 335.  "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"  *BMS*, 137 S. Ct. at 1780 (quoting *Goodyear*, 564 U.S. at 919) (internal quotation marks and brackets omitted).  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."  *Id.* at 1781.

The "proper question" here "is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden*, 134 S. Ct. at 1125.  "[N]o less than a 'but for' connection between the defendant's forum-directed activities and the claim" is required for specific jurisdiction.  *LIBOR VI*, 2016 WL 7378980, at *8 (internal quotations and citations omitted); *see Walden*, 134 S. Ct. at 1124 ("reputational injury caused by the defendants'" conduct in key specific jurisdiction precedent, *Calder v. Jones*, 465 U.S. 783 (1984), "would not have occurred *but for* the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens" (emphasis added)); *Waldman*, 835 F.3d at 341 ("Courts typically require that the plaintiff show some sort of *causal relationship* between a defendant's [forum] contacts and the episode in suit." (internal quotation marks omitted) (emphasis added)).

Exercise of specific personal jurisdiction may be valid "where the defendant has

purposefully avail[ed] itself of the privilege of conducting activities *within* the forum State . . .

such that [the defendant] should reasonably anticipate being haled into court there." *Best Van*

*Lines, Inc. v. Walker*, 490 F.3d 239, 242-43 (2d Cir. 2007) (internal quotations and citations

omitted; emphasis added). Alternatively, under the "effects" test in *Calder*, alleged tortious

actions outside of the forum may suffice only when they were "expressly aimed" at the forum

and the claims in suit arose out of those actions. *O'Neill*, 714 F.3d at 674. Under that test, the

"fact that harm in the forum is foreseeable . . . is insufficient" to confer jurisdiction based on in-

forum effects of out-of-forum conduct. *Id*. Although the TAC includes bald legal conclusions

about undifferentiated Defendants' "purposeful availment" of the forum and the "reasonably

foreseeable effects" of their alleged acts on United States commerce (*see* TAC ¶ 15), those legal

conclusions are properly disregarded, and the remaining allegations fail as to the Foreign

Defendants under either of those theories of specific jurisdiction.

### A. A "Purposeful Availment" Theory Fails Because Plaintiffs Do Not Allege In-Forum Transactions Or Conduct By The Foreign Defendants Causally Connected To The Specific Claims Asserted.

#### 1. The purported misconduct is not alleged to have occurred within this forum.

The Complaint does not allege that the Foreign Defendants transacted with Plaintiffs, or

even communicated with Plaintiffs, in New York or elsewhere in the United States. Plaintiffs

thus have not alleged that any contacts the Foreign Defendants had with the United States were

the "but for" cause of Plaintiffs' claims. And the Foreign Defendants' declarations establish that

they could not have had in-forum contacts that are the "but for" cause of Plaintiffs' claims,

because the Foreign Defendants are absent from what Plaintiffs have alleged as the "consumer

retail market" in which they exchanged currency at their local banks. *See Nypl III*, 2017 WL

3309759, at *1-2.  Accordingly, the Foreign Defendants "are not subject to specific personal jurisdiction based on a 'purposeful availment' theory because the [P]laintiffs' claims do not arise from the defendants' activity in the forum."  *See Waldman*, 835 F.3d at 343.

The Supreme Court's recent decision in *BMS* clarified this requirement.  The Court held there that nonresident plaintiffs who neither purchased nor ingested a company's blood thinning drug in California could not sue the company in California state court for claims based on the allegedly harmful effects of the drug, even though the company conducted research on other drugs in California, had five laboratories in California, and contracted with a California company to distribute the drug nationally.  *See* 137 S. Ct. at 1778, 1781, 1783.  The Court found that specific jurisdiction was lacking because the plaintiffs in *BMS*, who had not purchased the drug from the defendant in the forum, could not establish an "adequate link" between the forum and *their* claims.  *See id.* at 1781-82.  Merely pointing to forum contacts that were not alleged to have caused the asserted injuries was insufficient:  "What is needed—and what is missing here—is a connection between the forum and the *specific claims* at issue."  *Id.* at 1781 (emphasis added).

