# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN NYPL; LISA MCCARTHY; MAD TRAVEL INC., A.K.A. TRAVEL LEADERS; VALARIE JOLLY; GO EVERYWHERE, INC.; WILLIAM RUBINSOHN, DOING BUSINESS AS RUBINSOHN TRAVEL, | Case No. 1:15-CV-09300 (LGS) |
| | [rel. 13-cv-7789-LGS] |
| Plaintiffs, | ECF CASE |
| v. | ORAL ARGUMENT REQUESTED |
| JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; HSBC FINANCE CORPORATION; HSBC BANK USA, N.A.; HSBC NORTH AMERICA HOLDINGS, INC.; HSBC HOLDINGS, PLC; CITICORP; CITIGROUP INC.; CITIBANK, N.A.; UBS AG; BARCLAYS PLC; BARCLAYS CAPITAL, INC.; ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND, PLC, | |
| Defendants. | |

# DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, ALTERNATIVELY, TO CERTIFY ORDER FOR APPEAL UNDER 28 U.S.C. § 1292(b)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.    PLAINTIFFS CANNOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING III*. ............................................................................................................... 2

II.   THE SCOPE OF PLAINTIFFS' CLAIMS SHOULD BE NARROWED TO END IN JANUARY 2013.................................................................................................... 8

III.  ALTERNATIVELY, THE COURT SHOULD CERTIFY ITS ORDER ON ANTITRUST INJURY FOR APPEAL UNDER 28 U.S.C. § 1292(b). ............................ 9

CONCLUSION ...................................................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agfa Corp. v. Goldman Sachs Grp., Inc.*,
    2016 WL 7009031 (S.D.N.Y. Nov. 30, 2016), *appeal docketed sub nom. Mag
    Instruments Inc. v. Goldman Sachs Grp., Inc.*, No. 16-4243 (2d Cir. 2016) .......................4, 10

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
    175 F. Supp. 3d 44, 50 (S.D.N.Y. 2016).............................................................................7, 8

*In re Aluminum Warehousing Antitrust Litig.*,
    2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014), *aff'd, Aluminum Warehousing
    III*, 833 F.3d 151 (2d Cir. 2016).........................................................................................4, 5

*In re Aluminum Warehousing Antitrust Litig.*,
    2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) ..........................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) ("*Aluminum Warehousing III*").............................1, 2, 3, 4, 5, 6

*Capitol Records, LLC v. Vimeo, LLC*,
    972 F. Supp. 2d 537 (S.D.N.Y. 2013).....................................................................................10

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016)........................................................................................7

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.*,
    712 F.3d 136 (2d Cir. 2013)......................................................................................................9

*Florio v. City of N.Y.*,
    2008 WL 3068247 (S.D.N.Y. Aug. 5, 2008) ...........................................................................9

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016)..........................................................................8

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)..................................................................................................6, 7

*Harry v. Total Gas & Power N. Am., Inc.*,
    2017 WL 1134851 (S.D.N.Y. Mar. 27, 2017) .......................................................................10

*Litzler v. CC Invs., L.D.C.*,
    362 F.3d 203 (2d Cir. 2004), *abrogated on other grounds by Credit Suisse
    Secs. (USA) LLC v. Simmonds*, 566 U.S. 221 (2012) ...............................................................9

*Nypl v. JPMorgan Chase & Co.*,
   2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ("*Nypl II*") ................................2, 3, 4

*Sullivan v. Barclays PLC*,
   2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)..........................................................7

*W.R. Huff. Asset Mgmt. Co. v. Deloitte & Touche, LLP*,
   549 F.3d 100 (2d Cir. 2008)................................................................................9

*In re WorldCom*,
   2003 WL 21498904 (S.D.N.Y. June 30, 2003) ..................................................10

## Other Authorities

28 U.S.C. § 1292(b) ....................................................................................2, 9, 11

Federal Rule of Civil Procedure 12(b)(6) .........................................................2, 8, 9

## PRELIMINARY STATEMENT[1]

Defendants respectfully move to dismiss plaintiffs' Third Amended Complaint ("TAC"), filed August 10, 2017, on the narrow legal ground that, even assuming plaintiffs adequately allege a link between pricing in the FX spot trading and consumer retail markets and that plaintiffs are efficient enforcers,[2] plaintiffs fail to allege antitrust injury under *In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) ("*Aluminum Warehousing III*").

