**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN NYPL; LISA MCCARTHY; MAD TRAVEL INC., A.K.A. TRAVEL LEADERS; VALARIE JOLLY; GO EVERYWHERE, INC.; WILLIAM RUBINSOHN, DOING BUSINESS AS RUBINSOHN TRAVEL,<br><br>Plaintiffs,<br>v.<br><br>JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; HSBC FINANCE CORPORATION, HSBC BANK USA, N.A.; HSBC NORTH AMERICA HOLDINGS, INC.; HSBC HOLDINGS, PLC; CITICORP; CITIGROUP INC.; CITIBANK, N.A.; UBS AG; BARCLAYS PLC; BARCLAYS CAPITAL INC.; ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND, PLC,<br><br>Defendants. | Case No. 1:15-CV-09300 (LGS)<br><br>[rel. 13-cv-7789-LGS]<br><br>ECF CASE<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' JOINT REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, ALTERNATIVELY, TO CERTIFY ORDER FOR APPEAL UNDER 28 U.S.C. § 1292(b)**

# TABLE OF CONTENTS

**I. PLAINTIFFS CANNOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING III.*** ... 1

**A. *Aluminum Warehousing III* Precludes Antitrust Injury Where, As Here, Plaintiffs Transacted In A Secondarily-Affected Market, Even If They Transacted At A Benchmark Generated By The Directly-Affected Market.** ... 1

**B. There Is No Exception In *Aluminum Warehousing III* For Entities That Purchase From A Defendant In The Secondarily-Affected Market.** ... 5

**C. Plaintiffs' New Attempt To Assert Collusion In The Consumer Retail Market Does Not Save Their Claims.** ... 5

**D. Plaintiffs Cannot Meet *Aluminum Warehousing III*'s "Inextricably Intertwined" Exception.** ... 6

**II. THE SCOPE OF PLAINTIFFS' CLAIMS SHOULD BE NARROWED TO END IN JANUARY 2013.** ... 8

**III. ALTERNATIVELY, THE COURT SHOULD CERTIFY ITS ORDER ON ANTITRUST INJURY FOR APPEAL UNDER 28 U.S.C. § 1292(b).** ... 9

**CONCLUSION** ... 10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agfa Corp. v. Goldman Sachs Grp., Inc.*,
2016 WL 7009031 (S.D.N.Y. Nov. 30, 2016), *appeal docketed sub nom. Mag Instruments Inc. v. Goldman Sachs Grp., Inc.*, No. 16-4243 (2d Cir. 2016) ....................1, 5, 10

*In re Aluminum Warehousing Antitrust Litig.*,
833 F.3d 151 (2d Cir. 2016)........................................................1, 2, 3, 4, 5, 6, 7, 10

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011)..........................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................9

*Florio v. City of N.Y.*,
2008 WL 3068247 (S.D.N.Y. Aug. 5, 2008) ..............................................................10

*Gelboim v. Bank of Am. et al.*,
823 F.3d 759 (2d Cir. 2016)......................................................................................3, 4

*Harry v. Total Gas & Power N. Am., Inc.*,
244 F. Supp. 3d 402 (S.D.N.Y. 2017)........................................................................10

*Hyde v. United States*,
225 U.S. 347 (1912)......................................................................................................9

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016)..........................................................................4

*Mayor & City Council of Balt. v. Citigroup Inc.*,
709 F.3d 129 (2d Cir. 2013)..........................................................................................5

*Mill-Run Tours, Inc. v. Windstream Servs.*,
2017 WL 2930932 (S.D.N.Y. July 7, 2017) ..................................................................7

*Nypl v. JPMorgan Chase & Co.*,
2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ........................................................5, 6, 7

*Sanner v. Bd. of Trade of City of Chi.*,
62 F.3d 918 (7th Cir. 1995) ..........................................................................................4

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
2017 WL 4250480 (S.D.N.Y. Sept. 25, 2017)................................................................9

*United States v. Borelli*,
336 F.2d 376 (2d Cir. 1964)....................................................................................................9

**Statutes**

28 U.S.C. § 1292(b) ........................................................................................................9, 10

## I. PLAINTIFFS CANNOT ALLEGE ANTITRUST INJURY UNDER *ALUMINUM WAREHOUSING III.*

### A. *Aluminum Warehousing III* Precludes Antitrust Injury Where, As Here, Plaintiffs Transacted In A Secondarily-Affected Market, Even If They Transacted At A Benchmark Generated By The Directly-Affected Market.

