USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/12/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
JOHN NYPL, et al.,
                          Plaintiffs,

              -against-

JPMORGAN CHASE & CO., et al.,
                          Defendants.
------------------------------------------------------------- X

15 Civ. 9300 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs[1] commenced this putative class action under the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1 et seq., alleging that they paid inflated foreign currency exchange rates as a result of a conspiracy among Defendants[2] to fix prices in the foreign exchange ("FX") or foreign currency market. Plaintiffs' Second Amended Complaint was dismissed in its entirety because it did not sufficiently plead antitrust standing. *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017 WL 1133446, at *3 (S.D.N.Y. Mar. 24, 2017). In an Opinion and Order dated August 3, 2017 (the "Opinion" or "Op."), Plaintiffs were granted leave to file a Third Amended Complaint ("TAC'"). *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017 WL 3309759, at *8 (S.D.N.Y. Aug. 3, 2017). The TAC asserts claims under the Sherman Act and California state law. Defendants move to dismiss the TAC in its entirety under Federal Rule of Civil Procedure 12(b)(6), or, alternatively, to dismiss Plaintiffs' claims extending past January 2013 and certify this Order for appeal under 28 U.S.C. § 1292(b). For

---

[1] The named plaintiffs are John Nypl; Lisa McCarthy; Mad Travel, Inc., a.k.a. Travel Leaders; Valarie Jolly; Go Everywhere, Inc.; and William Rubinsohn, d.b.a. Rubinsohn Travel.
[2] Defendants are JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Bank of America Corporation; Bank of America, N.A.; HSBC Finance Corporation; HSBC Bank USA, N.A.; HSBC North America Holdings Inc.; HSBC Holdings plc; Citicorp; Citigroup, Inc.; Citibank, N.A.; UBS AG; Barclays PLC; Barclays Capital, Inc.; Royal Bank of Scotland Group plc; and Royal Bank of Scotland, plc.

the following reasons, Defendants' motion to dismiss the TAC entirely is denied; their motion to limit the time period for Plaintiffs' claims is granted in part; and their request to certify this Order for appeal is denied.

Familiarity with the Opinion, the underlying facts and procedural history is assumed.

## I. STANDARD

On a motion to dismiss, a court accepts as true all well pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d at 566 (2d Cir. 2016), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, the court is limited to reviewing the complaint, any documents attached to that pleading or incorporated in it by reference, any documents heavily relied upon by the complaint as to their "terms and effect" and which are therefore integral to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## II. DISCUSSION

In their motion to dismiss the TAC, Defendants essentially renew and further elaborate on an argument they raised opposing leave to amend -- that Plaintiffs cannot adequately allege antitrust injury under *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum III*"), 833 F.3d

151 (2d Cir. 2016). Defendants' motion to dismiss is denied for the reasons previously stated in the Opinion and explained further below.

### A. Antitrust Injury

The TAC sufficiently pleads antitrust injury because it alleges facts supporting a reasonable inference that the foreign currency consumer retail market in which Plaintiffs participated was directly restrained by Defendants' alleged manipulation of FX benchmark rates.

"[T]o suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *Aluminum III*, 833 F.3d at 161. As relevant here, the directly restrained market "is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant."[3] *Id.* A defendant's conduct may "directly restrain" more than one market. *Id.* ("[A]ntitrust injury is suffered by participants in the restrained market (or markets).").

As discussed in the Opinion, the Second Circuit held in *Gelboim v. Bank of Am. Corp.* that plaintiffs sufficiently alleged antitrust injury where they claimed to have purchased financial instruments with rates of return pegged to LIBOR from defendant banks responsible for setting the benchmark rate. 823 F.3d 759, 765 (2d Cir. 2016). The Second Circuit held that the plaintiffs had suffered antitrust injury when they received a lower rate of return on account of defendants' collusion to depress LIBOR. *Id.* at 764. "[E]ven if none of [plaintiffs'] financial

---

[3] Sometimes, "the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target." *Aluminum III*, 833 F.3d at 161; *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 483–84 (1982) (holding that plaintiff had suffered antitrust injury because although she was not a competitor or customer of defendants, her injury was "inextricably intertwined" with the injury defendants sought to inflict on their target market). The Court is not relying on the "inextricably intertwined" exception to decide this motion.

instruments paid interest *at* LIBOR, *Socony-Vacuum* allows an antitrust claim based on the influence that a conspiracy exerts on the starting point for prices." *Id.* at 776 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)). That other variables besides LIBOR affected the plaintiffs' return did not undermine their assertion of antitrust injury. *Id*. at 773. The plaintiffs included bondholders, as well as derivatives holders and others; but the Second Circuit's analysis and conclusion regarding antitrust injury were the same without regard to the type of financial instrument purchased, each by definition purchased in a different market. *See id.* at 767, 774–75.

