Law Offices
of
# Lingel H. Winters
A PROFESSIONAL CORPORATION
388 Market St. Suite 900
San Francisco, California 94111
(415) 398-2941

July 2026, 2018

**BY ECF**

The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

      *Re:*    *Nypl v JPMorgan Chase & Co.*; No. 15 -cv-LGS 9300 (S.D.NY.)
              Motion for Reconsideration of ECF No. 319 per ECF No. 321 and 327

Dear Judge Schofield,

    The *Nypl* Plaintiffs respectfully submit this Letter Motion for Reconsideration of this Court's Order ECF No. 319 entered June 20, 2018 and Reply to the Defendants' letter of March 28, 2018 in response to Plaintiffs' letter of March 7, 2018. Leave of Court was granted to file this Letter Motion in ECF Nos. 321 and, 327 & 332.

    The grounds for the Motion are

    **I.**     **The TAC's Allegation of "Purchase" Includes Credit, Debit orAnd ATM Transactions. The TAC Never Alleged Nor Was Ever Limited To "Physical" Purchases. The TAC's Allegations That The Plaintiffs "Purchased," "Paid," Were "Sold,""Charged" Etc. Do Not Limit The Means Of Payment**

    The Third Amended Complaint ("TAC" ECF No. 189) has withstood challenges to its sufficiency and plausability. *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1276869 and 2017 WL 3309759 ("Orders"), which are incorporated herein.

    The TAC alleges "All consumers and businesses in the United States who directly purchased foreign currency from Defendants and their co-conspirators for their own end use since January 1, 2007 [to December 31, 2013]... ". (TAC ¶¶24,20-29,40-41). The allegation of "purchased" is not qualified by any reference to the purchase of physical currency in any of Plaintiffs' complaints, nor in this Court's Orders nor in the Plea Agreements. The Defendants' opening sentence, statement, and premise for their entire argument is demonstrably not true. The Defendants begin by setting up their straw man, incorrectly claiming that the Plaintiffs are limited to "the purchase of *physical* currency.," suggesting that other forms of purchases and payments are excluded. To support this opening false premise, which is the basis for their whole argument, the Defendants then make the following false statement that: "[T]he four complaints Plaintiffs have filed since 2015 have all asserted claims based on purchases of *physical* foreign

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 2

currency ….." To emphasize this false claim, the Defendants use the term "physical" no less than ten times in their first two pages! The fact is that neither the TAC nor any of "the four complaints" use or mention the adjective "physical~~"~~"; and neither do this Court's Orders nor the Plea Agreements. The Defendants' effort to recast the ~~TAC"S~~TAC's allegations--incorrectly asserting that they are only quoting from the TAC-- is a legerdemain that should not go unnoticed by the Court.

The TAC does not limit the ~~means~~method of payment used by the Plaintiffs when they purchased and paid ~~for~~ the Defendants' unlawfully inflated overcharges. The plain meaning of "purchase" or " payment" does not limit the means or methods of the purchase or payment, whether it be cash, check, credit card, debit card, ATM card, or wire~~.~~ as is demonstrated in Defendant JPMorgan Chase's advertisement stating: "*Purchases* made with the credit cards..." (Decl Winters Exhibit L) and UBS's "UBS credit and debit cards give you the flexibility to access cash without fees and make *purchases* worldwide." (Decl Winters Exhibit Q (Emphasis supplied).

Defendants' advertisements (Decl Winters L through R) provide the context for concluding that purchase includes all forms of payment including credit, debit and ATM cards. *Deal v. United States*, 508 U.S. 129 (1993). ("the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

II. **The "Federal Reserve Payments Study 2016" Confirms The Fair And Reasonable Inference That "Purchased" and "Payment" ~~Includes~~Include Credit, Debit And ATM Card Purchases Initiated From Plaintiffs' Accounts In The United States**

