UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
                                                          :
JOHN NYPL, et al.,                                        :
                                    Plaintiffs,           :
                                                          :         15 Civ. 9300 (LGS)
              -against-                                    :
                                                          :       **OPINION AND ORDER**
JP MORGAN CHASE & CO., et al.,                            :
                                   Defendants.            :
----------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

　　This case concerns the impact of an alleged conspiracy among banks to fix prices in the

foreign exchange ("FX") market on consumers' purchases of euros with U.S. Dollars within the

United States.  Defendants JP Morgan Chase & Co. and JPMorgan Chase Bank, N.A.

(individually or together, "JPMC"); Defendants Citibank, N.A., Citicorp, and Citigroup, Inc.

(collectively, "Citi"); Defendants Barclays Capital, Inc. and Barclays PLC (collectively,

"Barclays"); and Defendants Bank of America, N.A.; Bank of America Corporation; HSBC Bank

(USA), N.A.; HSBC North American Holdings Inc.; Royal Bank of Scotland, plc ("RBS") and

UBS AG ("UBS") move for summary judgment on Plaintiffs' remaining claims.  For the reasons

below, Defendants' motion is granted.

## I.　　BACKGROUND

　　Familiarity with the underlying facts and procedural history is assumed.  *See Nypl v. JP

Morgan Chase & Co.*, No. 15 Civ. 9300, 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022) (denying

Plaintiffs' motion for class certification, granting in part Defendants' *Daubert* motion and

denying Plaintiffs' *Daubert* motion); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2017

WL 3309759 (S.D.N.Y. Aug. 3, 2017) (granting in part Plaintiffs' motion for leave to file the

Third Amended Complaint); *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300, 2018 WL

1276869 (S.D.N.Y. Mar. 12, 2018) (denying Defendants' motion to dismiss the Third Amended

Complaint and granting in part Defendants' motion to limit the time period for Plaintiffs' claims. The following facts are drawn from the parties' Rule 56.1 statements and other submissions on this motion.  The facts are undisputed or based on record evidence drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties.  *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

In short, Plaintiffs allege that they purchased euros at manipulated rates from Defendants in the consumer retail market.  Because Plaintiffs' pleadings did not provide notice that any Plaintiff sought to recover for credit, debit, wire or other non-physical currency transactions or any transactions made abroad, Plaintiffs' claims are limited to transactions "involving foreign currency purchased with U.S. Dollars and physically received at Defendants' retail branches within the United States."  Order dated Sept. 6, 2018, at 1, 4 (Dkt. No. 349).  These transactions are referred to below as "qualifying transactions" or "qualifying purchases."

Plaintiffs allege that Defendants conspired to manipulate exchange rates in the FX spot market that then were used to calculate the prices charged to retail customers.  Plaintiffs base this allegation on plea agreements and regulatory orders involving certain Defendants.  Those plea agreements and the allegations in Plaintiffs' Third Amended Complaint ("TAC") focus on two benchmarks: the WMR London closing fix ("the WMR fix") and the European Central Bank fix (the "ECB fix").  Plaintiffs also now assert that those plea agreements and other documents show that Defendants conspired to manipulate "market prices generally" and to widen bid/ask spreads.

## II.    STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable [finder of fact] could return a verdict for a nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242

(2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).  In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 354 (2d Cir. 2021).  When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record.  *See* Fed. R. Civ. P. 56(c)(1)(A).  "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory."  *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## III.   DISCUSSION

### A.  Federal Claims

"The three required elements of an antitrust claim are (1) a violation of antitrust law; (2) injury and causation; and (3) damages."  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (cleaned up); *accord In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 550 (S.D.N.Y. 2021).  Defendants' motion for summary judgment is granted because, based on the record evidence, no reasonable jury could find that the alleged conspiracy caused injury to Plaintiffs.  It is therefore unnecessary to reach the question of whether any injury suffered by Plaintiffs is sufficient to confer antitrust standing.  *See Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 98 (2d Cir. 2022) (discussing requirements of antitrust standing).