*Waldman* likewise provides important guidance.  There, the Second Circuit applied *Walden* in overturning, for lack of personal jurisdiction, a jury verdict finding defendant Palestinian organizations liable under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), for six attacks committed "in and around" Jerusalem by nonparties affiliated with those organizations.  *Id*. at 335.  Although one organization maintained an office in the forum for lobbying the U.S. government, that did not establish purposeful availment, where the *plaintiffs' claims* did not arise from either "the defendants' purposeful contacts with the forum" or "any activity by the defendants in this forum."  *Id.* at 343.  The Second Circuit applied, for the first time, *Walden*'s instruction that a "defendant's suit-related conduct must create a substantial connection with the

forum State."  134 S. Ct. at 1121.  And the Second Circuit thus interpreted "suit-related conduct" to mean conduct "that could have subjected [the defendant] to liability" to the Plaintiffs before the district court.  *Waldman*, 835 F.3d at 335.  There was no such conduct within the United States.  *Id.*; *see id.* at 337.

Here, the Complaint is similarly missing factual allegations connecting the "episode[s]-in-suit" giving rise to Plaintiffs' purported "consumer retail market" claims—the "specific claims at issue," *BMS*, 137 S. Ct. at 1781—to the Foreign Defendants' "minimum contacts" with the forum.  All of the named Plaintiffs (except Plaintiff Nypl) identify by name particular Defendants as the local banks at which Plaintiffs engaged in FX consumer retail transactions, and those Plaintiffs' allegations are clear that they did not transact with *any* Foreign Defendant.  TAC ¶¶ 21-23.  Reinforcing that point, in counsel's purported investigation into the asserted "mechanical, direct correlation" between the FX spot market benchmarks allegedly manipulated and the consumer retail FX rates Plaintiffs paid in the United States, counsel transacted at San Francisco branches of three Defendants, but none of those was a Foreign Defendant.  TAC ¶¶ 6, 41, 60-65.  So, of course, the "correlation" Plaintiffs allege cannot be attributed to the consumer retail pricing decisions of the Foreign Defendants.  Indeed, it is not surprising that counsel's investigation did not include transactions with any Foreign Defendant, given that the Foreign Defendants do not engage in Plaintiffs' alleged "consumer retail market" FX transactions in the United States, and thus the Foreign Defendants could not have caused Plaintiffs' asserted injuries.  *See* Dickinson Decl. ¶ 8; Chambers Decl. ¶ 5; Gougherty Decl. ¶¶ 5, 9; Connors Decl. ¶ 6.

Prominently, then, the Complaint fails to allege transactions in the forum between the Foreign Defendants and Plaintiffs, or communications directed by the Foreign Defendants to

Plaintiffs in the forum.  And through that failure, the Complaint omits averments of conduct in New York, or elsewhere in the United States, by the Foreign Defendants that "could have subjected them to liability" to the Plaintiffs before this Court.  *See Waldman*, 835 F.3d at 335, 337, 341; *LIBOR VI*, 2016 WL 7378980, at \*8 ("[A]ny allegations of forum-related contacts that 'relate to' the antitrust conspiracy but that are not causally connected to actual LIBOR submissions [allegedly false] are jurisdictionally insufficient."); *Walden*, 134 S. Ct. at 1124.[13]

Nor does the Complaint support an inference of in-forum conduct by the Foreign Defendants that ranks as "*suit-related* conduct . . . creat[ing] *a substantial connection with the forum State*" through reliance on government enforcement actions.  *Walden*, 134 S. Ct. at 1121 (emphasis added).  Those enforcement actions concern the FX spot market.  *Supra* note 10. They do not concern the "completely different" market in which Plaintiffs allegedly transacted, the FX "consumer retail market."  *Nypl II*, 2017 WL 1133446, at \*2 (quoting *Nypl I*, 2016 WL 3211440, at \*3).  And recent decisions of other courts in this District in cases alleging manipulation of international financial benchmarks have made clear that unrelated in-forum conduct does not suffice:  A Foreign Defendant's "presence" in the United States "is irrelevant because continuous presence in the forum does not confer specific jurisdiction unless its presence involves 'suit related conduct.'"  *Platinum Fix*, 2017 WL 1169626, at \*44 (citing *Waldman*, 835 F.3d at 335, and *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13 Civ. 981, 2015