Respectfully, defendants believe that this Court's ruling granting leave to amend effectively created a new standard for antitrust injury that is inconsistent with Second Circuit law. Only a plaintiff who participates "in the very market that is directly restrained" has suffered antitrust injury, unless that plaintiff can show that its injury is "'inextricably intertwined' with the injury of the ultimate target." *Id.* at 160-61 (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479 (1982)). Plaintiffs here concede that they did not participate "in the very market that was directly restrained" (the FX spot trading market), and they do not allege that their injury is "inextricably intertwined" with any spot trading market manipulation. The alleged fact that prices in the consumer retail market were based, at least in part, on a benchmark derived from transactions in the spot trading market does not distinguish *Aluminum Warehousing III*. On the contrary, the Second Circuit in *Aluminum Warehousing III* accepted plaintiffs' allegations that prices in the plaintiffs' markets were based on a benchmark—the "Midwest Premium"—that was directly affected by the challenged restraints.

---

[1]     This memorandum does not repeat the procedural and factual background of this case, with which the Court is familiar. *See* Defendants' Joint Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint (ECF 132) and Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint (ECF 179).

[2]     Defendants will not re-argue these points here, but incorporate their prior briefing by reference.

If the Rule 12(b)(6) motion is denied, defendants respectfully move the Court to certify that ruling for appeal under 28 U.S.C. § 1292(b).  Defendants also move to narrow the scope of plaintiffs' claims to end in January 2013 because plaintiffs allege no wrongdoing after that date.

**ARGUMENT**

## I.    PLAINTIFFS CANNOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING III*.

In *Aluminum Warehousing III*, the Second Circuit recognized "the antitrust standing requirement that the putative plaintiff participate in the market that is directly manipulated by the collusive conduct."  833 F.3d at 161; *see also id.* at 160 (citing cases where standing exists because "plaintiffs were participants in the market that was the *immediate target* of the alleged scheme, and that is where they directly suffered harm at the hands of the defendants") (emphasis added).  The sole exception recognized by the Second Circuit is where the injury in a secondary market (the one where plaintiffs transacted) is "inextricably intertwined" with the injury in the immediately-restrained market.  *Id*. at 161.

In finding that the *Nypl* plaintiffs sufficiently alleged antitrust injury, this Court did not rely upon the "inextricably intertwined" exception.  *See Nypl v. JPMorgan Chase & Co.*, 2017 WL 3309759, at *4 (S.D.N.Y. Aug. 3, 2017) ("*Nypl II*").  Instead, this Court held that notwithstanding the allegation that the FX spot trading market is "completely different" from the consumer retail market, plaintiffs satisfy the requirements of *Aluminum Warehousing III* because the two markets are connected by a benchmark:  "So long as the prices Plaintiffs paid in the consumer retail market were based, at least in significant part, on the manipulated FX benchmark

rates, Plaintiffs have suffered antitrust injury regardless of other differences between the two markets." *Id*.[3]