In the Second Circuit, "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("*Aluminum Warehousing III*"). Accordingly, it is not the strength of the relationship between a benchmark and the alleged harm suffered in a secondary market where the plaintiff transacted that determines whether the plaintiff suffered antitrust injury. Instead, it is whether the plaintiff suffered injury "in the market that was the immediate target of the alleged scheme . . . ." *Id.* at 160; *see Agfa Corp. v. Goldman Sachs Grp., Inc.*, 2016 WL 7009031, at *5 (S.D.N.Y. Nov. 30, 2016) ("[*Aluminum Warehousing III*] makes clear that as a matter of law," for plaintiffs in a secondarily-affected market, "being affected by the anticompetitive conduct is simply not enough."), *appeal docketed sub nom. Mag Instruments Inc. v. Goldman Sachs Grp., Inc.*, No. 16-4243 (2d Cir. 2016). Plaintiffs' opposition confirms that plaintiffs cannot meet this standard.[1]

Plaintiffs' assertion that *Aluminum Warehousing III* did not involve a benchmark, Pl. Opp. at 12, ignores the market dynamics accepted as true by the Second Circuit in that case. There, the restrained warehouse market allegedly generated a benchmark—the Midwest Premium—reflecting aluminum storage and transportation costs "based on a survey of the prevailing spot price of aluminum for delivery" reported to "the trade publication Platts."

---

[1] Defendants incorporate herein their Joint Mem. of Law in Supp. of Their Mot. to Dismiss the Second Am. Compl. (ECF 132) and Joint Mem. of Law in Opp. to Pl. Mot. for Leave to File a Third Am. Compl. (ECF 179).

*Aluminum Warehousing III*, 833 F.3d at 155. The Commercial Plaintiffs who purchased aluminum in the separate physical market alleged, for example, that "aluminum is sold pursuant to a benchmark price consisting of the LME price plus a local premium referred to as the 'Midwest Premium'" derived from a "sample of" "spot buyers and sellers." Commercial End Users' Corrected Consol. Class Action Compl. ¶¶ 56-57, 13-md-02481-KBF (Mar. 24, 2014), ECF 242 ("these benchmark prices were set in various markets"). The same is true here, where plaintiffs allege that their consumer retail transactions incorporated FX spot benchmarks derived from the allegedly restrained FX spot trading market. Third Am. Compl. ("TAC") ¶¶ 5-6, 50.

Nor does plaintiffs' allegation that FX spot benchmarks are a component of consumer retail prices distinguish *Aluminum Warehousing III*. The Second Circuit accepted as true that restraints in the warehouse market "directly increased the Midwest Premium," and that the Consumer and Commercial Plaintiffs who purchased physical aluminum "pa[id] a higher Midwest Premium."[2] *Aluminum Warehousing III*, 833 F.3d at 155, 162. Nonetheless, the Second Circuit held that indirect physical aluminum purchasers did not suffer antitrust injury because they did not transact in the directly restrained "LME-warehouse storage market, . . . where the direct, immediate impact would have been felt." *Id.* at 162. Here—even accepting as true that alleged FX spot market manipulation affected FX spot benchmarks that, in turn, were a component of consumer retail prices (TAC ¶ 60)—plaintiffs still lack antitrust standing because they cannot allege that they participated in the "directly restrained" spot trading market. *Aluminum Warehousing III*, 833 F.3d at 161. The requirement that a plaintiff participate "in the