Following *Gelboim*, the district courts have similarly found antitrust injury in other cases alleging manipulation of financial or commodities benchmarks.[4] "Courts in this Circuit consider manipulation of a price benchmark to constitute restraint of the market which that benchmark guides." *In re N. Sea Brent Crude Oil Futures Litig.*, 13 MD 2475, 2017 WL 2493135, at *10 (S.D.N.Y. June 8, 2017) (citing *Gelboim*, 823 F.3d at 776-77).

The TAC plausibly alleges that Plaintiffs were consumers in a market where competition was directly restrained and consequently suffered antitrust injury by claiming that the manipulated FX benchmark rates were the primary component of the prices Plaintiffs paid for foreign currency in the consumer retail market. Specifically, Plaintiffs allege that they "purchased price-fixed foreign currency from Defendants at the Benchmark exchange rates, derived from spot trading, plus a small commission."

Defendants' contrary arguments in this motion are unpersuasive. First, Defendants assert that *Aluminum III*'s holding that indirect purchasers of physical aluminum lacked antitrust

---

[4] *See* Op., 2017 WL 3309759, at *4 for a discussion of district court opinions making such findings.

4

standing controls here. *Aluminum III* drew a distinction between the markets for physical aluminum and aluminum warehousing and reasoned that indirect purchasers "d[id] not and c[ould not] allege that they participated in [the aluminum warehousing] market," which is where the alleged price manipulation took place. 833 F.3d at 162. Defendants argue that *Aluminum III* controls because that case also involved a benchmark rate, the Midwest Premium, which allegedly was affected by defendants' collusive behavior, which behavior in turn affected the prices plaintiffs paid for physical aluminum. But in *Aluminum III*, although the conspiracy in the aluminum storage market allegedly affected the price of physical aluminum, plaintiffs' injury brought by that price increase "was suffered down the distribution chain of a separate market, and was a purely incidental byproduct of the alleged scheme." *Id.* at 162. The Midwest Premium does not reflect the price of the underlying commodity at issue; instead it is a proxy for "the cost of delivering (and financing and insuring)" aluminum in a particular region. *Id.* at 155. In other words, the benchmark in question in *Aluminum III* is a proxy for downstream distribution costs. In this case, the TAC alleges that the FX benchmark rates did not merely affect the foreign exchange retail market "down the distribution chain," but instead was a common basis for prices of the same instruments in two different markets.

Defendants claim that this distinction is immaterial because after *Aluminum III* was decided, the district court in that case found that direct purchasers of physical aluminum lacked antitrust standing under the Second Circuit's opinion. *Agfa Corp. v. Goldman Sachs Grp., Inc.*, Nos. 14 Civ. 211, 14 Civ. 217, 14 Civ. 6849, 15 Civ. 8307, 16 Civ. 5955, 2016 WL 7009031, at *6 (S.D.N.Y. Nov. 30, 2016), *appeal docketed* sub nom. *Mag Instruments Inc. v. Goldman Sachs Grp., Inc.*, No. 16-4243 (2d Cir. 2016). But the direct purchasers, while "farther 'up' the distribution chain" than indirect purchasers, *id.*, were nonetheless "down the distribution chain"

5

from participants in the aluminum warehousing market, *Aluminum III*, 833 F.3d at 162. In this case, as alleged in the TAC, retail foreign exchange purchasers are not situated further down a supply chain from the FX spot market, where distribution costs are passed on from one link to the next. Rather, the FX benchmark rates directly affect both markets by determining the cost of the underlying instruments, where the only additional input for retail prices is "a small commission."

Second, Defendants seek to distinguish *Gelboim* and argue that it does not support a finding of antitrust injury in this case because the opinion does not address which market was directly restrained and whether claimants had transacted in some separate market. Defendants further argue that, unlike the FX benchmarks, LIBOR is not calculated from underlying market transactions and is not itself a market. Thus, manipulation of LIBOR itself purportedly does not count as direct manipulation of a market, separate from activity in a secondary market.

These arguments fail to address *Gelboim*'s holding that four separate groups of plaintiffs operating in different markets had successfully pleaded antitrust injury, including not only the over-the-counter plaintiffs who had purchased directly from at least one defendant, but also "Exchange-based plaintiffs" who did not purchase from the bank defendants. 823 F.3d at 767-68, 772. What these plaintiffs' injuries had in common was not the market in which they had participated, but that the instruments they had acquired were all "calculated on the basis of . . . LIBOR." *Id.* at 768. Because the price of all these securities was calculated directly based on LIBOR, the manipulation of LIBOR affected all of these markets directly for purposes of antitrust injury. As Judge Koeltl found in *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017), in cases like *Gelboim* and *FOREX*, "when plaintiffs allege injury based on a derivative or futures instrument for anticompetitive acts committed in the market

6

underlying that precise instrument—the markets are 'so closely related that the distinction between them is of no consequence to antitrust standing analysis.'" *Id.* at 421 (quoting *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 929 (7th Cir. 1995)).