The fair and reasonable inference that "purchased" includes credit, debit, and ATM card purchases is confirmed by the "Federal Reserve Payments Study 2016" (Decl Winters Exhibit A ECF No. 330). In its Study, the Fed, which governs the banks, stated: "*Payments included in the study were initiated from accounts domiciled in the United States and typically involved the use of debit cards*..., credit cards, electronic credit and debit transfers using the automated clearinghouse (ACH) system or checks"... including "*automated teller machines* (ATM) cash withdrawals." (at p. 1). (Emphasis supplied). The Fed's inclusion of credit, debit and ATM in "payments" is its recognition of the migration of payments from cash and check to predominant credit, debit and ATM card ("cards") payments since 2007, the beginning of the class period. The ~~Fed~~Federal Reserve Payments Study stated:"Just over a decade ago, checks were the predominant type of noncash payments in the United States, while one by one, starting in 2007, non-prepaid debit card, then credit card, and then ACH payments (with debit transfers and credit transfers combined) overtook checks. ~~(figure 2).~~" (at p.3) and its conclusion that "Taken together, debit cards (including prepaid and non-prepaid cards), credit cards, ACH credit transfers, ACH debit transfers, and checks comprise a core set of noncash payment types commonly used today by consumers and businesses in the United States." (at p.2). Thus, the ~~Fed~~Federal Reserve Payments Study confirms that the TAC's allegation of "purchased" includes credit, debit and ATM payments, as the "core set of noncash payment types commonly used

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 3

today by consumers and businesses in the United States," and these noncash payment types have become commonly used due to Defendants banks' own conduct in actively promoting Plaintiffs' purchases of foreign currency with credit, debit, ATM and wire. (Decl. Winters Exhibits L through ~~Q~~R).

That the allegation of "purchased" is sufficient to include all types of payment including credit, debit, ATM and wire payments is confirmed by the Second Circuit's recent ruling that such "detailed factual allegations" need not be alleged. *Wacker v. JPMorgan Chase & Co.*, 678 Fed. Appx. (2017) at *29, *30, (bid/asks on silver futures or "the identity of JP Morgan's counterparties or the amount of the alleged outsized profit that JP Morgan reaped" or "assessing the choice of a benchmark at the pleading stage" need not be alleged in the complaint.), citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321("A plaintiff need only allege enough facts 'to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'"). *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (The pleadings need only "raise a reasonable expectation that *discovery* will reveal evidence of illegality.").

The Federal Reserve Payments Study 2016 provides additional context for concluding that purchase includes all forms of payment including credit, debit and ATM cards. *Deal v. United States*, 508 U.S. 129 (1993). ("the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

### III. Credit, Debit and ATM Purchases Are ~~"~~Initiated From Plaintiffs' Accounts In The United States~~"~~

Instead of reaching into one's purse to get cash or write a check, a debit card user simply draws upon its own cash on deposit in its own bank account at one of the Defendant banks transferring the cash from its bank account to the bank's account to pay the inflated "full price" for foreign currency. An ATM card or wire likewise draws upon one's own cash in one's own bank account. *United States v. Visa U.S.A., Inc.*, 163 F. Supp.2d 322 (S.D.N.Y. 2001 at p. 331 aff'd 344 F.3d 229 (2d Cir. 2003)("...the fact that upon use [debit cards] promptly access money directly from a cardholder's checking or deposit account strongly differentiates them from credit and charge cards."), whereas a credit card draws upon one's own credit account at Defendant bank to pay Defendant card issuer bank for foreign currency. Thus, purchases of foreign currency by credit, debit and ATM cards in the United States draw upon one's own checking or deposit account or credit account at the purchaser's local bank branch and are "*purchase[s][of] foreign currency for dollars at their local bank[s] accounts*." The Federal Reserve's inclusion of credit, debit, and ATM as "Payments" where these types of purchases are initiated from accounts in the United States demonstrates the sufficiency of the TAC's allegation of "purchased" to include discovery of credit, debit and ATM foreign currency retail transactions initiated from Plaintiffs' accounts at Defendants' branches in the United States.

Defendants' own advertising demonstrates that Defendants understood and actively promoted "purchases" with credit, debit, ATM and wire at home and abroad. The Federal

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 4

Reserve's statement that this "core set of noncash payment types [is] commonly used today by consumers and businesses in the United States," together with Defendants own conduct in actively promoting the use of credit, debit ATM and wire to purchase foreign currency as shown in
      Exhibits L through ~~Q~~R to the Declaration of Winters, have made such non-cash purchases commonplace and ubiquitous and controverts Defendants' claim of surprise that "purchases" include credit, debit ATM and wire transactions.[1] *Deal v. United States*, 508 U.S. 129, 132 (1993).