### 1. Plaintiffs Nypl and Rubinsohn

Defendants are granted summary judgment on Nypl and Rubinsohn's claims because no reasonable jury could find that either Plaintiff made a qualifying transaction. It is undisputed that neither Nypl nor Rubinsohn physically received euros purchased with U.S. dollars at one of Defendants' branches in the U.S. Plaintiffs quibble over the definition of "purchase" and cite generally to Nypl and Rubinsohn's deposition transcripts without identifying any evidence that Nypl or Rubinsohn actually made a physical purchase in any U.S. branch of any Defendant bank. While courts need not go "hunting for truffles buried in . . . the record," a review of the portions of the transcripts submitted with Plaintiffs' motion papers reveals no such evidence. *See Westcon Grp., Inc. v. CCC Techs., Inc.*, No. 19 Civ. 2303, 2022 WL 4134578, at *3 (S.D.N.Y. Sept. 12, 2022) ("Judges are not like pigs, hunting for truffles buried in briefs or the record." (internal quotation marks omitted)); *see also 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 456 (S.D.N.Y. 2019) ("Absent additional specificity from Plaintiffs, this Court declines the invitation to sift through the record to divine what facts Plaintiffs seek to establish."). Thus, Plaintiffs have not raised a triable issue of fact as to either Nypl or Rubinsohn's claims.

Plaintiffs also argue that the Court erred in its Order more than four years ago limiting Plaintiffs' claims to those pleaded, i.e., to purchases of physical euros at a U.S. branch. Plaintiffs have not identified a basis for an untimely request for reconsideration or relief from that prior Order. *See* S.D.N.Y. Local Rule 6.3 (requiring that a motion for reconsideration or reargument be served within fourteen days after entry of an order); Fed. R. Civ. P. 60(b)-(c) (requiring motions for relief from an order based on, e.g., "mistake," "newly discovered evidence," or any "fraud" or "misrepresentation" to be filed within one year). In any event, Plaintiffs' arguments mischaracterize the basis for that decision. The limitation of Plaintiffs' claims to physical

purchases was based on analysis of what claims fairly are encompassed by Plaintiffs' allegations, not on any representations by Defendants.

### 2.   Plaintiffs McCarthy, Mad Travel, Jolly and Go Everywhere, Inc.

Defendants are granted summary judgment on the claims of McCarthy and Jolly, and their respective businesses Mad Travel and Go Everywhere, Inc., because no reasonable jury could find that they made any of their transactions at supracompetitive prices.  Unlike Nypl and Rubinsohn, Plaintiffs McCarthy and Jolly testified that they purchased physical euros with U.S. dollars at U.S. branches of one of the Defendant banks, JPMC, on their own behalf and on behalf of their respective businesses.  McCarthy made qualifying purchases "on occasion" but does not recall when or how often, nor does she have receipts.  Jolly made qualifying purchases several times per year, though she has receipts for purchases only on four specific days.  Defendants' motion is granted because there is no evidence in the record that the prices Plaintiffs paid on those days -- or on any particular day that they might have traded, whether supported by documentation or not -- were inflated by the alleged conspiracy and thereby caused any injury to Plaintiffs.[1]

### a.   Evidence of Antitrust Violation and Damages

In opposition to Defendants' motion, Plaintiffs continue to rely heavily on certain guilty pleas and other orders issued in regulatory proceedings.  Several Defendants pleaded guilty to engaging in -- and/or were found by regulatory agencies to have engaged in -- a conspiracy to

---

[1] Defendants argue at length that McCarthy and Jolly lack documentation to show that they made specific transactions on specific days, such as receipts.  To be clear, such documentary evidence is not required to survive summary judgment, nor would it necessarily be required at trial. Plaintiffs could proffer other evidence of when they made certain transactions, such as their own testimony.  However, the record shows that no such evidence could be offered at trial, since Plaintiffs do not recall any qualifying transactions other than those for which Jolly has receipts. Therefore, and for the reasons that follow, no reasonable jury could find by a preponderance of the evidence that those transactions or any other was affected by Defendants' alleged conduct.

manipulate benchmark rates and other aspects of FX spot market pricing.  Pursuant to 15 U.S.C. § 16, final judgments in government antitrust enforcement actions are "prima facie evidence" against the defendant in later civil cases "as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto."  Whether under ordinary equitable estoppel principles or § 16, the guilty pleas and regulatory orders may create a triable issue of fact on one or more of the elements of Plaintiffs' claims.  But even so, and even assuming that all of the Plaintiffs' documentary evidence is admissible at trial, the pleas and orders are insufficient to survive summary judgment on the injury element.