---

[13]  *See also FrontPoint*, 2017 WL 3600425, at \*6 ("Plaintiffs do not identify *any* specific trades or contracts that are alleged to have been collusive, nor do they identify which Foreign Defendants were party to such transactions."). To the extent Plaintiffs are attempting to contend that *unnamed* members of the putative national or California classes (TAC ¶¶ 24, 99) would be able to assert that they transacted with the Foreign Defendants within the forum, such allegations about *unnamed* class members cannot establish specific jurisdiction.  Plaintiffs cannot assert injury based on those unknown persons not before the Court.  Article III of the U.S. Constitution compels focusing on the named plaintiffs, who lack standing to sue based on the alleged injuries of nonparties, including unnamed members of the putative class.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)).  In any event, the Foreign Defendants' declarations show that any such allegations would simply be incorrect.

WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015)); *accord Sullivan*, 2017 WL 685570, at *45 ("an assortment of U.S. ties related to UBS's presence in the broader financial services industry" not "suit related conduct");  *FrontPoint*, 2017 WL 3600425, at *6 (foreign banks' trading with in-forum counterparties of financial instruments whose value was derived from benchmarks allegedly manipulated not "suit related conduct"); *see also BMS*, 137 S. Ct. at 1781 (specific jurisdiction cannot be based on "defendant's unconnected activities in the [forum]").

As those decisions confirm, due process requires Plaintiffs to allege more to show a "connection between the forum and the *specific claims at issue*."  *BMS*, 137 S. Ct. at 1781 (emphasis added).  Exercise of specific jurisdiction over the Foreign Defendants based on Plaintiffs' deficient allegations would violate the principles underlying personal jurisdiction. Such an expansive exercise of jurisdiction would not provide the Foreign Defendants "fair warning that a particular activity may subject [them] to the jurisdiction of" a forum in which they are not at home.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation omitted; brackets in original).

### 2.   This Court's *FOREX* decision does not relieve these Plaintiffs of their burden to adequately plead specific jurisdiction.

In opposing the Foreign Defendants' prior Rule 12(b)(2) motion, Plaintiffs sought to circumvent specific jurisdiction requirements by drawing a comparison to this Court's March 2016 Rule 12(b)(2) decision in *FOREX*.  Pls.' Rule 12(b)(2) Opp'n 2, 4 (Dkt. 134) (Sept. 14, 2016).  That approach is meritless.  Unlike the *FOREX* plaintiffs, Plaintiffs have not alleged facts (rather than legal conclusions) particular to the Foreign Defendants showing that their "suit-related conduct . . . create[d] a substantial connection with the forum State."  *Walden*, 134 S. Ct. at 1121.

17

In particular, in *FOREX*, this Court concluded that the operative complaint sufficiently connected the plaintiffs' allegations—namely, direct injury to the plaintiffs in the FX spot market resulting from the alleged conspiracy in that FX spot market—with two foreign banks that, among other things, had routinely entered into FX spot trading transactions in New York.  *See FOREX*, 2016 WL 1268267, at *5.  Additionally, the *FOREX* plaintiffs were able to "supplement[]" those allegations with information from federal financial regulatory filings quantifying the "gross notional outstanding *spot FX* contracts" reported for the New York branches of the banks.  *Id.* at *6 (emphasis added).  "Taken as a whole," this Court concluded that the operative pleading described "suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the New Defendants' substantial FX businesses here."  *Id.*

By contrast here:  The Complaint, like its predecessor, lacks facts showing that the Foreign Defendants' "suit-related conduct . . . create[d] a substantial connection" with the United States, *Walden*, 134 S. Ct. at 1121, focusing, as *BMS* requires, on the "connection between the forum and the *specific claims* at issue," 137 S. Ct. at 1781.  Plaintiffs assert injury from the alleged "supracompetititve [*sic*] foreign currency exchange rate overcharges imposed on and paid" by them in the alleged consumer *retail* market.  TAC ¶ 68.  Yet they have asserted, and the Court has accepted, that the consumer retail market is "completely different" from the FX spot market.  *Nypl II*, 2017 WL 1133446, at *2 (quoting *Nypl I*, 2016 WL 3211440, at *3).  So Plaintiffs have not alleged, and in light of the filed declarations they cannot show, that the Foreign Defendants were the banks that "imposed" any consumer retail "overcharge[]" on Plaintiffs.