Respectfully, *Aluminum Warehousing III* does not support this Court's conclusion that antitrust injury exists where the plaintiff transacted in a separate market whose prices are allegedly determined in significant part by a benchmark derived from the immediately-restrained market. On the contrary, the Consumer and Commercial plaintiffs in *Aluminum Warehousing III* (*i.e.*, the plaintiffs whose claims were the subject of that appeal) alleged that the prices they paid directly incorporated a benchmark that was set based on the restrained market. Like the FX benchmarks at issue here, which are derived from trading in the allegedly restrained FX spot trading market (TAC ¶¶ 5-6, 50), the restrained warehouse market in *Aluminum Warehousing III* also generated a benchmark—the Midwest Premium—"based on a survey of the prevailing spot price of aluminum for delivery" as reported to "the trade publication Platts." *Aluminum Warehousing III*, 833 F.3d at 155. The Second Circuit assumed the truth of the allegations that the restraints in the warehouse market "directly increased the Midwest Premium," *id.*, and that plaintiffs were injured "by paying a higher Midwest Premium." *Id.* at 162. Notwithstanding the fact that they alleged injury from paying a higher benchmark-based price, these plaintiffs did not suffer antitrust injury because they did not transact "in the LME warehouse storage market, … where the direct, immediate impact would have been felt," *id.*, and therefore their injury was "collateral damage." *Id.* at 163.[4] The *Nypl* plaintiffs' allegations require the same result.

---

[3] This Court further characterized the present case as involving "a benchmark that is both derived from one market and determinative of price in the other market." *Id.* at *6. That characterization appears in the Court's discussion of the efficient enforcer prong, but is nonetheless relevant here in describing the benchmark's role.

[4] The district court decision, which was affirmed, provides further details on the alleged benchmark-based relationship between the immediately-restrained market and the separate (continued…)

Furthermore, in concluding that the Proposed TAC sufficiently alleged antitrust injury, this Court also distinguished *Aluminum Warehousing III* on the ground that in that case, the injury "'was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme,'" whereas in *Nypl*, "the FX benchmark rates did not merely trickle down or have an incidental effect but instead directly influenced the foreign exchange retail market as the primary price component."  *Nypl II*, 2017 WL 3309759, at *5 (quoting *Aluminum Warehousing III*, 833 F.3d at 162).[5]  However, in characterizing the pricing effects at issue as "incidental," the Second Circuit was not commenting on the strength of the statistical or mathematical relationship between prices in the restrained and secondarily-affected markets necessary for antitrust injury, as this Court seemed to suggest.  Indeed, the Second Circuit and the district court assumed the truth of the Consumer and Commercial plaintiffs' allegations in *Aluminum Warehousing III* that the alleged warehouse manipulation "directly increased the Midwest Premium, which the plaintiffs … paid downstream," *Aluminum Warehousing III*, 833 F.3d at 155, and that plaintiffs' aluminum purchases were "priced with

market in which the plaintiffs transacted.  That decision notes the allegation that "plaintiffs have paid a common, standardized benchmark price for aluminum consisting of the cash price of aluminum purchased on the LME…plus the 'Midwest Premium.'…A private publishing company, Platts, publishes a measure of the Midwest Premium based on data it collects from buyers and sellers of aluminum…."  2014 WL 4277510, at *4 (S.D.N.Y. Aug. 29, 2014), *aff'd*, *Aluminum Warehousing III*, 833 F.3d 151 (2d Cir. 2016).  The court observed that "plaintiffs uniformly allege" that they paid a price "which incorporated an inflated Midwest Premium."  *Id*. at *20.  It noted that one of the named Commercial plaintiffs alleged that the price it paid "was based on the Midwest Premium."  *Id*. at *9.  The allegations made it "clear" that these plaintiffs were "negatively impacted" due to a "rise in the Midwest Premium."  *Id*. at *2.