---

[2] *See also* Commercial End Users' Corrected Consol. Class Action Compl. ¶¶ 6, 11 (alleging that manipulation in the warehouse market "succeeded in increasing the cost of primary aluminum" by raising the Midwest Premium and that the Commercial Plaintiffs "must pay" the Midwest Premium "to purchase aluminum").

very market that is directly restrained" does not vanish merely because an action in the directly restrained market affects—even substantially—a second market through a benchmark. *Id.*

While ignoring defendants' arguments as to why *Aluminum Warehousing III*, not *Gelboim*, is a better match for the allegations of this case (Mot. at 6-7), plaintiffs continue to assert that *Gelboim* provides for antitrust injury any time a plaintiff alleges that "they paid higher prices" as a result of the conspiracy. Pl. Opp. at 3 (quoting *Gelboim v. Bank of Am. et al*., 823 F.3d 759, 776-77 (2d Cir. 2016)). But, *Gelboim* did not address whether plaintiffs in a secondarily-affected market suffer antitrust injury. Indeed, the benchmark at issue there, LIBOR, is set based on submissions by panel banks, not by measuring transactions in an underlying market. Moreover, *Aluminum Warehousing III* post-dates *Gelboim*, and it is the operative law on the need to allege that plaintiffs transacted in the directly-restrained market.

Plaintiffs' repeated assertion that there is a single FX benchmarks market, Pl. Opp. at 1-3, 5, 8-10, 13, attempts an end-run around *Aluminum Warehousing III*. The purpose of *Aluminum Warehousing III*—to limit standing to those who transacted in the directly-restrained market—would be a nullity if a plaintiff in a secondarily-affected market could gain standing merely by alleging a statistical correlation between a benchmark in the directly-manipulated market and prices in the second market. In *Aluminum Warehousing III*, the secondarily-affected market allegedly used the Midwest Premium benchmark derived from the directly-affected market. Likewise, here, the secondarily-affected consumer retail market allegedly uses benchmarks arithmetically derived from the directly-affected FX spot market. TAC ¶¶ 5-6, 50.[3] There is no

---

[3] *E.g.*, TAC Ex. A-1 at 2-3 (alleging conspiracy to manipulate "the euro/U.S. dollar ('EUR/USD') currency pair exchanged in the foreign currency exchange *spot market* ('FX Spot Market')") (emphasis added); *see also id.* at 6 (alleging that conspiracy was carried out by "coordinating . . . trading . . . in connection with European Central Bank and World Markets/Reuters benchmark currency 'fixes'").

allegation that these FX spot benchmarks were derived from the FX consumer retail market. And plaintiffs have previously assured the Court that they only engaged in consumer retail transactions, not spot trades.[4] *See* Pl. Opp. to Def. Mot. to Stay or Consolidate (ECF 99) at 2-4.

Without explaining the apparent contradiction in their position, plaintiffs then concede that there are actually "two markets" (the "consumer retail" and "trading" markets) which plaintiffs allege are "related." Pl. Opp. at 11-12. Plaintiffs cite an out-of-circuit decision (*Sanner*) to suggest that anticompetitive acts that affect two markets can establish antitrust standing for both plaintiffs. But *Sanner* relied on *McCready*'s "inextricably intertwined" exception to antitrust injury. *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 929-30 (7th Cir. 1995). As discussed in section I.D below, plaintiffs misapply that exception. Similarly, plaintiffs' reliance on *Silver Fixing* is misplaced. That case involved a single market because the benchmark was set by an auction that only included the alleged conspirators. Judge Caproni concluded that applying *Aluminum Warehousing III* to limit standing to those transacting in the auction would lead to the "absurd" result "that the alleged conspirators are the only entities with standing." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 552 (S.D.N.Y. 2016).[5] Plaintiffs here cannot make a similar argument, given the demonstrated ability of FX spot traders to bring their own claims.