### B. Relevant Time Period

Barring dismissal outright, Defendants assert that the scope of claims in the TAC should be narrowed because it alleges no conduct after January 2013. The Court agrees in part. "Courts have dismissed claims that are outside part of a claimed class period where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015). "[I]n the absence of specific allegations of conspiratorial activity, conclusory statements couched as facts, are not sufficient to raise the inference that the conspiracy extended [past a certain point.]" *Id.* (citing *Iqbal*, 556 U.S. at 678).

The TAC contains conclusory statements that the alleged conspiracy is "ongoing," but such statements are insufficient under *Iqbal*, 556 U.S. at 678. Moreover, these statements are contradicted by documents attached to the TAC. In particular, a DOJ plea agreement indicates that the conduct at issue occurred "until at least January 2013," and consent orders with the OCC, Federal Reserve, and CTFC state that the conduct occurred through 2013, 2013 and 2012, respectively. Because the TAC contains no specific allegations of conspiratorial activity after 2013 and the attached documents suggest that the conspiracy ended in 2013 at the latest, Plaintiffs' claims extending after December 31, 2013, are dismissed.

### C. Certification of an Interlocutory Appeal

A district court may certify an interlocutory appeal of a non-final order when the court is "of the opinion that such order involves a controlling question of law as to which there is

substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Certification under Section 1292(b) requires "exceptional circumstances justifying a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Transp. Workers Union of Am., Local 100, AFL–CIO v. N.Y.C. Transit Auth.,* 505 F.3d 226, 229 (2d Cir. 2007) (internal quotation marks omitted). Certification is thus appropriate only in the small subset of cases where "an intermediate appeal may avoid protracted litigation." *Koehler v. Bank of Berm. Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996). The ultimate decision of whether to certify an interlocutory appeal "is entirely a matter of discretion for the district court." *In re Roman Catholic Diocese of Albany, N.Y., Inc.,* 745 F.3d 30, 36 (2d Cir. 2014) (per curiam).

Defendants fail to meet the requirements for certification of an interlocutory appeal. This Order may involve a controlling question of law -- whether Plaintiffs satisfy *Aluminum III* where they allege collusive trading in the FX spot market leading to manipulation of a benchmark that directly controls another market. But Defendants do not demonstrate a "substantial ground for difference of opinion." 28 U.S.C. § 1292(b). "[T]he mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996). "Rather, it is the duty of the district judge to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." *Id.* (internal quotation marks and alterations omitted).

The district court opinions in this Circuit that have considered these issues have generally found that "manipulation of a price benchmark . . . constitute[s] restraint of the market which that benchmark guides," *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2493135, at *9,

and the ones that apparently disagree are distinguishable, as discussed above. *Compare, e.g.*, *Sullivan v. Barclays PLC*, No. 13 Civ. 2811, 2017 WL 685570, at *1, *14 (S.D.N.Y. Feb. 21, 2017); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 644, 653 (S.D.N.Y. 2016); *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13 Civ. 7789, 2016 WL 5108131, at *6 (S.D.N.Y. Sept. 20, 2016); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 59 (S.D.N.Y. 2016) *with Harry v. Total Gas & Power N. Am. Inc.*, 244 F. Supp. 3d at 423 (dismissing plaintiffs who transacted in physical natural gas from, or derivatives indexed to, a different regional hub from the one allegedly manipulated); *In re Aluminum Warehousing Antitrust Litig.*, 13 MD 2481, 2016 WL 5818585 (S.D.N.Y. Oct. 5, 2016) (dismissing first-level aluminum purchasers under *Aluminum III*); *Agfa Corp.*, 2016 WL 7009031 (dismissing direct purchasers of physical aluminum under *Aluminum Warehousing III*).

The Court thus declines to certify this Order for interlocutory appeal.

## III.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the TAC in its entirety is DENIED. Their motion to limit the time period for Plaintiffs' claims is GRANTED in part such that claims extending after December 31, 2013, are DISMISSED. Defendants' motion to certify this Order for interlocutory appeal is DENIED. The motion for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to close the motions at Docket Nos. 205 and 236.

Dated: March 12, 2018
      New York, New York

                                          LORNA G. SCHOFIELD
                                       **UNITED STATES DISTRICT JUDGE**