> **IV. On The Credit, Debit and ATM Cards Issued By Defendants, Visa and MasterCard Accept The Spot Benchmark Exchange Rates That Defendants Manipulated And Do Not Make Independent Determinations**

On the credit, debit and ATM cards issued by Defendants, ~~Visa~~Visa's and MasterCard accept the spot or wholesale benchmark exchange rates that Defendants manipulated and do not make independent determinations. The "Visa Core Rules" ~~(Decl Winters Exhibit B)~~ state at ¶1.1.4.2 "Exchange Rates For Operating Certificates":

> A Member (or its Sponsor) must use the exchange rate provided by Visa to file an Operating Certificate when a conversion is required. The quarterly exchange rate is provided via Operating Certificate tools and is a simple average of 3 monthly *spot* rates for the quarter, sourced from the Financial Times and Thomson *Reuters*. (Decl Winters Exhibit B) (Emphasis supplied).

By filing the Operating Certificates, Defendant banks agreed with Visa and each other that the spot wholesale FX benchmark exchange rates "sourced from Reuters" that they had manipulated ~~would be applied~~ are paid by Plaintiffs in credit, debit and ATM card transactions. In their Rules and Regulations, Visa and MasterCard ~~in their rules and regulations confirm that the conversion exchange rates for credit, debit and ATM cards issued by Defendants are~~ corroborate that the spot or "wholesale" FX benchmark exchange rates manipulated by Defendants~~. See~~ are applied in credit, debit and ATM card transactions, stating that the exchange rate between the Transaction Currency and the Billing Currency used for processing International Transactions is "a rate selected by Visa from the range of rates available in *wholesale currency markets* for the applicable Processing date...plus or minus any adjustment determined by the Issuer."[2] (Emphasis supplied). Visa Operating Regulations dated 15 October

---

[1] That "purchases" include credit, debit ATM and wire transactions as actively promoted by Defendant banks and described by the Fed Payments Study is reflected in the Merriam-Webster online Dictionary's definition of "purchase" as "to acquire by paying money or its equivalent" and "transaction" as "an exchange or transfer of goods, services or funds - *electronic*."

[2] In other words, Defendant card Issuer Banks make any final plus or minus adjustment, not Visa.

Honorable Lorna G. Schofield
July 26, 2018
Page 5

2013[23] at Chapter V under **Exchange Rates** at pp. 168-170 (Decl Winters Exhibit H). Likewise, the MasterCard also applies the spot FX benchmark or "wholesale exchange rate." MasterCard Rules Rule 6.2 (4.) Currency Conversion Procedure (Decl Winters Exhibit I).

By including the spot or wholesale FX benchmark exchange rates that Defendant banks manipulated as the primary component in foreign currency conversions on the credit, debit and ATM cards issued by Defendant banks, Visa and MasterCard do not make an independent determination of the exchange rates. They accept the benchmark exchange rates that Defendants manipulated, implement them and maintain the chain of causation.

But the issue of independent action is not to be addressed at the pleading stage, but must await discovery. *Anderson News, LLC v American Media, Inc.* 680 F.3d 162, 184-185 (2d Cir. 2012):

> "However, to present a plausible claim at the pleading stage, the plaintiff *need not* show that its allegations... rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, see e.g. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S 574, 597-98, ... or a trial, *see e.g. Monsanto, [Co. v. Spray-Rite Service Corp, 465 U.S. at 768*; *Theatre Enterprises,* 346 U.S. at 540-541....it simply calls for enough fact to raise expectations that discovery will reveal evidence* of illegal agreement...The choice between or among plausible inferences or scenarios is one for the factfinder...see id. [*Anderson v. Bessemer City*, 470 U.S. 564, 575; *Monsanto [Co. v. Spray-Rite Service Corp.*, 465 U.S.752 at 766 & n.11(the meaning of documents that are "subject to" divergent, "reasonable interpretations" either...as referring to unilateral and independent actions, is "properly...left to the jury"; id at 767 n.12 ("The choice between two reasonable interpretations of...testimony properly [i]s left for the jury.")..."[F]act-specific question[s] cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 2013 (2d Cir. 2001) ("*Todd*"). A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible...given that the plausibility requirement does not impose a probability requirement at the pleading stage," the *Twombly* Court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." (Emphasis supplied).

---

[23] Visa's prior Operating Regulations dated November 15, 2008 are the same (p.497). (Decl Winters Exhibit H at p.3.