Plaintiffs argue at length that they have established an antitrust violation and that they need not prove damages with specificity at this stage.  For instance, it can be assumed that certain Defendants' admissions to engaging in an antitrust conspiracy establish the first element of Plaintiffs' claims -- i.e., that those Defendants committed an "antitrust violation" on each day that the conspiracy existed, including the days McCarthy and Jolly bought euros.  *See, e.g.*, *Smith v. United States*, 568 U.S. 106, 111 (2013) ("Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence." (cleaned up)); *United States v. Socony-Vacuum Oil. Co.*, 310 U.S. 150, 227 (1940) ("A conspiracy thus continued is in effect renewed during each day of its continuance." (internal quotation marks omitted)).  It also can be assumed that, if Plaintiffs could prove the *fact* of damages, even an approximate *calculation* of damages would suffice to survive summary judgment and go to trial on the third element of Plaintiffs' claim.  *See Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927) ("Damages are not rendered uncertain because they cannot be calculated with reasonable exactness.  It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate." (internal quotation marks omitted)); *accord Baker v. Weber*, No. 19 Civ. 1093, 2022 WL 3589095, at *3

(S.D.N.Y. Aug. 23, 2022), *report and recommendation adopted*, 2023 WL 199009 (S.D.N.Y. Jan. 17, 2023).

However, Plaintiffs have put forward no evidence on the second element of their antitrust claims -- i.e., whether the conspiracy caused injury to Plaintiffs.  Contrary to Plaintiffs' argument, the fact that the alleged price-fixing conspiracy is *per se* illegal does not absolve Plaintiffs of the burden to prove that they were injured by the conspiracy.  The *per se* standard eases Plaintiffs' burden on the element of antitrust violation, but that is separate from the element of injury.  *See Cordes*, 502 F.3d at 105 ("There is no controversy here regarding the first . . . element. Horizontal price-fixing agreements are *per se* violations of the Sherman Act. . . .  The second element -- whether termed 'antitrust injury,' 'causation or impact,' or 'injury and causation' -- is more complicated.").  The *per se* rule also may be relevant to part of the test for antitrust injury, but it does not relieve Plaintiffs of the burden to prove that they were harmed.

The injury element of an antitrust claim "poses two distinct questions": (1) "the familiar factual question whether the plaintiff has indeed suffered harm, or 'injury-in-fact'" and (2) "the legal question whether any such injury is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.* at 106.  That is, *if* Plaintiffs could prove that they suffered *any* kind of injury in the form of higher prices, they could likely prove that they suffered "antitrust injury," i.e., the kind of injury the antitrust laws guard against.  *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer [an antitrust injury.]").  That may be so even if the conspiracy does not eliminate *all* competition from the market, even if some market forces still affect the price, and even if the defendants might argue that the prices are nonetheless "reasonable" in some sense.  *Id.* at 772-74.  But that entire inquiry is moot if the plaintiffs were not actually harmed by the prices

they paid.  The existence of a price-fixing conspiracy "constitutes strong evidence that the alleged agreement caused at least some element of the subsequent price increases," but Plaintiffs still must prove that there *were* price increases at relevant times.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012); *see also In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 101 (2d Cir. 2017) (noting that "a presumption of causation" may apply where conduct is unlawful because of its tendency to cause a certain injury, but only if "that injury occurred").  That Plaintiffs cannot do on the current record, for the reasons explained below.

### b.  Evidence of Antitrust Injury

The guilty pleas and regulatory proceedings on which Plaintiffs rely say nothing about what effect Defendants' conduct had on the spot price on any particular day or throughout the relevant period.  As the Court held in denying class certification, the guilty pleas establish that the *effect* of the conspiracy was "multi-directional" and "episodic."  *Nypl*, 2022 WL 819771, at *8.  Plaintiffs argue that the Court erred, at the class certification stage, in finding that the conspiracy *itself* was episodic rather than continuous.  That argument was rejected in the class certification decision, and the deadline for seeking reconsideration has long since passed.  In any event, this argument is based on a misreading of that prior decision.  The class certification decision did not deny that the conspiracy existed throughout the relevant period, or that it was against the law at all times while it existed.  But that does not mean prices were manipulated in any particular direction at any particular time.  The conspiracy's *impact* may be episodic and multi-directional, even though the conspiracy itself is continuous and eliminates competition on a "constant" basis, as one witness testified.  The very documents on which Plaintiffs rely state that the conspiracy raised and lowered prices at different times, and likely had no effect at other times.  Plaintiffs' claims fail because no record evidence provides a basis for a jury to decide in what direction

prices were distorted when Plaintiffs bought euros, and therefore no evidence that Plaintiffs purchased euros at a supracompetitive price.