Moreover, among the combination of circumstances "[t]aken as a whole" that led the Court to sustain specific jurisdiction in *FOREX* was the court's inference that the New Defendants "each had, within the United States, tens of billions of dollars' worth of FX Instruments outstanding each day, including, undoubtedly, transactions with members of the proposed Classes during the Class Period." *See FOREX*, 2016 WL 1268267, at *6.[14] But, to again paraphrase Plaintiffs' argument, the combination of circumstances here is "completely different." Plaintiffs here urge exercise of personal jurisdiction over foreign banks for injuries from overcharges in their FX "consumer retail market" transactions in the United States, where the Foreign Defendants engaged in *no* such FX consumer retail transactions with the named Plaintiffs (or the putative class members) in the United States. Accordingly, in-forum contacts by the Foreign Defendants with the United States are absent here as to the "*specific* claims at issue." *See BMS*, 137 S. Ct. at 1781 (emphasis added).

Notably, this Court also concluded in *FOREX* that personal jurisdiction is lacking over defendants that do not "engage in FX activity in the United States or even operate or maintain offices here." *See* 2016 WL 1268267, at *4, 7 (dismissing Standard Chartered plc). All claims against HSBC Holdings plc and The Royal Bank of Scotland Group plc should be dismissed on the same rationale: They are foreign parent holding companies, not banks and not dealers in any foreign currency exchange market, and they do not—and throughout the putative class period did

---

[14]   This Court in *Forex* did not hold that transactions within the United States were, standing alone, sufficient for specific jurisdiction, but rather that they were sufficient, when considered in combination with the other nonconclusory allegations in the *FOREX* complaint, to support specific jurisdiction. That is, the Court considered the transactions, not in isolation, but as part of "the relationship among the defendant, the forum, and the litigation." *Keeton*, 465 U.S. at 775 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). To be sure, transactions within the United States not alleged to be "within the scope" of the alleged conspiracy would not support specific jurisdiction over a claim arising from that alleged conspiracy. *Cf. LIBOR VI*, 2016 WL 7378980, at *8-9 ("defendants' sales and trades of LIBOR-based products to plaintiffs in the United States" were "not meaningful in a jurisdictional analysis" where they were "not within the scope of the reputation-motivated antitrust conspiracy" alleged). Nor does the "the presence of U.S. victims alone . . . make out jurisdiction." *Sullivan*, 2017 WL 685570, at *44.

not—sell foreign currency to banking customers in New York or anywhere else in the United States.  *See* App.

Likewise, Barclays PLC also is a holding company, and does not—and throughout the putative class period did not—sell foreign currency to banking customers in New York or anywhere else in the United States.  The Royal Bank of Scotland plc similarly does not—and throughout the putative class period did not—engage in consumer retail foreign-exchange transactions (that is, transactions in which the customer takes physical possession of foreign currency) in the United States.  And, similarly, UBS AG does not—and throughout the putative class period did not—maintain consumer retail branches in the United States that hold foreign currency for immediate delivery to clients.  *See* App.

Additionally, to the extent Plaintiffs are attempting to rely on FX trading conduct within the United States by subsidiaries or affiliates of the Foreign Defendants—as is the case with the claims against Barclays, HSBC, RBS, and UBS—the Complaint contains no allegations sufficient to disregard traditional principles of corporate separateness previously described by this Court, and Plaintiffs supply no justification for subjecting any parent company to personal jurisdiction.[15]

### B.    The "Effects" Test Fails Because Plaintiffs Do Not Allege That The Foreign Defendants Intentionally Targeted This Forum.

The Complaint also fails to allege adequately specific personal jurisdiction over Plaintiffs' claims through the "effects" test for out-of-forum conduct.  Under that theory,

---

[15]   "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  *FOREX*, 2016 WL 1268267, at *7 (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)); *see Keeton*, 465 U.S. at 781 n.13.  Accordingly, "[f]or plaintiffs to establish personal jurisdiction through the activity of banks' subsidiaries and affiliates, plaintiffs must first show a 'merging [of] parent and subsidiary for jurisdictional purposes[, which] requires an inquiry comparable to the corporate law question of piercing the corporate veil.'"  *LIBOR VI*, 2016 WL 7378980, at *10 (quoting *Goodyear*, 564 U.S. at 930) (internal quotation marks omitted) (alterations in original); *see Platinum Fix*, 2017 WL 1169626, at *45-48 (rejecting personal jurisdiction allegations seeking to "disregard the [defendant's] corporate form").