[5]     To the extent the Court's opinion relied on the "down the distribution chain" aspect of this analysis, that also does not distinguish *Aluminum Warehousing III*.  The district court subsequently found that direct purchasers of physical aluminum lacked antitrust standing under the Second Circuit's opinion.  *Agfa Corp. v. Goldman Sachs Grp., Inc.*, 2016 WL 7009031, at *6 (S.D.N.Y. Nov. 30, 2016) ("the fundamental mistake plaintiffs make here…is to conflate experiencing some effect of anticompetitive conduct on the one hand, with what constitutes antitrust injury as a matter of law, on the other"), *appeal docketed sub nom. Mag Instruments Inc. v. Goldman Sachs Grp., Inc.*, No. 16-4243 (2d Cir. 2016).

reference to the Midwest Premium," *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *1. Despite the assumed relationship between the Midwest Premium benchmark and the Consumer and Commercial plaintiffs' prices, those plaintiffs still lacked antitrust injury because they "d[id] not and cannot allege that they participated in [the aluminum warehouse] market." *Aluminum Warehousing III*, 833 F.3d at 162. The Second Circuit's reference to an "incidental byproduct" did not negate its assumption that the two markets were connected by a benchmark that, as here, was derived from the immediately-affected market and, in turn, allegedly affected prices in the market where plaintiffs transacted.[6]

Rather, the Second Circuit's reference to an "incidental byproduct" concerned those plaintiffs' inability to invoke the "inextricably intertwined" exception, an exception that plaintiffs here cannot—and do not purport to—satisfy.[7] To invoke this exception, plaintiffs in *Aluminum Warehousing III* needed to allege that the impact in the markets in which they participated was a "necessary step" in restraining prices in the immediately-restrained warehouse market. 833 F.3d at 162. The Second Circuit held that this exception was not met because any

---

[6]    Nor did the incorporation of the Midwest Premium benchmark into physical aluminum prices merge the restrained market and the market in which the Consumer and Commercial plaintiffs transacted into a single "Midwest Premium" market. The markets remained separate. Although this Court did not seem to rely on the *Nypl* plaintiffs' allegation that there is a uniform "benchmark exchange rates" market (*e.g.*, TAC ¶ 39), *Aluminum Warehousing III* would not support such a broad definition of the market for antitrust injury purposes simply because FX benchmarks that are allegedly derived from one market affect prices in other markets.

[7]    Plaintiffs do not and cannot allege that their injury was a "'necessary step'" to effectuating alleged FX spot trading market manipulation. *Id.* Plaintiffs do not allege that defendants needed to manipulate FX retail consumer transactions in order to manipulate FX spot trading prices or, indeed, that a bank even needed to have retail operations in order to participate in the FX spot trading market. In seeking leave to amend, plaintiffs did not argue that they satisfy the "inextricably intertwined" standard. *See* Pl. Mot. to Amend (ECF 171) at 10 (discussing *Aluminum Warehousing III* but never mentioning the "inextricably intertwined" standard).

effects in the plaintiffs' secondarily-affected market were merely "incidental" to, and not a "necessary step" in, the direct restraint in the warehouse market.

Respectfully, the Second Circuit's decision in *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016)—which pre-dates *Aluminum Warehousing III*—is far less analogous here than *Aluminum Warehousing III*.  Although both cases involved a type of benchmark, the *Gelboim* Court had no occasion to consider whether the plaintiffs' injury was suffered in the directly-restrained market.  Instead, in *Gelboim*, the parties litigated an antecedent question: whether the defendants' alleged agreement to suppress LIBOR amounted to *per se* illegal price fixing that caused injuries flowing from a reduction in competition.[8]  The *Gelboim* Court did not then consider which market was the directly-restrained market and whether claimants had transacted in some separate market.

Not only did *Gelboim* not address the "separate markets" issue raised here, but it is distinguishable on its facts.  The plaintiffs in *Gelboim* alleged an agreement to directly manipulate LIBOR, which is a benchmark calculated from a survey of banks.  LIBOR is not calculated arithmetically from allegedly manipulated transactions in any underlying market and, more importantly, is not itself a market.[9]  In *Aluminum Warehousing III*, in contrast, plaintiffs alleged manipulation of a separate market that directly affected the Midwest Premium benchmark which, in turn, affected the price of physical aluminum purchased by plaintiffs.  In contrast to the *Gelboim* plaintiffs (and like the *Aluminum Warehousing III* plaintiffs), plaintiffs

---

[8]     823 F.3d at 764-65, 770 ("The district court reasoned that the LIBOR-setting process was collaborative rather than competitive [and] that any manipulation to depress LIBOR therefore did not cause appellants to suffer anticompetitive harm. . . . The district court . . . elided the distinction between antitrust violation and antitrust injury by placing considerable weight on appellants' failure to show 'harm to competition.'").