---

4 Contrary to plaintiffs' claim that there are disputed factual issues about the "scope" of the market and plaintiffs' involvement therein, Pl. Opp. at 14, defendants' motion accepts as true plaintiffs' allegations that they did not engage in spot trades but only engaged in consumer retail transactions. Similarly, plaintiffs' claim that *Aluminum Warehousing III* does not apply because the plaintiffs there disavowed transacting in the directly-restrained warehousing market is disingenuous because plaintiffs here, too, disavow having engaged in the spot trades that were allegedly directly manipulated. Pl. Opp. at 13-14.

5 *Silver Fixing* highlights why *Aluminum Warehousing III*, not *Gelboim*, should control here. Analogous to *Silver Fixing*, where the only participants in the auction process were alleged conspirators, *Gelboim* concerned a benchmark that is based on submissions, not a formulaic measurement of transactions in any underlying market that was allegedly directly manipulated.

### B. There Is No Exception In *Aluminum Warehousing III* For Entities That Purchase From A Defendant In The Secondarily-Affected Market.

Plaintiffs' argument that they directly purchased from certain defendants in the consumer retail market ignores the relevant inquiry, which focuses on the market in which they transacted, not with whom they transacted. As this Court previously noted: "The relevant inquiry is not whether Defendants directly transacted with Plaintiffs, but whether Defendants directly restrained the market in which Plaintiffs participated." *Nypl v. JPMorgan Chase & Co.*, 2017 WL 1133446, at *5 (S.D.N.Y. Mar. 24, 2017) ("*Nypl I*"). That observation was consistent with *Aluminum Warehousing III*, which turned on the fact that plaintiffs did not transact in the directly-affected market, not the identity of those with whom they transacted in the secondarily-affected market. Indeed, applying *Aluminum Warehousing III*, Judge Forrest later dismissed the claims of direct purchasers (i.e., plaintiffs who purchased physical aluminum from the defendants) on the same grounds that the Second Circuit dismissed the indirect purchasers. *Agfa Corp.*, 2016 WL 7009031, at *6 ("Plaintiffs' alleged purchases of physical aluminum [directly from certain defendants], even at inflated prices, do not change the fact that the anticompetitive conduct occurred in a different market . . . .").

### C. Plaintiffs' New Attempt To Assert Collusion In The Consumer Retail Market Does Not Save Their Claims.

In a misguided attempt to distinguish *Aluminum Warehousing III*, plaintiffs assert for the first time (and without a single citation to their TAC) that defendants colluded to "inject" FX benchmarks into consumer retail rates. Pl. Opp. at 4-5. But, the TAC does not even hint at such a conspiracy, much less allege it with the requisite facts.

The "plaintiff's job . . . is to allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt. v. Citigroup Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). The TAC itself does not actually describe any alleged manipulation, other than that

defendants conspired to "manipulate and rig the Benchmark exchange rates." TAC ¶ 39. Indeed, plaintiffs' allegations of manipulation are based entirely on regulatory findings attached to the TAC, all of which pertain exclusively to alleged conduct in the spot market. *See, e.g.*, TAC Ex. A-1 at ¶ 2-3 (DOJ plea agreement alleging manipulation of "euro/U.S. dollar . . . currency pair exchanged in the foreign currency exchange spot market" through coordination of trading in connection with ECB and WM/R benchmarks). As this Court previously recognized,

> [t]he Complaint here does not plausibly allege that the end-user (i.e., consumer) retail foreign currency market in which Plaintiffs participated was directly restrained by Defendants' alleged anticompetitive acts. All of the Complaint's allegations of wrongdoing are based on the DOJ press release and relate to Defendants' manipulation of the FX spot market and the benchmark exchange rates derived from trades in the FX spot market . . . .