Honorable Lorna G. Schofield
July 2026, 2018
Page 6

Having survived motions to dismiss, the *Anderson* procedure contemplates discovery in preparation for resolution of the independent action issue, *inter alia*, by the jury.

### V. The FX Benchmark Exchange Rates ~~Defendants~~Defendant Banks Manipulated Are The Primary Component Of The Prices Plaintiffs' Paid For Foreign Currency On Their Credit, Debit And ATM Cards Issued By Defendant Banks

As confirmed by this Court in *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1276869 at*3, the TAC plausibly alleges antitrust injury by claiming "that the manipulated FX benchmark rates were the primary component of the prices Plaintiffs paid for foreign currency in the consumer retail market." The same is true for purchases of foreign currency on credit, debit and ATM cards--the FX benchmark exchange rates manipulated by Defendants are the primary component of the exchange rates paid by Plaintiffs for foreign currency on credit, debit and ATM cards issued by Defendant banks.

*Nypl* ~~plaintiffs~~Plaintiffs' expert Carl Saba performed an analysis and concluded that there is a strong correlation between the benchmark ECB Fix Rates that were manipulated by Defendants and the base exchange rates quoted by Visa and MasterCard to End users). (Decl. Saba Decl Winters Exhibit S). In his declaration, Mr. Saba stated:

> My analysis leads me to conclude that over the 144 days analyzed, there appears to be a strong correlation between the ECB Fix Rate for the EUR/USD currency pair, and the base exchange rates quoted by Visa and Mastercard to End-users (before addition of transaction fees). For the large majority of days, the variance between the End-user rates and the ECB Fix Rate *is less than 1%* (Decl Saba Decl Winters Exhibit S ¶9 ). (Emphasis supplied).

Mr. Saba further tested the correlation by performing a linear regression and stated in his declaration: "The regression I performed indicated a strong fit in how accurately it predicts the Visa or MasterCard End user rate in relation to the ECB Benchmark Fix Rate." (Decl Saba Decl Winters Exhibit S ¶6). Since the ECB Benchmark exchange rates that Defendants manipulated are strongly correlated with and are the primary price component of the End user exchange rates in an arithmetic, mechanical way in Plaintiffs' purchases of foreign currency from Defendant banks with the debit, credit and ATM cards issued by Defendant banks, Plaintiffs as End users suffered direct injury in their direct purchases of foreign currency from Defendants with credit, debit and ATM cards issued by Defendant banks. (Decl Saba Decl Winters Exhibit S ¶¶4-9). *In re Foreign Exchange Benchmark Rates Antitrust Litigation* (hereafter "*FOREX*"), U.S. Dist LEXIS 128237 (S.D.N.Y. 2016) at *47 ("...[the Exchange]Plaintiffs here plead a more direct (and nearly mechanical) relationship viewed in the light of the 'chain of causation' between the prices in the FX spot market and futures markets"). As Defendant Citicorp has stated: "When you swipe a credit card, you get *an exchange rate that is automatically adjusted to market conditions*." (Citigroup ~~Ad~~advertisement, Decl Winters Ex. M). As this Court observed in Nypl , 2017 WL 3309759 at *4: "In *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773-775 [2d Cir. 2016]...The plaintiffs included bondholders, as well as derivatives holders and others; but the

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 7


Second Circuit's analysis and conclusion regarding antitrust injury was the same without regard to the type of financial instrument purchased...," and, likewise, without regard to the ~~mode~~Nypl Plaintiffs' modes of purchase by credit, debit, ATM Card and wire.

Thus, since the FX benchmark exchange rates that Defendants manipulated are the primary component of the prices Plaintiffs' paid for foreign currency on their credit, debit and ATM cards issued by Defendant banks,[~~34~~] as Mr. Saba's analysis shows (Decl Winters Exhibit S), the TAC plausibly alleges that Plaintiffs suffered antitrust injury and direct injury and are efficient enforcers. *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1276869 *3 and 2017 WL 3309759 *5 through *7.[~~4~~5]

### VI. Defendant Banks Actively Promoted The Use Of The Cards They Issued To Purchase Foreign Currency At Home And Abroad And ~~The Use Of~~Purchases With The Cards At Home And Abroad Has The Same Financial Injurious Impact In Drawing On Plaintiffs' Accounts At Their Branches In the United States And Billed To Plaintiffs Addresses In The United States