### i.   Defendants' Guilty Pleas & Regulatory Orders

Defendants' guilty pleas, on their face, describe episodic and multi-directional price manipulation.  For example, certain Defendants admitted in their guilty pleas that they conspired to "increase *or decrease* the price of" euros against dollars.  Those Defendants admitted that they engaged in "near daily conversations" that, "in certain instances" coordinated trading around the "fixes," i.e., the setting of benchmark rates.  The TAC focused solely on alleged manipulation of those benchmark rates, but the Court has since held that the benchmark-fixing was episodic and multi-directional.  Plaintiffs' expert testified that he did not "analyze defendants' conduct for all the days" or indeed "any days" in the relevant period, and he had no opinion on whether the prices on any day were supracompetitive, because he believed that such opinions were relevant only to damages.

Plaintiffs now spread their focus to Defendants' other admitted conduct.  For example, the Defendants that pleaded guilty also admitted to "withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position."  Those pleas, by their terms, describe conduct that is episodic and multi-directional.  That is, the admitted conduct occurred only when a conspirator was exposed to certain risk, and might inflate or depress the price depending on which favored the co-conspirator's open position.

Several kinds of misconduct described in the guilty pleas do not apply to Plaintiffs' claims at all.  Much of the conduct pertains only to transactions "via telephone, email, and/or electronic chat," not to the in-person, physical transactions at issue in this case.  And statements about Defendants' efforts to widen bid/ask spreads are irrelevant because there is no evidence that

9

Plaintiffs engaged in transactions where prices included a bid/ask spread.  For similar reasons, the recent jury finding that a conspiracy existed to widen bid/ask spreads does not affect the analysis of Plaintiffs' claims.  Plaintiffs refer generally to their expert's supplemental report and deposition and claim he will calculate an "apportionment of the spread between purchase and sale transactions."  Even assuming Plaintiffs' expert could calculate the amount by which the spread was widened in the market for the euros between 2007 and 2013, and allocate that spread between an increase in the ask price and a decrease in the bid price, the deposition and report contain no methodology for connecting *any* such spread to transactions that Plaintiffs actually made.

Other isolated statements in the guilty pleas on which Plaintiffs rely are irrelevant.  The fact that the Defendants admitted to referring to themselves as the "Cartel" or the "Mafia" sheds no light on the frequency or direction of manipulation.  And statements to the effect that Defendants' conduct occurred "in a continuous and uninterrupted flow" of interstate commerce are relevant to a different element of Sherman Act liability, the interstate commerce requirement.  Those statements do not suggest that Defendants' actually manipulated prices on a "continuous and uninterrupted" basis, much less that they always moved prices in a particular direction.

Plaintiffs also rely on statements made in other regulatory proceedings, which are similarly unhelpful to Plaintiffs.  Statements by the Board of Governors of the Federal Reserve, that certain Defendants entered "agreements . . . to coordinate FX trading in a manner designed to influence . . . benchmark fixes and market prices generally," do not suggest that those agreements fixed "market prices generally" in any particular direction at any particular time.  The Commodity Futures Trading Commission orders state that manipulative conduct occurred only "at times" during the relevant period and that the defendants "altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an

effort by the group to attempt to manipulate certain FX benchmark rates, *in some cases downward and in some cases upward*."  And orders of the Office of the Comptroller of the Currency contain no detail on the alleged misconduct.

### ii.    Evidence of the Amount of Harm Caused

In the absence of evidence about the conspiracy's effect on the spot price on any particular day, Plaintiffs rely on the Department of Justice's calculation of the fines that it recommended in connection with the guilty pleas.  Plaintiffs rely on the "estimation that the alleged misconduct had, on average, changed the 1:15 pm ECB and 4:00 pm WM/R fixing rates for EUR/USD by three pips during the period between 2008 and 2012."  Even assuming that estimate is competent evidence of the average impact in absolute terms on those benchmarks, and even assuming those benchmarks played a role in calculating the prices Plaintiffs paid, DOJ's calculation is no evidence of how much prices were inflated on any given day.  "Three pips" is an estimate of how much the benchmark rates had been "changed" "move[d]" or been "[a]ffect[ed]" -- up or down -- not how much they were inflated.  *See* Def. Citi's Resp. to Pl.'s 4th Interrog., App. at 2, 4; Def. JPMC's Resp. to Pl.'s 4th Interrog., App. A at 2, 3; Def. Barclays's, Resp. to Pl.'s 4th Interrog., App. A at A-5; Def. RBS's Resp. to Pl.'s 4th Interrog., App. at 1, 2 (Dkt. Nos. 850-14, 850-15).  That is, the estimate not only averages effects across individual days, it encompasses both days on which the conspirators inflated and depressed the benchmark rates, according to their interests that day.  While some victims of the conspiracy could be harmed no matter which way the price was manipulated, Plaintiffs could only have been injured on days when the price of euros was higher relative to dollars.