"specific personal jurisdiction properly exists where the defendant took 'intentional, and allegedly tortious, actions . . . expressly aimed' at the forum." *O'Neill*, 714 F.3d at 674 (quoting *Calder*, 465 U.S. at 789). For it to apply, "the defendant must 'expressly aim[ ]' his conduct at" the forum, *Waldman*, 835 F.3d at 337 (citation omitted), which means Plaintiffs must "plead facts demonstrating that the [misconduct alleged] *was done with the express aim of causing* an effect in New York" and that the claims in suit arose out of those actions, *7 W. 57th St.*, 2015 WL 1514539, at *11 (emphasis added).

Here, Plaintiffs simply have not asserted that the Foreign Defendants' actions abroad, such as the allegedly manipulative conduct, were expressly aimed at New York or the United States.[16] The Complaint does not allege that the Foreign Defendants acted with the required intent, namely "calculat[ion] to cause injury" in New York or, for that matter, anywhere else in the United States. *See Calder*, 465 U.S. at 791; *Waldman*, 835 F.3d at 337-38, 340.

At best, the Complaint attempts to impose liability based on tortious acts that occurred outside the United States and allegedly had "effects" on Plaintiffs in their alleged consumer retail market in the United States through what they call a "mechanical, direct correlation" between the prices local banks charged them and what Plaintiffs dub the "FX Benchmark exchange rates or 'Fix Rates'" which are "derived daily from FX spot trading." *See, e.g.*, TAC ¶¶ 6, 41, 60-65. But the geographic "nucleus," or "focal point," of the alleged misconduct was the United Kingdom and Continental Europe, not New York or the United States. *See Waldman*, 835 F.3d at 340. After all, the key "FX Benchmark exchange rates" are those at issue in the May 2015

---

[16]  This Court in *FOREX* explicitly relied on pleaded "examples of each New Defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown)," to conclude that two of the Foreign Defendants' suit-related conduct had effects expressly aimed inside this forum. 2016 WL 1268267, at *6 (BTMU and Société Générale). Plaintiffs here, by contrast, fail to provide examples of *any* in-forum communications connecting any Foreign Defendant to the "consumer retail market" transactions giving rise to the liability asserted here.

government agency resolutions that inspired Plaintiffs to file this case, namely "the World Markets/Reuters fix, which occurs each trading day at 4:00 PM (GMT)," and is also known as the "WM/R 4 p.m. *London fix*," and the "European Central Bank fix, which occurs each trading day at 2:15 PM (CET)," and is "set by the ECB."[17]   The allegations of misconduct thus are centered outside New York and outside the United States, and, under numerous prior decisions, they simply cannot satisfy Plaintiffs' obligation to establish specific jurisdiction *in this forum* without showing purposeful targeting of this forum.[18]

Again, Plaintiffs' continued failure to meet their burden to allege that the Foreign Defendants "expressly aimed" their conduct at the forum is especially glaring courts given that courts "in this district have held that general allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at" the United States. *Platinum Fix*, 2017 WL 1169626, at *45; *see FrontPoint*, 2017 WL 3600425, at *7 ("[A]bsent allegation that defendant's conduct was expressly aimed at the United States, the fact 'that Defendants' alleged manipulation of the Fix Price had harmful effects on U.S.-based exchanges is insufficient' to confer personal jurisdiction.") (quoting *Platinum Fix*, 2017 WL 1169626, at *44); *see also Laydon II*, 2017 WL 1113080, at *4 (dismissing where pleading contained "no facts to suggest that [foreign bank] expressly aimed the effects of their alleged manipulative conduct at the United States").[19]

---

[17]  TAC ¶ 8 (quoting, *e.g.*, Plea Agreement, *United States v. The Royal Bank of Scotland PLC*, No. 3:15-cr-80, Dkt. 9 ¶ 4(f) (D. Conn. filed May 20, 2015) (TAC Ex. A-4) (Dkt. 190-4)); *see In re The Royal Bank of Scotland plc*, CFTC Docket No. 15-05, at 4 & n.4 (Nov. 11, 2014) (TAC Ex. B-3) (Dkt. 190-10) (emphasis added).