[9]     Indeed, a central theme of *Gelboim* is the allegation that the submissions were not an accurate reflection of underlying market conditions.

here allege that defendants manipulated the FX spot trading market—as to which other plaintiffs have brought suit—which, in turn, affected the calculation of FX benchmarks that, in turn, directly impacted plaintiffs' prices in the separate consumer retail market.  Unlike the *Gelboim* plaintiffs, plaintiffs here do not (and cannot) allege that the FX benchmarks were manipulated directly, *i.e.*, apart from alleged manipulation of the spot trading market from which the benchmarks derive.

Alleged direct manipulation of a benchmark also distinguishes the three other benchmark cases from other district court judges on which this Court relied.[10]  *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 653 (S.D.N.Y. 2016), involved alleged manipulation of the gold fixing itself, which the court deemed "an artificially constructed private 'auction' that was instituted for the sole purpose of allowing the Fixing Banks to set a market-wide benchmark."  Indeed, in analyzing the *Aluminum Warehousing III* question of whether the plaintiffs were participants in the defendants' market, the court noted that, in the particular case of the gold fixing, applying *Aluminum Warehousing III* to limit standing to those transacting in the auction would lead to the "absurd" result "that the alleged conspirators are the only entities with standing."  *Id.*  No such issue arises in applying *Aluminum Warehousing III* here, as other plaintiffs are pursuing claims on the basis of injury in the FX spot trading market, having allegedly transacted in the very market that was purportedly manipulated.  Likewise, *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017), involved alleged direct manipulation of the Euribor submissions themselves, and the opinion did not address *Aluminum Warehousing III*.  Finally, *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 50 (S.D.N.Y. 2016), which

---

[10]     This is not to say, nor did *Gelboim* hold, that every market potentially impacted by LIBOR or a benchmark calculated in a similar manner suffers antitrust injury.

pre-dates *Aluminum Warehousing III*, involved direct manipulation of the submissions that

would determine the benchmark (and not merely manipulation of the underlying interdealer

swaps market used to generate proposed submissions).[11]

In sum, the TAC does not and cannot allege antitrust injury or standing under *Aluminum

Warehousing III*, warranting dismissal of plaintiffs' federal antitrust claim under Rule 12(b)(6).

And, as set forth in defendants' opposition to plaintiffs' motion for leave to amend, the

California law claims should fall with the federal antitrust claim.[12]

## II.     THE SCOPE OF PLAINTIFFS' CLAIMS SHOULD BE NARROWED TO END IN JANUARY 2013.

In dismissing the Second Amended Complaint ("SAC"), the Court did not reach

defendants' argument that the scope of plaintiffs' claims should be narrowed because plaintiffs

allege no conduct after January 2013.  Like its predecessor, the TAC's allegations do not suggest

that any conduct occurred beyond January 2013.[13]  For the reasons set forth in defendants'

motion to dismiss the SAC, these claims should be narrowed to end in January 2013.[14]

---

[11]     This Court's ruling with respect to the Exchange Class is also distinguishable.  Following *Aluminum Warehousing III*, the Exchange Class argued that defendants intended to directly manipulate the FX futures market and alleged direct manipulative acts occurring in the Exchange market, including manipulation of the CME settlement rate.  *FOREX* Pl. Letter Aug. 24, 2016 (*FOREX* ECF 650) at 1-2.  The Court relied on the argument that "the conspiracy was intended in part to earn Defendants 'ill-gotten trading profits' on [exchange-traded FX products]" in finding antitrust injury sufficiently alleged.  *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *5 (S.D.N.Y. Sept. 20, 2016).  The *Nypl* plaintiffs do not allege facts suggesting that any direct acts of manipulation occurred in the consumer retail market, or that the aim of the purported conspiracy was to profit from consumer retail transactions.