*Nypl I*, 2017 WL 1133446, at *5. While the TAC adds allegations concerning the purported *relationship* between FX benchmarks and consumer retail prices, it does not add factual allegations concerning collusion in the consumer retail market. Moreover, plaintiffs allege no facts suggesting that certain defendants even participate in the consumer retail FX market in the United States.[6]

### D. Plaintiffs Cannot Meet *Aluminum Warehousing III*'s "Inextricably Intertwined" Exception.

Plaintiffs misapply the "inextricably intertwined" exception. Pl. Opp. at 10. Plaintiffs do not argue, as required for the exception to apply, that manipulation of consumer retail transactions was a "necessary step" in effectuating the alleged manipulation of FX benchmark rates. *See Aluminum Warehousing III*, 833 F.3d at 162. Nor do plaintiffs allege that manipulating the consumer retail transactions was the means by which the spot market was

---

6 Barclays Capital Inc., Barclays PLC, HSBC North America Holdings, Inc., HSBC Holdings plc, The Royal Bank of Scotland PLC, The Royal Bank of Scotland Group PLC, and UBS AG.

manipulated. To the contrary, plaintiffs argue that the causation runs in the other direction, *i.e.*, that the *benchmarks* were the "conduit, market forces and fulcrums" by which their consumer retail prices were allegedly impacted. Pl. Opp. at 11. Plaintiffs' argument that "there is a correlation between FX benchmark foreign exchange rates and the foreign exchange rates that Plaintiffs paid," *id.* at 10, makes the very mistake the Second Circuit cautioned against. That is, plaintiffs equate a direct, but "incidental," byproduct of the alleged manipulation with an injury that is a necessary step in effectuating the manipulation. *Aluminum Warehousing III*, 833 F.3d at 162. As this Court acknowledged in dismissing the SAC, "[i]f the end-user market was the target and the FX spot market was the means, then under *McCready* participants in the FX spot market would have antitrust injury, but not Plaintiffs." *Nypl I*, 2017 WL 1133446, at *5.[7]

Plaintiffs misconstrue the Second Circuit's holding in *Aluminum Warehousing III* that plaintiffs' injury "was a purely incidental byproduct of the alleged scheme." *Aluminum Warehousing III*, 833 F.3d at 162. That holding concerned those plaintiffs' inability to invoke the "inextricably intertwined" exception because their injury was not a necessary means for restraining the directly-affected market. *Id.* The effects in the physical aluminum market, however strong they might be, were nonetheless "incidental" to the alleged restraints. This "incidental byproduct" language did not purport to establish an exception under which plaintiffs who transacted in the secondarily-affected market could nonetheless establish antitrust injury merely by alleging a more-than-incidental connection to the directly-restrained market. The plaintiffs in *Aluminum Warehousing III* made such allegations yet still lacked standing.

---

[7] Plaintiffs' new assertion that retail manipulation was intended to generate "a mutually reinforcing price-fix stabilization effect" (Pl. Opp. at 10-11) is wholly unsupported by the TAC and the cited regulatory orders, and constitutes an impermissible attempt to amend the TAC in an opposition brief. *Mill-Run Tours, Inc. v. Windstream Servs.*, 2017 WL 2930932, at *4 (S.D.N.Y. July 7, 2017) ("a complaint cannot be amended by the opposition brief").

## II. THE SCOPE OF PLAINTIFFS' CLAIMS SHOULD BE NARROWED TO END IN JANUARY 2013.

Plaintiffs' opposition confirms that the TAC is devoid of any well-pleaded factual allegations that the alleged conspiracy continued beyond January 2013. Plaintiffs' conspiracy allegations are based exclusively on regulatory orders, none of which found a conspiracy that continued beyond January 2013, and some of which directly contradict that conclusion. For example, the CFTC order against Citi expressly found that "in early 2013, Citibank banned multi-bank chatrooms for its FX personnel," which were the alleged instrumentality of the conspiracy. TAC Ex. B-1 at 9.[8] Plaintiffs cannot assert purely conclusory claims that materially contradict the documents on which plaintiffs base their conspiracy allegations. *See, e.g.*, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146-47 (2d Cir. 2011) (where an allegation "is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true").