Defendant banks actively promoted the use of the cards they issued to purchase foreign currency both at home and abroad. The use of the cards at home has its financial impact in the United States in that Plaintiffs' cards are initiated from and draw on Plaintiffs' accounts at their branches in the United States on which the FX benchmark exchange rates Defendants manipulated were the primary component and which are billed to Plaintiffs' addresses in the United States. *United States v. Visa U.S.A., Inc.*, 163 F. Supp.2d 322 (S.D.N.Y. 2001 at p. 331 *aff'd* 344 F.3d 229 (2d Cir. 2003)("...the fact that upon use [debit cards] promptly access money directly from a cardholder's checking or deposit account..."), and a credit card draws on one's own credit account at Defendant bank to pay Defendant card issuer bank for foreign currency.

---

[~~34~~] This Court upheld Plaintiffs' ~~PTAC~~TAC with respect to the second, third and fourth Efficient Enforcer Factors in *Nypl v. JPMorgan Chase & Co. et al.* 2017 WL 3309759 at *4 through *8. (S.D.N.Y. 2017)~~, re-alleged in the PFAC.~~

[~~4~~5] By contrast to the *Nypl case, Salveson v. JPMorgan Chase & Co.*, 663 F. App" x 71, 75 (2d Cir. 2016), does not deal with a cardholder's direct payment of the full price to Defendant banks for foreign currency as alleged in the TAC. Instead, *Salveson* deals with an inter-bank interchange fee, paid by the merchant's acquiring bank to the card issuing bank, and *Salveson* states that "The cardholder has not directly paid the [inter-bank] interchange fee, *but rather has only paid the full price for the item or service it has purchased*." (Emphasis supplied). Thus, *Salveson* confirms that the cardholder is a direct purchaser since the cardholder *has paid the full price, for the item or service it has purchased*; namely, the inflated full price for foreign currency directly paid by the cardholder, as alleged in the ~~PFAC~~TAC. *Salveson* is a summary order that "do[es] not have precedential effect" as recited in the order.

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 8


And the use of the cards to purchase foreign currency abroad has the same <u>injurious</u> financial impact <u>on Plaintiffs' accounts</u> in the United States since Plaintiffs' <u>credit, debit and ATM</u> cards likewise draw on Plaintiffs' accounts at their branches in the United States on which the FX benchmark exchange rates Defendants manipulated were the primary component and which are billed to Plaintiffs' addresses in the United States. In promoting the use of their credit, debit and ATM cards for purchasing foreign currency at home and abroad Defendant banks acknowledged that use of the cards abroad has the same financial impact on cardholders' accounts in the United States as the card's use at home in the United States. As Bank of America explains in its advertising: *Cash in foreign countries is dispensed in the local currency and debited from your account in dollars*. (Decl. Winters Ex. N-1 at p.9).(Emphasis supplied), and *the dispens[ing] in local currency* and *debiting to your account in dollars* involves the purchase of foreign currency at exchange rates that included the FX benchmark exchange rates that Defendant banks manipulated as the primary component.

Thus, Plaintiffs' purchases of foreign currency on credit, debit and ATM cards abroad at exchange rates that include the FX benchmark exchange rates as the primary component, draw on and injure Plaintiffs' in their accounts at their branches in the United States.