Plaintiffs also emphasize comments by the sentencing judge, Judge Underhill, at the time of certain Defendants' guilty pleas.  Judge Underhill remarked on the size of the fines, which he believed reflected the seriousness of the offenses.  Judge Underhill also mentioned that restitution

would be worked out in civil cases.  Plaintiffs' reliance on those statements misses the mark for several reasons.  First, the fact that civil cases were chosen as the preferred mechanism of making whole the victims of Defendants' conspiracy says nothing about whether *these* Plaintiffs have meritorious claims.  Defendants' choice to defend this lawsuit does not render any guilty plea a "fraud."  Second, the remarks by the sentencing judge about the size of the fines and potential future restitution underscore the inapplicability of the DOJ estimates discussed above.  The DOJ's "three pips" number was used to calculate the fines that DOJ actually imposed on the Defendants that pleaded.  As the sentencing judge acknowledged, that number is wholly separate from calculating any restitution that might be owed to compensate victims.  The latter would have been the function of this lawsuit, if Plaintiffs could have proven compensable injury.

Because there is no record evidence from which a reasonable jury could find that any manipulation of FX spot market prices caused inflated retail prices in any particular transaction, it is unnecessary to resolve the parties' dispute over precisely how those retail prices were calculated and which spot prices or benchmarks factored into that calculation.

### B.  California Claims

Defendants' motion for summary judgment is granted on Plaintiffs' California Cartwright Act claims for substantially the reasons discussed above, and for the independent reason that Plaintiffs abandoned these claims.  Case law interpreting the federal antitrust laws is "instructive, not conclusive, when construing the Cartwright Act."  *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 120 (2d Cir. 2021) (internal quotation marks omitted).  In many respects, but not all, "[t]he analysis of claims brought under California's Cartwright Act 'mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act."  *Fed. Trade Comm'n v. Shkreli*, No. 20 Civ. 706, 2022 WL 135026, at *43 (S.D.N.Y. Jan. 14, 2022) (quoting *County of Tuolomne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,

1160 (9th Cir. 2001)).  At a minimum, "resulting damage" from a conspiracy in restraint of trade is an element of a Cartwright Act claim.  *See, e.g.*, *Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.*, 265 Cal. Rptr. 3d 495, 501 (2020).  That element is not met for the same reasons discussed above that the causation and injury elements of a federal antitrust claim are not satisfied.

In any event, Defendants argue that the Cartwright Act does not apply to any of Plaintiffs' claims because none of them have "significant contacts with California, such that their claims predominantly arose here, and gave rise to a significant interest on the part of California in applying its laws to" the claims.  *See J.P. Morgan & Co., Inc. v. Super. Ct.*, 6 Cal. Rptr. 3d 214, 233-34 (2003).  Nypl is a California resident, but all of the other Plaintiffs live and do business in either Florida, Texas or Pennsylvania.  McCarthy testified that she made qualifying FX purchases in Florida, and Jolly testified that she made qualifying purchases in Texas.  As discussed above, there is no dispute that the only Plaintiff with a connection to California -- Nypl -- made no qualifying transactions.  Because Plaintiffs failed to respond to Defendants' argument that the Cartwright Act does not apply to any other Plaintiff's claims, Plaintiffs have abandoned those claims.  *See, e.g.*, *Townsquare Media, Inc. v. Regency Furniture, Inc.*, No. 21 Civ. 4695, 2022 WL 4538954, at *20 (S.D.N.Y. Sept. 28, 2022).

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted.  The request for oral argument is denied as moot.

The Clerk of Court is directed to close the motion at Dkt. No. 806 and close the case.

Dated: March 29, 2023
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**