[18]  Examples of similar prior decisions predating the filing of Plaintiffs' *prior* complaint include *7 W. 57th St.*, 2015 WL 1514539, at *11; *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2015 WL 6243526, at *32 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*"); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) ("*Laydon I*"); *Galope v. Deutsche Bank Nat'l Tr. Co.*, No. 12-00323, 2014 WL 8662645, at *3-4 (C.D. Cal. Nov. 14, 2014), *aff'd*, 666 Fed. App'x 671 (9th Cir. Dec. 14, 2016).

[19]  These decisions further expose the inadequacy of the Complaint's conclusory allegation of "foreseeable" effects

Likewise, "mere knowledge" does not meet the "express aim" requirement.  *See Waldman*, 835 F.3d at 338; *Laydon II*, 2017 WL 1113080, at *4.  In that regard, Plaintiffs' allegations that they have discerned a "statistically significant linear relationship" between the FX spot market benchmarks determined in the United Kingdom and Continental Europe and the purported rates charged by branches of certain Defendants—but not the Foreign Defendants— are particularly defective, (TAC ¶¶ 63-64), and cannot satisfy the "effects" test.  The TAC does not allege any reason why the Foreign Defendants would know of such a correlation (let alone that they would mistake it for causation), and given their absence from the retail consumer FX market in the United States, there is no reason to conclude that the Foreign Defendants had acquired such knowledge.  And even if the Foreign Defendants knew of that relationship, such knowledge is not enough to establish that the Foreign Defendants calculated to cause injury to New York or the United States.

### C.     The Conspiracy Alleged In *FOREX* Cannot Sustain Vicarious Specific Jurisdiction Over The Foreign Defendants.

The Complaint does not plead any basis for subjecting the Foreign Defendants to personal jurisdiction vicariously through the alleged in-forum conduct of other Defendants.  Bald recitation of language of conspiracy cannot suffice to show specific jurisdiction.  *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972) (Friendly, J.) ("the mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator" absent allegation, missing here, of partnership with "general supervision" relationship between defendants).  Fatally, in addition to omitting allegations of forum contacts

---

in the United States (TAC ¶ 15):  "[T]he mere 'fact that harm in the forum is foreseeable' [is] 'insufficient for the purpose of establishing specific personal jurisdiction over a defendant.'"  *Sullivan*, 2017 WL 685570, at *43 (quoting *Waldman*, 835 F.3d at 339 (in turn quoting *O'Neill*, 714 F.3d at 674)); *see id.* at *45 (dismissing where pleading lacked allegations of express aiming).

by the Foreign Defendants giving rise to Plaintiffs' asserted claims concerning the "consumer retail market," *Nypl III*, 2017 WL 3309759, at *1-2, the Complaint omits allegations that any such transactions or communications were within "the scope of the conspiratorial agreement" alleged in *FOREX*. *See LIBOR VI*, 2016 WL 7378980, at *4 (citing *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) (internal quotation marks omitted)); *see also Platinum Fix*, 2017 WL 1169626, at *49 (rejecting conclusory effort to invoke conspiracy jurisdiction); *Laydon II*, 2017 WL 1113080, at *5-6; *7 W. 57th St.*, 2015 WL 1514539, at *12-13.  By omitting factual allegations that any Foreign Defendant "committed any act in furtherance of the conspiracy from within the United States or purposefully directed its misconduct at the United States," Plaintiffs have closed off any jurisdictional conspiracy theory.  *See FrontPoint*, 2017 WL 3600425 at *8.

In any event, although the availability "of the conspiracy theory of personal jurisdiction is unsettled in this Circuit," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262, 2016 WL 1558504, at *9 n.8 (S.D.N.Y. Apr. 14, 2016), personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum State," *Walden*, 134 S. Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475) (emphasis in original).  That means personal jurisdiction consistent with the Due Process Clause cannot be obtained over the Foreign Defendants based on the alleged conduct of other Defendants.  *Cf. LIBOR VI*, 2016 WL 7378980, at *12 (declining to opine "as to whether conspiracy jurisdiction survives as a doctrine after" *Walden*).