[12]     *See* Defendants' Joint Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint (ECF 179) at 23-25.

[13]     *See, e.g.*, TAC Ex. A-1 at ¶ 2 (DOJ plea agreement indicating that conduct occurred until "January 2013"); *see also* TAC Ex. D-1 at ¶ 6, Ex. C-2 at 2, Ex. B-5 at 2 (OCC, Fed, and CFTC orders stating that conduct continued until 2013, 2013, and 2012, respectively).

[14]     *See* Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Complaint (ECF 132) at 23-25.

## III.   ALTERNATIVELY, THE COURT SHOULD CERTIFY ITS ORDER ON ANTITRUST INJURY FOR APPEAL UNDER 28 U.S.C. § 1292(b).

If the Court denies defendants' Rule 12(b)(6) motion as to antitrust standing, defendants respectfully request that the Court certify that portion of its order for appeal under 28 U.S.C. § 1292(b) because the litigation would be "materially advance[d]" by a Second Circuit decision on this "controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).[15]  All three elements are satisfied here.  Moreover, given the complexity of this case, certification under Section 1292(b) could assist in avoiding prolonged and costly proceedings.

1.   An appeal would materially advance the litigation because if the Second Circuit holds that plaintiffs lack antitrust standing under *Aluminum Warehousing III*, their claims would be dismissed.  *See Florio v. City of N.Y.*, 2008 WL 3068247, at *1 (S.D.N.Y. Aug. 5, 2008) ("An immediate appeal is considered to advance the ultimate termination of the litigation if that 'appeal promises to advance the time for trial or to shorten the time required for trial.'") (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998)).  In the event of such a ruling, no plausible amendment could save plaintiffs' claims.

2.   The Court's antitrust injury ruling would involve a controlling question of law.  The question of whether the *Nypl* plaintiffs satisfy *Aluminum Warehousing III* where they allege

---

[15]     Courts in this district have granted section 1292(b) certification from denials of Rule 12 motions, including on threshold issues such as standing.  *See Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136 (2d Cir. 2013) (reviewing the Federal Housing Finance Agency's standing to bring claims on behalf of Fannie Mae and Freddie Mac and the timeliness of its claims); *W.R. Huff. Asset Mgmt. Co. v. Deloitte & Touche, LLP*, 549 F.3d 100 (2d Cir. 2008) (appeal of an investment adviser's standing to assert claims on behalf of clients); *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203 (2d Cir. 2004) (appeal concerning the statute of limitations under Section 16 of the Securities Exchange Act of 1934), *abrogated on other grounds by Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 229 n.7 (2012).

manipulation in one market but allege injury in another market (albeit another market that, as in *Aluminum Warehousing III*, is connected to the directly manipulated market by a benchmark) is a pure question of law.[16]   Under *Aluminum Warehousing III*, their claim is legally deficient regardless of whether pricing in the markets is statistically correlated or connected by a benchmark.

      3.   There is substantial ground for difference of opinion on the antitrust injury question, as shown above.[17]   Courts in this district have held that plaintiffs failed to allege antitrust injury under *Aluminum Warehousing III* where they transacted in a market that was not directly restrained and did not meet the "inextricably intertwined" exception.[18]   Defendants respectfully submit that good grounds exist to conclude that the Second Circuit's reference to an "incidental byproduct" reflected the fact that the effects in the plaintiffs' market were not a necessary means to effectuate the conspiracy in the directly restrained market, and that the phrase does not imply that a statistical or mathematical correlation between pricing in the two markets satisfies the legal standard.   Rather, the Commercial and Consumer plaintiffs' claims failed notwithstanding their allegations of a benchmark-based relationship between prices in those two markets.