---

[8] The other CFTC orders annexed to the complaint contain similar statements. TAC Ex. B-2 at 10 ("After the Relevant Period, in December 2012, HSBC banned multi-bank chat rooms for its FX personnel."); TAC Ex. B-3 at 7 ("In August 2012, RBS restricted participation by traders in multi-bank chat rooms."); TAC Ex. B-4 at 8 (After the "Relevant Period" (ending in 2012), UBS "banned nearly all participation by Investment Bank staff in multi-bank chat rooms in November 2013."); TAC Ex. B-5 at 8 (After the "Relevant Period" (ending in 2012), JPM "banned persistent multi-bank chat rooms in December 2013."); TAC Ex. B-6 ("On October 22, 2012, FX traders at Barclays were formally instructed to cease participation in multi-bank chatrooms."). The DOJ FX plea agreements cited by plaintiffs, which are the only governmental orders attached to the TAC purporting to find evidence of a conspiracy, define their "Relevant Period" as "at least as early as December 2007 and continuing until at least January 2013." TAC Exs. A-1, A-2, A-3, A-4 at ¶ 4(a); *see also* TAC Ex. A-5, Ex. 2 at 8 ("UBS participated in this collusive conduct from in or about October 2011 and continued until at least January 2013."). The Federal Reserve Board orders annexed to the complaint similarly identify a relevant period continuing until 2013. TAC Exs. C-1, C-2, C-3, C-4, C-5, C-6 at 2-3. The OCC orders refer only to conduct up to 2013. TAC Ex. D-1 at ¶ 11 (Citi prohibited the use of multibank chatrooms in "January 2013"); Ex. D-2 at ¶ 11 (JPM prohibited the use of multibank chatrooms in "December 2013"); Ex. D-3 at ¶ 6 (Relevant Period extends until 2013).

Plaintiffs here allege nothing to suggest a continuing conspiracy, nor do they allege any facts indicating that they have investigated possible misconduct beyond what appears in the regulatory actions. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 2017 WL 4250480, at *28-29 (S.D.N.Y. Sept. 25, 2017) (finding that plaintiffs had not "plausibly allege[d] an antitrust conspiracy that continued until at least February 5, 2011" where "the last specific instance of inter-defendant collusion alleged in the complaint occurred on May 14, 2009 . . .").[9]

Plaintiffs attempt to evade their burden under *Twombly* of alleging facts showing a continuing conspiracy by suggesting that defendants must affirmatively plead withdrawal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Plaintiffs' cases do not concern whether allegations of a continuing conspiracy suffice to withstand a motion to dismiss. Instead, they involve the applicability of a withdrawal defense at criminal trials where an alleged conspirator claims it withdrew from a continuing conspiracy. *See, e.g.*, *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir. 1964) (addressing argument that "evidence established as a matter of law that they withdrew from the conspiracy" and noting the "rigorous requirements for making out the *defense* of withdrawal from a conspiracy") (emphasis added); *Hyde v. United States*, 225 U.S. 347, 369 (1912) (statute of limitation did not bar charges where conspiracy was continuous and defendant showed no affirmative act of withdrawal). Here, there is no allegation of any conspiracy beyond January 2013 from which defendants might need to show withdrawal.

## III. ALTERNATIVELY, THE COURT SHOULD CERTIFY ITS ORDER ON ANTITRUST INJURY FOR APPEAL UNDER 28 U.S.C. § 1292(b).

---

9 *See also* Defs.' Joint Mem. of Law in Supp. of Their Mot. to Dismiss the Second Am. Compl. (ECF 132) at 23-25 (citing additional cases on plaintiffs' obligation to affirmatively plead that conspiracy continued beyond a certain date).