Defendant banks themselves actively promoted the use of credit, debit and ATM cards ~~abroad entailing~~<u>for making</u> purchases of <u>goods and services abroad, including</u> foreign currency. JPMorgan Chase, N.A. advertised: "<u>"</u>*Purchases*<u>'</u> *made with the credit cards outside the U.S.* will not be subject to foreign transaction fees," (Decl ~~winters~~<u>Winters</u> Ex. L) and promoted the use of Chase's debit card "*when traveling internationally*." (Decl WintersEx. L-1). Citigroup advertised: "4 tips to Consider When Using Travel Credit Cards Overseas. Exchange rates... "When you swipe a credit card, you get *an exchange rate that is automatically adjusted to market conditions*;" namely, the benchmark exchange rates that Defendants' manipulated. Citigroup promoted: ATM card ~~useage~~<u>usage</u> abroad: "Citibank customers have access to 10,001 surcharge-free ATMs in 19 countries." (Decl Winters Ex. M). Bank of America advertises: "Credit cards with no foreign transaction fees give you the freedom to *travel internationally and spend money* without worrying about the added cost of foreign transaction fees. How is cash dispensed in foreign countries? *Cash in foreign countries is dispensed in the local currency and debited from your account in dollars*. (Decl Winters Ex. N-1). Barclays advertises: Using Your Barclaycard When Travelling Abroad...Don't forget to pack your Barclaycard - it's an easy and secure way to spend wherever you are in the world. (Decl Winters Ex. O), Barclays states: *Yes, you can use your debit card in millions of shops and cash machines worldwide* - anywhere you see the Visa sign." (Decl Winters Ex. O-1). HSBC advertises: "*Using Your HSBC Debit and Credit Card Abroad. As well as your travel money, you can also use your HSBC Debit and Credit Cards when you're overseas*." (Decl Winters Ex. P-2). UBS AG states: "Wealth Management Americas - *UBS credit and debit cards give you the flexability to access cash without fees and make purchases worldwide*." (Decl Winters Ex. Q). The Royal Bank of Scotland advertises: "Reward black credit card – *Substantial spending power with some special travel benefits*." (Decl Winters Ex. R).<u> (Emphasis supplied).</u>

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 9

By actively promoting the use of their credit, debit, ATM cards and wire for purchasing foreign currency at home and abroad, where the manipulated FX exchange rates were the primary component of the exchange rates Plaintiffs paid, that were drawn on Plaintiffs' accounts at Defendants' branches in the United States, Defendant banks authorized and encouraged the use of the credit, debit, ATM cards they issued as ~~mechanisms~~machinery for purchasing foreign currency at the FX benchmark exchange rates they manipulated. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 at 223 (1940) ("Instead, any conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity...is illegal per se,' *and the precise 'machinery employed...is immaterial*.'"). (Emphasis supplied).

~~Since they actively promoted the use of credit, debit, ATM cards and wire to purchase foreign currency, Defendants can claim no surprise, and since discovery has just begun, having been delayed by DOJ stays and defense motions, Defendants can claim no prejudice.~~ Since they actively promoted the use of credit, debit, ATM cards and wire to purchase foreign currency, Defendants can claim no surprise, and since discovery has just begun, having been delayed by DOJ stays and defense motions, Defendants can claim no prejudice. Plaintiffs request oral argument.

### Conclusion

The TAC's allegation of "purchased" plausibly includes credit, debit ~~and~~, ATM ~~purchases as the Fed Payments Study confirms. As the Fed~~cards and wire purchases initiated from Plaintiffs' accounts at Defendants' branches in the United States. As the Federal Reserve Payments Study shows, since 2007, there has been a migration away from cash and check to the ~~now~~ predominant use of credit, debit and ATM card payments, which the Defendants actively promoted~~,~~ and of which Defendants have fair notice. By including the spot, wholesale FX benchmark exchange rates that Defendants manipulated as the primary component of the prices Plaintiffs' paid for foreign currency on the credit, debit and ATM cards issued by Defendant banks, as Mr. Saba's correlation analysis shows,Visa and MasterCard accept the benchmark exchange rates manipulated by Defendants and do not make an independent determination.

### ~~Conclusion~~

~~For all of the above reasons, including that the Federal Reserve Payments Study 2016" confirms that the TAC's allegation of "purchased" includes credit, debit and ATM purchases. In light of the Federal Reserve Payments Study, there is no need for a Fourth Amended Complaint.~~

Respectfully submitted,

**LAW OFFICES OF LINGEL H. WINTERS P. C.**

By: */s/ Lingel H. Winters*

**ALIOTO LAW FIRM**

Honorable Lorna G. Schofield
July ~~20~~26, 2018
Page 10

> By: /s/ Joseph M. Alioto
> **Attorneys for Plaintiffs**

cc: All Counsel by ECF

| Summary report: Litéra® Change-Pro TDC 7.5.0.185 Document comparison done on 7/31/2018 2:06:49 PM ||
|---|---|
| **Style name:** Shearman & Sterling ||
| **Intelligent Table Comparison:** Active ||
| **Original filename:** NYDOCS04-#620704-v2-Word_-_329.DOCX ||
| **Modified filename:** NYDOCS04-#620706-v1-Word_-_333.DOCX ||
| **Changes:** ||
| Add | 105 |
| Delete | 67 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 172 |