## III.   THE FOREIGN DEFENDANTS HAVE NOT CONSENTED TO JURISDICTION.

The Complaint is missing allegations establishing that any of the Foreign Defendants consented to this Court's jurisdiction over this action.  Three Foreign Defendants are not named in any of the pertinent enforcement actions (Barclays PLC, HSBC Holdings plc, and The Royal Bank of Scotland Group plc), so the consent argument is entirely unavailable as to them.

24

Even if Plaintiffs were to advance a "consent" argument with respect to the remaining Foreign Defendants based on the allegations in government agency proceedings, such an argument would fail on at least two grounds.

*First*, the resolutions and plea agreements cited cannot embody consent to personal jurisdiction as to Plaintiffs' claims, because the agency proceedings do not contain any assertions that any of *the Foreign Defendants* transacted with anyone in the United States FX "consumer retail market," let alone that any Foreign Defendant transacted with any Plaintiff.

*Second*, the resolutions and plea agreements cannot embody consent to *this Court's* exercise of personal jurisdiction over *Plaintiffs' claims*.  "A party's consent to jurisdiction in one case," the Second Circuit has explained, "extends to that case alone.  It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available."  *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991) (cited in *Laydon I*, 2015 WL 1515358, at *5 n.10); *see In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 100-01 (D.D.C. 2008).  The principle applies with equal force when the prior case is a "related" criminal proceeding.  *United States v. 51 Pieces of Real Prop., Roswell, New Mexico*, 17 F.3d 1306, 1313 (10th Cir. 1994).

## CONCLUSION

The Court should dismiss the Complaint for lack of personal jurisdiction as to the Foreign Defendants.

Dated:   New York, New York              Respectfully submitted,
         August 24, 2017

SULLIVAN & CROMWELL LLP                  GIBSON, DUNN & CRUTCHER LLP

By: /s/ Matthew A. Schwartz             By: /s/ Eric J. Stock
Matthew A. Schwartz                     Eric J. Stock
Matthew A. Peller                       Indraneel Sur
Maeghan O. Mikorski                     200 Park Avenue
125 Broad Street                        New York, New York 10166
New York, New York 10004                Telephone:  (212) 351-4000
Telephone: (212) 558-4000               estock@gibsondunn.com
schwartzmatthew@sullcrom.com            isur@gibsondunn.com
pellerm@sullcrom.com
mikorskim@sullcrom.com                  D. Jarrett Arp
                                        Melanie L. Katsur
***Attorneys for Foreign Defendant***   1050 Connecticut Avenue, N.W.
***Barclays PLC***                       Washington, D.C. 20036
                                        Telephone:  (202) 955-8500
                                        jarp@gibsondunn.com
LOCKE LORD LLP                          mkatsur@gibsondunn.com

By:  /s/ Gregory T. Casamento           ***Attorneys for Foreign Defendant***
Gregory T. Casamento                    ***UBS AG***
3 World Financial Center
New York, New York 10281
Telephone:  (212) 812-8325              DAVIS POLK & WARDWELL LLP
gcasamento@lockelord.com
                                        By:  /s/ Joel M. Cohen
Roger B. Cowie                          Joel M. Cohen
2200 Ross Avenue, Suite 2800            Melissa C. King
Dallas, Texas  75201-6776               450 Lexington Avenue
Telephone:  (214) 740-8000              New York, New York 10017
rcowie@lockelord.com                    Telephone:  (212) 450-4000
                                        joel.cohen@davispolk.com
J. Matthew Goodin                       melissa.king@davispolk.com
Julia C. Webb
111 S. Wacker Drive                     ***Attorneys for Foreign Defendants***
Chicago, Illinois 60606                 ***The Royal Bank of Scotland Group plc***
Telephone:  (312) 443-0472              ***and The Royal Bank of Scotland plc***
jmgoodin@lockelord.com
jwebb@lockelord.com

***Attorneys for Foreign Defendant***
***HSBC Holdings plc***