---

[16]   Certification is appropriate where the appeal involves "a 'pure' question of law that the reviewing court 'could decide quickly and cleanly without having to study the record.'"   *In re WorldCom*, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) (quoting *Ahrenholz v. Bd. of Trs. of Univ. of Illinois*, 219 F.3d 674, 676-77 (7th Cir. 2000)).

[17]   Substantial ground for difference of opinion exists when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit."   *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013) (quoting *In re Enron Corp.*, 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007)).

[18]   *E.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, 2017 WL 1134851 (S.D.N.Y. Mar. 27, 2017) (dismissing plaintiffs who transacted in physical natural gas from, or derivatives indexed to, a different regional hub than the one allegedly manipulated); *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) (dismissing first level purchasers under *Aluminum Warehousing III*); *Agfa Corp.*, 2016 WL 7009031 (dismissing claims of direct purchasers of physical aluminum under *Aluminum Warehousing III*).

## CONCLUSION

For these reasons, the Court should dismiss the TAC for failure to state a claim or, alternatively, certify the Court's order on antitrust standing under 28 U.S.C. § 1292(b).

Dated:  New York, New York
        August 24, 2017                                   Respectfully submitted,

COVINGTON & BURLING LLP

By: s/ Andrew A. Ruffino

Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
Facsimile:  (212) 841-1010
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile:  (202) 662-6291
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com

***Attorneys for Defendants Citigroup Inc.,
Citicorp, and Citibank, N.A.***

DAVIS POLK & WARDWELL LLP

By:  s/ Joel M. Cohen*

Joel M. Cohen
Melissa C. King
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-4800
joel.cohen@davispolk.com
melissa.king@davispolk.com

***Attorneys for the Defendants
The Royal Bank of Scotland Group plc
and The Royal Bank of Scotland plc***

SULLIVAN & CROMWELL LLP

By: s/ Matthew A. Schwartz*

Matthew A. Schwartz
Matthew A. Peller
Maeghan O. Mikorski
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4197
Facsimile: (212) 291-9481
schwartzmatthew@sullcrom.com
pellerm@sullcrom.com
mikorskim@sullcrom.com

***Attorneys for Defendants
Barclays PLC and Barclays Capital, Inc.***

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: s/ Peter E. Greene*

Peter E. Greene
Boris Bershteyn
Tansy Woan
Four Times Square
New York, NY 10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
peter.greene@skadden.com
boris.bershteyn@skadden.com
tansy.woan@skadden.com

*Attorneys for Defendants JPMorgan Chase
& Co. and JPMorgan Chase Bank, N.A.*

GIBSON, DUNN & CRUTCHER LLP

By: s/ Eric Stock*

Eric Stock
Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile:  (212) 716-0875
isur@gibsondunn.com
estock@gibsondunn.com

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
Facsimile:  (202) 530-9527
jarp@gibsondunn.com
mkatsur@gibsondunn.com

*Attorneys for Defendant UBS AG*

LOCKE LORD LLP

By:  s/ Gregory T. Casamento*

Gregory T. Casamento
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-6776
Telephone: (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 S. Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 443-0472
jmgoodin@lockelord.com
jwebb@lockelord.com

*Attorneys for Defendants HSBC Finance
Corporation, HSBC Bank USA, N.A.,
HSBC North America Holdings, Inc., and
HSBC Holdings plc*

SHEARMAN & STERLING LLP

By: s/ Adam S. Hakki*

Adam S. Hakki
Richard F. Schwed
Jeffrey J. Resetarits
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7179
ahakki@shearman.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com

*Attorneys for Defendants Bank of America
Corporation and Bank of America, N.A.*

* Signature used with permission pursuant to SDNY ECF Rule 8.5(b).