Plaintiffs oppose defendants' alternative request that the Court's antitrust standing ruling be certified for appeal because plaintiffs claim there are disputed issues of fact. Pl. Opp. at 16-18. Plaintiffs again overlook that defendants' motion to dismiss accepts as true plaintiffs' allegations about FX benchmark manipulation, and the relationship between those benchmarks and plaintiffs' consumer retail prices. Defendants' motion also assumes as true plaintiffs' allegations that they conducted consumer retail transactions but not spot trades. Defendants argue, as a matter of law, that these allegations do not support antitrust injury under *Aluminum Warehousing III*, which was an appeal from a ruling on a motion to dismiss. Moreover, if successful, an appeal would materially advance this litigation because plaintiffs' claims would be dismissed, thus "shorten[ing] the time required for trial." *See Florio v. City of N.Y.*, 2008 WL 3068247, at *1 (S.D.N.Y. Aug. 5, 2008) (quotation omitted). And, as shown in the 12(b)(6) argument, there is substantial ground for difference of opinion on the question of antitrust injury. Indeed, courts in this district have held that plaintiffs failed to allege antitrust injury under *Aluminum Warehousing III* where they transacted outside the directly restrained market and did not meet the "inextricably intertwined" exception.[10]

## CONCLUSION

For these reasons, the Court should dismiss the TAC for failure to state a claim or, alternatively, certify the Court's order on antitrust standing under 28 U.S.C. § 1292(b).

Dated: New York, New York
October 16, 2017

Respectfully submitted,

---

10 *E.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017) (dismissing plaintiffs who transacted in physical natural gas from, or derivatives indexed to, a different regional hub than the one allegedly manipulated); *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) (dismissing first level purchasers under *Aluminum Warehousing III*); *Agfa Corp.*, 2016 WL 7009031 (dismissing direct physical aluminum purchasers).

COVINGTON & BURLING LLP

By: s/ Andrew A. Ruffino

Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
Facsimile: (212) 841-1010
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com

***Attorneys for Defendants Citigroup Inc., Citicorp, and Citibank, N.A.***

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: s/ Peter E. Greene*

Peter E. Greene
Boris Bershteyn
Tansy Woan
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
peter.greene@skadden.com
boris.bershteyn@skadden.com
tansy.woan@skadden.com

***Attorneys for Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.***

DAVIS POLK & WARDWELL LLP

By: s/ Joel M. Cohen*

Joel M. Cohen
Melissa C. King
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 450-4800
joel.cohen@davispolk.com
melissa.king@davispolk.com

***Attorneys for the Defendants The Royal Bank of Scotland Group plc and The Royal Bank of Scotland plc***

SULLIVAN & CROMWELL LLP

By: s/ Matthew A. Schwartz*

Matthew A. Schwartz
Matthew A. Peller
Maeghan O. Mikorski
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4197
Facsimile: (212) 291-9481
schwartzmatthew@sullcrom.com
pellerm@sullcrom.com
mikorskim@sullcrom.com

***Attorneys for Defendants Barclays PLC and Barclays Capital Inc.***

GIBSON, DUNN & CRUTCHER LLP

By: s/ Eric Stock*

Eric Stock
Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 716-0875
isur@gibsondunn.com
estock@gibsondunn.com

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9527
jarp@gibsondunn.com
mkatsur@gibsondunn.com

***Attorneys for Defendant UBS AG***

LOCKE LORD LLP

By: s/ Gregory T. Casamento*

Gregory T. Casamento
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-6776
Telephone: (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 S. Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-0472
jmgoodin@lockelord.com
jwebb@lockelord.com

***Attorneys for Defendants HSBC Bank USA, N.A., HSBC North America Holdings, Inc., and HSBC Holdings plc***

SHEARMAN & STERLING LLP

By: s/ Adam S. Hakki*

Adam S. Hakki
Richard F. Schwed
Jeffrey J. Resetarits
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-7179
ahakki@shearman.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com

***Attorneys for Defendants Bank of America Corporation and Bank of America, N.A.***

* Signature used with permission pursuant to SDNY ECF Rule 8.5(b).